Teresa C. Chow (SBN 237694)
*tchow@bakerlaw.com*
Nicole Chérie Delgado (SBN 307848)
*ndelgado@bakerlaw.com*
**BAKER & HOSTETLER LLP**
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90025-0509
Telephone:  (310) 820-8800
Facsimile:   (310) 820-8859

Albert G. Lin (*Pro Hac Vice*)
*alin@bakerlaw.com*
Marissa A. Peirsol (*Pro Hac Vice*)
*mpeirsol@bakerlaw.com*
Douglas A. Vonderhaar (*Pro Hac Vice*)
*dvonderhaar@bakerlaw.com*
**BAKER & HOSTETLER LLP**
200 Civic Center Drive, Suite 1200
Columbus, OH 43215
Tel.: (614) 462-4732
Fax: (614) 462-2616

Brandon T. Crossland (*Pro Hac Vice*)
*bcrossland@bakerlaw.com*
Lindy K. Keown (*Pro Hac Vice*)
*lkeown@bakerlaw.com*
**BAKER & HOSTETLER LLP**
200 S. Orange Avenue, Suite 2300
Orlando, FL 32801
Tel.: (407) 649-4000
Fax: (407) 841-0168

*Attorneys for Plaintiffs and Counter-Defendants*
Diamond Resorts U.S. Collection Development, LLC and Diamond Resorts Hawaii Collection Development, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, LLC, a Delaware limited liability company, *et al*., <br><br> Plaintiff, <br><br> v. <br><br> PANDORA MARKETING, LLC d/b/a TIMESHARE COMPLIANCE, a Wyoming limited liability company, *et al*., <br><br> Defendants. <br><br> AND ALL RELATED COUNTER-ACTIONS. | Case No.: 2:20-cv-05486-DSF-ADS <br><br> [REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL] <br><br> **DIAMOND'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** <br><br> Date:  May 9, 2022 <br> Time:  1:30 p.m. <br> Judge: The Honorable Dale S. Fischer <br> Crtrm: 7D |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ......................................................................... 1

II.   COUNTERSTATEMENT OF FACTS ............................................ 2

    A.   The Subject Statements Are False And Misleading. ........................... 2

        1.   Defendants' advertising and sales process makes numerous false representations ............................................................ 2

        2.   Voluminous evidence establishes the statements are false and misleading. .............................................................. 3

        3.   Voluminous evidence establishes the subject statements are made to Owners. .......................................................... 4

    B.   There Is Voluminous Evidence The Exit Service Has Caused Diverted Loan Payments, Loss Of Sales, Damages And Other Harm Requiring Restitution. .................................................. 5

        1.   There is voluminous evidence that the fact of damages has occurred. ............................................................... 5

            a.   Baldwin Report raises issue of fact on damages caused by Defendants. .................................................... 5

            b.   The competing reports of Jarosz and Argiz raise an issue of fact as to the amount of damages caused by Defendants. .......................................................... 6

        2.   There is extensive evidence that Diamond Owners stopped paying due to the "exit" service. .................................... 7

    C.   Defendants Admit To Interfering With Diamond Contracts And Violating The Law. .................................................... 9

        1.   Defendants' MSJ admits the point of their service is to "exit" Diamond contracts, which is "interference and disruption." .............................................................. 9

    D.   Defendants' Summary Judgment Cannot Be Based On Complaints About Diamond's Sales Practices. ............................ 10

III.  THE MIDDLE DISTRICT OF FLORIDA RECENTLY DENIED DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN A SIMILAR LAWSUIT ............................................................ 12

IV.   THIS COURT SHOULD DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE LANHAM ACT .......................... 14

    A.   Falsity, Commercial Speech, Deception, And Materiality Are Not Disputable. ............................................................. 15

1   1.   The subject statements are literally false and/or misleading, which is supported by substantial evidence.............................. 15

2.   There is no dispute as to commercial speech, deception, or materiality. ........................................................................ 18

B.   The Slattery Defendants Do Not Contest Knowledge And Participation In False And Misleading Advertising And Other Aspects Of The "Exit" Scheme ............................................. 19

C.   There Is Voluminous Evidence Of Injury, Causation, And Standing ................................................................................ 22

1.   The standard for standing under the Lanham Act. ............... 23

2.   Evidence of economic injury. .............................................. 24

3.   Evidence of reputational injury. .......................................... 27

4.   Diamond meets the proximate cause requirement. ............... 29

  a.   Economic Injury ......................................... 30

  b.   Reputational Harm ....................................... 31

  c.   The cases cited by the Exit Defendants fail to support their motion ............................ 31

  d.   The Exit Defendants' remaining arguments fail. ........... 35

D.   There Is Voluminous Evidence Of Damages And Disgorgement...... 36

E.   All Of The Subject Statements Were Made Within The Statute Of Limitations. ............................................................................. 38

F.   Case Law Supports Liability Under The Lanham Act. ................... 39

V.   THIS COURT SHOULD DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE CALIFORNIA FALSE ADVERTISING LAW. .................................................................. 41

VI.   THIS COURT SHOULD DENY DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AS TO THE TORTIOUS INTERFERENCE CLAIMS. .................................................................................... 41

A.   Contract Validity, Defendants' Knowledge, Intentional Act To Breach Or Disrupt, And Actual Breach Or Disruption Are Established. ............................................................................. 41

B.   Diamond Owners Have Enforceable Contracts That Were Disrupted By Defendants. ....................................................... 42

C.   There Is Voluminous Evidence Of Injury And Standing. ................. 43

D.   There Is Voluminous Evidence Of Causation And Damages. ........... 45

1             1.     Baldwin Report ................................................. 45

2             2.     Jarosz Report ................................................... 45

3             3.     Defendants cannot rely upon a "predisposal to breach"
                    argument ........................................................... 45

4             4.     There are fact issues relating to the statute of limitations,
5                     which do not bar the claim. ............................. 47

6       E.    Case Law Supports Liability Under TIWC ................................ 50

7             1.     Westgate Resorts v. Sussman and Wyndham Vacation
                    Ownership, Inc. v. Sussman are distinguishable. .................... 50

8
9 VII.    THIS COURT SHOULD DENY DEFENDANTS' MOTION FOR
        SUMMARY JUDGMENT AS TO THE UCL CLAIMS. ........................... 53

10      A.    There Is Voluminous Evidence Of Unlawful, Unfair, And
         Fraudulent Acts. .................................................. 54

11
            1.     Defendants' conduct is unlawful. .................. 54
12
            2.     Defendants' conduct is unfair. ..................... 54
13
            3.     Defendants' conduct is fraudulent. .............. 55
14
15      B.    Defendants Admit They Engage In Referrals, Which Violates Cal.
         Bus. & Prof. Code § 6155. ............................. 55

16      C.    There Is Voluminous Evidence Of Damages. ....................... 56

17      D.    Case Law Supports Liability Under The UCL. ...................... 56

18 VIII.   THIS COURT SHOULD DENY DEFENDANTS' MOTION FOR
19        SUMMARY JUDGMENT AS TO AIDING & ABETTING ...................... 58

20      A.    The Slattery Defendants Know That The Exit Defendants Are
         Interfering With Diamond's Timeshare Contracts And Committing
21          UCL Violations. ..................................................... 58

22      B.    Documents And Testimony Establish The Causation And Damages
         Necessary To Prove Diamond's Aiding And Abetting Claims. ......... 59

23      C.    Case Law Supports Liability Under Aiding and Abetting ............. 61

24 VII.    THIS COURT SHOULD DENY DEFENDANTS' MOTION FOR
25        SUMMARY JUDGMENT AS TO CIVIL CONSPIRACY. ...................... 61

    VIII.   CONCLUSION ................................................................ 63
26

27

28

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*AECOM Energy & Constr., Inc. v. Ripley*,
  348 F. Supp. 3d 1038 (C.D. Cal. 2018), *rev'd on other grounds*, 851 F. App'x
  20 (9th Cir. 2021)................................................................. 19, 20, 39

*Allergan U.S., Inc. v. Prescribers Choice, Inc.*,
  364 F. Supp. 3d 1089 (C.D. Cal. 2019) ................................ 18, 39, 40

*Am. Bank of St. Paul v. TD Bank, N.A.*,
  713 F.3d 455 (8th Cir. 2013)................................................ 63

*Am. Master Lease LLC v. Idanta Partners, Ltd.*,
  225 Cal. App. 4th 1451 (2014) ............................................. 58, 60

*April Enters., Inc. v. KTTV*,
  147 Cal. App. 3d 805 (1983)................................................. 47

*Bandag, Inc. v. Bolser's Tire Stores*,
  750 F.2d 903 (Fed. Cir. 1984).............................................. 23

*Berg & Berg Enters., LLC v. Sherwood Partners, Inc.*,
  131 Cal. App. 4th 802 (2005) .............................................. 58

*Blizzard Ent. Inc. v. Ceiling Fan Software LLC*,
  28 F. Supp. 3d 1006 (C.D. Cal. 2013) .................................. 41, 56

*Brady v. Bayer Corp.*,
  26 Cal. App. 5th 1156 (2018) .............................................. 56

*Bral Corp. v. Johnstown Am. Corp.*,
  919 F. Supp. 2d 599 (W.D. Pa. 2013) .................................. 49

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008) ......... 31

*Brunswick Corp. v. Spinit Reel Co.*,
  832 F.2d 513 (10th Cir. 1987).............................................. 28

*Burger v. Hartley*,
  896 F. Supp. 2d 1157 (S.D. Fla. 2012) ................................. 63

*CareDx, Inc. v. Natera, Inc.*,
  2019 WL 7037799 (D. Del. 2019) ........................................ 26

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999) ................................................................................. 56, 57

*Chu v. Hong*,
   249 S.W.3d 441 (Tex. 2008) ................................................................................. 62

*Church & Dwight Co., Inc. v. SPD Swiss Prec. Diag., GmBH*,
   843 F.3d 48 (2nd Cir. 2016) ........................................................................... 39, 40

*Clark v. Superior Ct.*,
   50 Cal. 4th 605 (2010) ......................................................................................... 57

*Cleary v. News Corp.*,
   30 F.3d 1255 (9th Cir. 1994)................................................................................ 40

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
   173 F.3d 725 (9th Cir. 1999)................................................................. 23, 29, 45

*Craigslist Inc. v. 3Taps Inc.*,
   942 F. Supp. 2d 962 (N.D. Cal. 2013) ................................................................ 61

*CRST Van Expedited, Inc. v. Werner Enters., Inc.*,
   479 F.3d 1099 (9th Cir. 2007).............................................................................. 56

*Curley v. Wells Fargo & Co.*,
   2014 WL 2187037 (N.D. Cal. 2014)................................................................... 47

*Dean v. United of Omaha Life Ins.*,
   2007 WL 7079558 (C.D. Cal. 2007)............................................................. 38, 48

*Diamond Resorts Int'l, Inc. v. Aaronson*,
   371 F. Supp. 3d 1088 (M.D. Fla. 2019) ....................................................... *passim*

*Diamond Resorts U.S. Collection Dev., LLC v. Newton Group Transfers, LLC*,
   Case No. 9:18-cv-80311 (S.D. Fla. April 4, 2022) ....................................... *passim*

*Diamond Resorts U.S. Collection Dev., LLC v. Pandora Mktg., LLC*,
   2020 WL 8768056 (C.D. Cal. 2020)................................................... 22, 31, 32, 35

*Diamond Resorts U.S. Collection Dev., LLC v. Pandora Mktg., LLC*,
   2021 WL 1573073 (C.D. Cal. 2021)................................................................... 58

*Direct Techs., LLC v. Elec. Arts, Inc.*,
   836 F.3d 1059 (9th Cir. 2016).............................................................. 26, 28, 37

*Doe v. Cutter Biological, Inc.*,
   971 F.2d 375 (9th Cir. 1992)................................................................. 26, 28, 37

*Donovan v. Crisostomo*,
   689 F.2d 869 (9th Cir. 1982) ............................................................................... 21

-v-

*Duty Free Ams., Inc. v. Estee Lauders Cos., Inc.*,
   797 F.3d 1248 (11th Cir. 2015).................................................................. 19

*Eisenberg Vill. of L.A. Jewish Home for the Aging*
   *v. Suffolk Constr. Co., Inc.*, 53 Cal. App. 5th 1201 (2020)....................... 47

*Estakhrian v. Obenstine*,
   2019 WL 3035119 (C.D. Cal. 2019)........................................................... 55

*In re First Alliance Mortg. Co.*,
   471 F.3d 977 (9th Cir. 2006)....................................................................... 60

*Gen. Bedding Corp. v. Echevarria*,
   947 F.2d 1395 (9th Cir. 1991)..................................................................... 48

*Gilbrook v. City of Westminster*,
   177 F.3d 839 (9th Cir. 1999)....................................................................... 61

*Grassmueck v. Potala Village, LLC*,
   2018 WL 2984831 (W.D. Wash. 2018)....................................................... 21

*Gryczman v. 4550 Pico Partners, Ltd.*,
   107 Cal. App. 4th 1 (2003).......................................................................... 47

*H.I.S.C., Inc. v. Franmar Int'l Importers, Ltd.*,
   2022 WL 104730 (S.D. Cal. 2022).............................................................. 23

*Halicki Films LLC v. Sanderson Sales and Mktg.*,
   547 F.3d 1213 (9th Cir. 2008)..................................................................... 25

*Harper House, Inc. v. Thomas Nelson, Inc.*,
   889 F.2d 197 (9th Cir. 1989)....................................................................... 23

*Hitachi, Ltd. v. AmTRAN Tech. Co. Ltd.*,
   2006 WL 2038248 (N.D. Cal. 2006)........................................................... 20

*Holmes v. Securities Investor Protection Corp.*,
   503 U.S. 258 (1992).................................................................................... 31

*Honda Trading Am. Corp. v. Basf Corp.*,
   2020 WL 5913492 (C.D. Cal. 2020)........................................................... 47

*ITEX Corp. v. Global Links Corp.*,
   90 F. Supp. 3d 1158 (D. Nev. 2015)........................................................... 19

*Jackson v. LegalMatch.com*,
   42 Cal. App. 5th 760 (2019)........................................................................ 55

*Karl Storz Endoscopy-Am., Inc. v. Surgical Techs., Inc.*,
   285 F.3d 848 (9th Cir. 1992)....................................................................... 37

*Kasky v. Nike, Inc.*,
    27 Cal. 4th 939 (2002) ........................................................................................ 56

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ...................................................................................... 57

*LegalForce RAPC Worldwide P.C. v. UpCounsel, Inc.*,
    2019 WL 160335 (N.D. Cal. 2019) ............................................................ 55, 56

*Lexmark Int'l, Inc. v. Static Control Comps., Inc.*,
    572 U.S. 118 (2014) ...................................................................................*passim*

*Lindy Pen Co. v. Bic Pen Corp.*,
    982 F.2d 1400 (9th Cir. 1993) ............................................................................ 23

*Mass. Mut. Life Ins. Co. v. Superior Ct.*,
    97 Cal. App. 4th 1282 (2002) ............................................................................ 56

*Merck Eprova AG v. Gnosis SPA*,
    901 F.Supp.2d 436 (S.D.N.Y. 2012) ................................................................. 19

*Nagy v. Standard Ins. Co.*,
    2012 WL 13005649 (C.D. Cal. Jan. 5 2012) ...................................................... 7

*Nano-Second Tech. Co., Ltd. v. Dynaflex Intern.*,
    2013 WL 1855828 (C.D. Cal. May 1, 2013) .................................................... 47

*Nat. Grange of the Ord. of Patrons of Husbandry v. Cal. Guild*,
    334 F. Supp. 3d 1057 (E.D. Cal. 2018) ...................................................... 18, 39

*Neilson v. Union Bank of Cal.*,
    290 F. Supp. 2d 1101 (C.D. Cal. 2003) ............................................................ 58

*Nestle USA, Inc. v. Crest Foods, Inc.*,
    2017 WL 3267665 (C.D. Cal. 2017) .................................................................. 61

*Norgart v. Upjohn Co.*,
    21 Cal. 4th 383 (1999) ........................................................................................ 47

*Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*,
    310 F. Supp. 3d 1089 (S.D. Cal. 2018) ......................................................*passim*

*Ohio Nat. Life Assur. Corp. v. Davis*,
    13 F. Supp. 3d 876 (N.D. Ill. 2014) .................................................................. 63

*Orange Lake Country Club, Inc. v. Reed Hein & Assocs.*,
    ECF 326 (M.D. Fla. 2019) .................................................................................. 33

*Orange Lake Country Club, Inc. v. Reed Hein & Assocs., LLC*,
    2019 WL 7423517 (M.D. Fla. 2019) ........................................................... 28, 32

*Pacific Gas & Elec. Co. v. Bear Stearns & Co.*,
    50 Cal.3d 1118 (1990) ................................................................ 42

*Pan Pac. Retail Props., Inc. v. Gulf Ins. Co.*,
    471 F.3d 961 (9th Cir. 2006)..................................... 26, 28, 37

*Peter Farrell Supercars, Inc. v. Monsen*,
    82 Fed. App'x 293 (4th Cir. 2003).......................................... 49

*POM Wonderful LLC v. Purely Juice, Inc.*,
    2008 WL 4222045 (C.D. Cal. 2008).......................................... 56

*Puri v. Khalsa*,
    674 Fed. App'x 679 (9th Cir. 2017)........................................ 49

*Ramirez v. Victoria's Secret Stores, LLC*,
    2019 WL 6998784 (C.D. Cal. July 18, 2019) ............................ 7

*In re Rood*,
    482 B.R. 132 (D. Md. 2012) ..................................................... 63

*Rosenthal & Rosenthal of Cal., Inc. v. Hilco Trading, LLC*,
    2020 WL 2510587 (C.D. Cal. 2020).......................................... 49

*Semco, Inv. v., Amcast, Inc.*,
    52 F.3d 108 (6th Cir. 1995)...................................................... 18

*Signal Hill Serv., Inc. v. Macquarie Bank Ltd.*,
    2013 WL 12244056 (C.D. Cal. June 12, 2013) ....................... 42

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997).................................................. 28

*Spence v. Clary*,
    2021 WL 304391 (C.D. Cal. 2021)........................................... 48

*Summit Tech. v. High-Line Med. Instrs., Co.*,
    933 F. Supp. 918 (C.D. Cal. 1996)................................. 40, 56

*Sunset Landmark Invest., LLC v. Chubb Custom Ins. Co.*,
    2018 WL 5116468 (C.D. Cal. Oct. 1, 2018) ............................. 7

*Tsemetzin v. Coast Fed. Sav. & Loan Ass'n*,
    57 Cal. App. 4th 1334 (1997) .................................................. 50

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
    522 F. Supp. 1238 (D. Ariz. 1981).......................................... 35

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
    601 F. Supp. 1140 (D. Ariz. 1984).......................................... 28

-viii-

*U-Haul Int'l, Inc. v. Jartran, Inc.,*
   793 F.2d 1034 (9th Cir. 1986)........................................................................ 21

*U.S. Struct. Plywood Integrity Coal. v. PFS Corp.,*
   524 F. Supp. 3d 1320 (S.D. Fla. 2021) ......................................................... 20

*Underground Sols., Inc. v. Palermo,*
   188 F. Supp. 3d 717 (N.D. Ill. 2016) ............................................................ 18

*United Steelworkers of Am. v. Phelps Dodge Corp.,*
   865 F.2d 1539 (9th Cir. 1989)........................................................................ 61

*Upper Deck Co. v. Panini Am., Inc.,*
   469 F. Supp. 3d 963 (S.D. Cal. 2020) ........................................................... 43

*Valentich v. United States,*
   194 F. Supp. 3d 1033 (E.D. Cal. 2016) ......................................................... 21

*Victory Carriers, Inc. v. Stockton Stevedoring Co.,*
   388 F.2d 955 (9th Cir. 1968).......................................................................... 22

*Westgate Resorts, Ltd. v. Reed Hein & Associates, LLC,*
   2020 WL 674108 (M.D. Fla. Feb. 11, 2020) ....................................... 33, 50, 51, 52

*Westgate Resorts, Ltd. v. Reed Hein & Assocs., LLC,*
   2018 WL 5279156 (M.D. Fla. 2018) ............................................................. 33

*Westgate Resorts, Ltd. v. Sussman,*
   2019 WL 3848805 (M.D. Fla. 2019) ...................................................... 50, 51

*Westgate Resorts, Ltd. v. Sussman,*
   387 F. Supp. 3d 1318 (M.D. Fla. 2019) ........................................................ 46

*Westgate Resorts v. Reed Hein & Assocs.,*
   2020 WL 3265972 (M.D. Fla. 2020) ............................................................. 33

*Wyndham Vacation Ownership, Inc. v. Miller,*
   2019 WL 5394074 (M.D. Fla. 2019) ............................................................. 19

*Wyndham Vacation Ownership, Inc. v. Slattery, Sobel & Decamp, LLP,*
   Case No. 6:19-cv-1908, ECF 734 (M.D. Fla. March 22, 2022).................... *passim*

*Wyndham Vacation Ownership, Inc. v. Gallagher,*
   2019 WL 5458815 (M.D. Fla. 2019) ....................................................... 34, 35

*Wyndham Vacation Ownership, Inc. v. Slattery, Sobel & Decamp, LLP,*
   2021 WL 5275700 (M.D. Fla. 2022) ............................................................. 13

*Wyndham Vacation Ownership, Inc. v. Slattery, Sobel & Decamp, LLP,*
   2022 WL 291787 (M.D. Fla. 2022) ............................................................... 13

*Wyndham Vacation Ownership, Inc. v. Sussman*,
   2021 WL 4949162 (M.D. Fla. 2021), *reconsideration denied*, 2021 WL
   5174784 (Nov. 2, 2021) ....................................................................... 50, 52, 53

*Wyndham Vacation Ownership, Inc. v. Totten Franqui Davis & Burk, LLC*,
   2019 WL 7905018 (S.D. Fla. 2019) ................................................................. 34

*Wyndham Vacation Ownership v. Reed Hein & Assocs., LLC*,
   2019 WL 3934468 (M.D. Fla. 2019) ........................................................... 34, 35

*Wyndham Vacation Ownership v. Sussman*,
   2021 WL 4948099 (M.D. Fla. 2021) ........................................................... 28, 29

*Zetwick v. City of Yolo*,
   850 F.3d 436 (9th Cir. 2017)............................................................. 26, 28, 37

**Statutes**

15 U.S.C. § 1125(a) .............................................................. 24, 25, 26, 29

Cal. Bus. & Prof. Code § 6152 ............................................................... 55

Cal. Bus. & Prof. Code § 6155 ............................................... 10, 55, 56

Cal. Bus. & Prof. Code § 17200 ......................................................... 55, 56

Cal. Bus. & Prof. Code § 17203 ............................................................... 57

Cal. Bus. & Prof. Code § 17204 ............................................................... 57

Cal. Bus. & Prof. Code § 17500 ......................................................... 40, 56

**Rules**

Cal. Civ. Proc. § 339 ............................................................................. 47

Fed. R. Civ. P. 33 .................................................................................. 20

-x-

# I.    **INTRODUCTION**

Substantial evidence supports that Defendants' "exit" scheme is a nationwide consumer scam.[1] The Exit Defendants falsely advertise they, along with a group of lawyers, cancel timeshare contracts based on Diamond's misrepresentations and unethical sales practices, through litigation, class actions, bundled lawsuits, or negotiations threatening the same. In actuality, Defendants merely instruct Owners to breach their contracts and stop communications with Diamond. Despite what is promised in advertising, the Lawyer Defendants send "exit" letters to Diamond to block communications and request cancellation, without any follow-up. As a direct result of this scam, most Diamond Owners' contracts are cancelled through non-payment or default—not any legal or "exit" service provided by Defendants. Diamond submits that it has established the elements of various claims as set forth in its Motion for Partial Summary Judgment [ECF 593-55] ("Diamond's Motion").

In a parallel case, raising substantially identical claims based on identical evidence as to these same Defendants, the Middle District of Florida held that elements of the Lanham Act claims were established against Defendants on summary judgment. *See Wyndham Vac. Ownership, Inc. v. Slattery, Sobel & Decamp, LLP*, Case No. 6:19-cv-1908, Order [ECF 734] (M.D. Fla. March 22, 2022) (Lin Decl., Ex. 258) ("Wyndham Order"). Furthermore, the Court denied the Slattery Defendants' motion for summary judgment and held there was sufficient information supporting injury and damages to be presented to the jury. *Id.* at 6-9.[2]

Despite legal and factual evidence establishing this scam, Defendants seek dismissal claiming Diamond has not established causation, damages, or restitution.[3]

---

[1] The March 11 Order [ECF 589] allows this Opposition to be up to 63 pages, which is the total of Defendants' MSJs.  The Exit Defendants' motion is 47 pages, and the Slattery Defendants' motion is 16 pages.

[2] Similarly, in the recently decided *Diamond v. Newton Group Transfers,* Case No. 9:18-cv-80311, Order at 35, Lin Decl. Ex. 265 (S.D. Fla. April 4, 2022), substantially similar expert analysis presented jury questions on causation, injury, and damages, resulting in a denial of defendants MSJs in a timeshare "exit" case.

[3] Defendants filed their MSJs after the March 14 deadline set by this Court's Order [ECF 589], and the Slattery Defendants never filed a motion to seal despite

Failing that, Defendants seek to limit Diamond's damages through the statute of limitations. However, such arguments simply raise factual issues the jury will determine at trial. Accordingly, this Court should deny Defendants' motions for summary judgment [ECF 596, 600] (collectively, the "Motions" or "MSJs").

## II.     COUNTERSTATEMENT OF FACTS

### A.     **The Subject Statements Are False And Misleading.**

> 1.     *Defendants' advertising and sales process makes numerous false representations.*

The Exit Defendants have developed an expansive multi-media marketing campaign, including internet, radio, television, text messages, and telephone marketing, built upon false and misleading representations about Defendants' "exit" service.  (UF-DIA[4] ¶ 14-15). These false and misleading statements include that:

(a) Defendants legally terminate timeshare contracts based on the timeshare developer's misrepresentations and unethical sales practices (UF-DIA ¶16);

(b) the "exit" is obtained through the legal work of attorneys based on consumer protection laws (UF-DIA ¶17);

(c) attorneys file litigation, class actions, or bundled lawsuits, or threaten such litigation to negotiate an "exit" (UF-DIA ¶18);

(d) the "exit" service has a 100% success rate or a 100% money back guarantee (UF-DIA ¶19); and

(e) the heirs of timeshare owners will automatically inherit the payment obligations of the timeshare contract. (UF-DIA ¶20.)

These false and misleading assertions are integrated into each facet of the Defendants' marketing campaigns and corresponding sales processes. They appear

---

submitting documents under seal. Defendants repeated failure to comply with discovery deadlines or the Federal and Local Rules is a separate ground for denial.
[4] "UF-DIA" refers to the Statement of Uncontroverted Facts and Conclusions of Law in Support of Plaintiffs' Motion for Partial Summary Judgment as to Counts I, II, III, IV, VII, X, XI, XII, XIII, XIV, and XVI of Plaintiffs' Fourth Amended Complaint and Dismissal on Summary Judgment of RAG's Counterclaim [ECF 591-2].

in marketing brochures: "[TSC] gets you out legally and permanently because we assign an attorney to EVERY case . . . . We do that based on misleading sales practice, fraud and omissions in the sales and marketing processes of these timeshare developers . . . ." (UF-DIA ¶21 ("How to Break Free").) These false and misleading assertions are repeated to prospective customers by Exit Defendants' "specialists" and "analysts" as captured on sales scripts that are used by the sales and marketing employees. (UF-DIA ¶¶22-25.) Audio files of actual sales calls between employees of the Exit Defendants and Owners confirm that these false and misleading, scripted statements are in fact communicated to Diamond Owners. (UF-DIA ¶¶22-34.)

None of the advertisements indicate that the "exit" is procured through breaching the timeshare contract via nonpayment or default.

### 2. *Voluminous evidence establishes the statements are false and misleading.*

Defendants' "exit" services are not consistent with the assertions made in the advertising and sales presentations. Contrary to their advertised services, the Exit Defendants admit they do not communicate with Diamond or litigate or negotiate an "exit" to the timeshare contract. (UF-DIA ¶41.) The attorneys receiving referrals from the Exit Defendants, including the Slattery Defendants and the McCroskey Defendants, do little more. In direct contradiction to the advertisements, the Slattery Defendants are not engaged in any in-court litigation against Diamond. (UF-DIA ¶49.) Nor have they filed any class actions or bundled lawsuits against Diamond. (*Id.*) For some—but not all—Owners represented by the Slattery Defendants, Slattery sent two letters to Diamond without any follow-up. (UF-DIA ¶¶51-55.)

Similarly, Miranda McCroskey, one of the McCroskey Defendants, admits that: (i) she did not send correspondence to Diamond on behalf of most of the Diamond Owners; and (ii) she never filed litigation or class action lawsuits against Diamond. (UF-DIA ¶¶56-58.) Instead of negotiating directly with Diamond, McCroskey prepared short "ghost letters"—which are intended to hide the lawyer's

-3-

involvement—for Owners to send directly to Diamond requesting cancellation. (UF-DIA ¶¶59-63.)

Rather than litigation or negotiation, Defendants end the contracts through breach and default.[5] (UF-DIA ¶85.) Defendants explicitly or implicitly instruct Diamond Owners to stop making timeshare contract payments and ignore developer communications.  (UF-DIA ¶¶69-76.)

Defendants' other assertions in their advertising are similarly incorrect. Defendants' "exit" strategy is not 100% effective as it relates to Diamond contracts. Not all Diamond Owners have been released from their timeshare contracts. (UF-DIA ¶77.) Because the "exit" service involves only an instruction or encouragement to default and wait for Diamond to eventually issue a cancellation letter, there is no litigation or other compelled process to force Diamond to take some action. (UF-DIA ¶¶78-79.)

Likewise, heirs of Owners are not automatically obligated. (UF-DIA ¶¶80-81.) This is both factually and legally false.

### 3. *Voluminous evidence establishes the subject statements are made to Owners.*

The Exit Defendants' false and misleading advertising is made to Diamond Owners who rely upon those statements to default their timeshare contracts. Diamond presented the testimony of multiple Diamond Owners who believed Defendants' false statements. (UF-DIA ¶¶83-84.) This testimony is consistent with consumer surveys. (UF-DIA ¶88.) It is only after retention that Diamond Owners learn that the "exit" is procured through default. (UF-DIA ¶85.) Even though an Owner could default for free, they are misled to pay a large fee to the Exit Defendants and a flat retainer to the Lawyer Defendants. (UF-DIA ¶¶92-93.) In addition to

---

[5] The Exit Defendants cite to a handful of examples of negotiated settlements between Diamond Owners and other lawyers with apparent relationships with the Exit Defendants in the past. (Defs. SS ¶¶27, 34.) But none of the settlements cited in Defendants' Motions for Summary Judgment involve the Lawyer Defendants.

paying for "exit" services, i.e. breach and default that does not require the involvement of the Exit Defendants or legal counsel, the Owners suffer from negative credit and negative tax consequences. (UF-DIA ¶¶89-93.)

**B.** **There Is Voluminous Evidence The Exit Service Has Caused Diverted Loan Payments, Loss Of Sales, Damages And Other Harm Requiring Restitution.**

Diamond did not move for summary judgment on the question of causation or the amount of its damages. Diamond admits that there is a dispute of fact to both questions that cannot be resolved on summary judgment. (Diamond's Mot. at 11-12.) In their Motions, Defendants double down on their argument that their conduct does not harm Diamond. As discussed below, both fact discovery and expert opinion reveals that Diamond was damaged by the Exit Defendants.

> 1.  *There is voluminous evidence that the fact of damages has occurred.*

As detailed in Diamond's Motion, Diamond has put forth significant evidence showing it has been damaged by Defendants' scheme. Diamond Owners directly state they stopped making timeshare payments because they retained the Exit Defendants. (UF-DIA ¶94.) In addition to testimony from Owners, Diamond has also presented expert analysis supporting the fact of damages. (UF-DIA ¶¶95-96.)

> a.  Baldwin Report raises issue of fact on damages caused by Defendants.

The analysis of Diamond's expert, Dr. Baldwin, raises issues of fact as to the amount of harm to Diamond caused by the "exit" scheme. Dr. Baldwin analyzed the loan data of over 75,000 Diamond Owners to determine if there was any correlation between the incident of Owner defaults and the involvement of an "exit" company. Dr. Baldwin concluded the following:

- There is a strong correlation between the odds of default for loans and the association with an "exit" company.

- The Defendants' involvement with an Owner's loan demonstrated an even stronger association with an Owners' default on their timeshare contract – more so than other timeshare exit companies and exit lawyers.

- Even controlling for other factors, including whether the Owner complained about their contract to Diamond—a factor that Defendants argue is of primary importance—the correlation between incidence of default and Defendants' "exit" service remains very strong and statistically significant: the odds of default increase by over 4600%.

(UF-DIA ¶95, Ex. 129, Baldwin Report, at DIUS_DIHI 153406.)

The significant increase in default rates of Diamond Owners once they get involved with Defendants raises an issue of fact as to whether Defendants cause Owners to default or breach their contracts. In the face of this evidence, dismissal of Diamond's claims on summary judgment is inappropriate.

> b. <u>The competing reports of Jarosz and Argiz raise an issue of fact as to the amount of damages caused by Defendants.</u>

To prove the amount of its damage at trial, Diamond intends to present the testimony of its expert, Mr. Jarosz. Based upon his extensive analysis of payment records, contracts, sales records and other financial related materials, Mr. Jarosz calculated numerous types of damages resulting from Defendants' misconduct. First, Mr. Jarosz concluded that Defendants' improperly obtained profits of approximately $8 million resulting from Defendants' false, misleading and disparaging advertising. (UF-DIA ¶96, Ex. 130, Jarosz Report, at DIUS_DIHI153470-DIUS_DIHI153471.) Second, Mr. Jarosz conducted an analysis of Diamond's losses resulting from Defendants' misconduct, including the loss of the loan payments, maintenance fees and the resale of points that Plaintiffs would have received in the absence of Defendants' misconduct, all of which total $16.7 million. (*Id*.) In addition, Mr. Jarosz also estimated punitive damages up to $4 million. (*Id*.) In total, Mr. Jarosz calculated damages to Plaintiffs resulting from Defendants' conduct of almost $30 million.

On rebuttal, Defendants' expert, Mr. Argiz concedes that Diamond's damages amount to almost $2.6 million. (UF-DIA-Opp'n[6] ¶162.) Both experts agree that there are quantifiable damages suffered by Diamond pursuant to Defendants' conduct – the dispute is to the amount of those damages. Such dispute creates a triable issue of fact, rendering summary judgment inappropriate. *Nagy v. Standard Ins. Co.*, 2012 WL 13005649, at *2 (C.D. Cal. Jan. 5 2012) (denying motion for summary judgment where "competing evidence [from experts] creates genuine issues of material fact"); *Sunset Landmark Invest., LLC v. Chubb Custom Ins. Co.*, 2018 WL 5116468, *5 (C.D. Cal. Oct. 1, 2018) (denying motion for summary judgment where experts raised issues of fact because "[o]n a motion for summary judgment, the Court is not inclined to evaluate the reliability, methodology, testimony, and conclusions of the expert witnesses"); *Ramirez v. Victoria's Secret Stores, LLC*, 2019 WL 6998784, *4 (C.D. Cal. July 18, 2019) (same).

> 2. *There is extensive evidence that Diamond Owners stopped paying due to the "exit" service.*

Plaintiffs misrepresent the evidence and claim that Diamond has identified only a handful of owners who stopped paying Diamond upon the advice of the Exit Defendants. (Defs. SS[7] ¶36.) But this is amply contradicted by the record. Diamond's Motion identifies numerous instances of Owners who stopped paying based upon the advice the Defendants. (UF-DIA ¶94.)

In this Opposition, Diamond identifies over 100 additional examples in the documents that have been produced of the Defendants telling Diamond Owners to stop paying or stop auto payments and Diamond Owners saying that they will comply or did comply with Defendants' advice or encouragement. (UF-DIA-Opp'n ¶152.)

---

[6] "UF-DIA-Opp'n" refers to Diamond's Counterstatement of Facts in Support of Diamond's Opposition to Defendants' Motions for Summary Judgment and the evidence cited therein filed concurrently with this Motion.
[7] "Defs. SS" refers to Defendants Pandora Marketing, LLC and Intermarketing Media, LLC's Separate Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment Or In the Alternative For Summary Adjudication of Claims (Or Defenses) and the evidence cited therein.

These statements are in the form of audio files between the Owner and an employee of Defendants, emails between Owners and employees of Defendants and Exit CRM entries documenting communication to and from Owners and Defendants. (UF-DIA-Opp'n ¶153.) The analysis includes: (1) 74 instances of communications between Owners and TSC; (2) 57 instances of communications between Owners and RAG; and (3) 4 instances of communications between Owners and Slattery. (UF-DIA-Opp'n ¶154.)

Although the form can differ, the substance of the statements to the Owners is always the same—stop your payments to Diamond:

- "He stated he didn't want to stop paying the mortgage fees because he doesn't want it to hit his credit. I told him I will have Bonnie give him a call later on today to better explain in depth why we want him to stop paying." (UF-DIA-Opp'n ¶152, Ex. 234 at 12.)

- "The client has informed me that she reached out to her developer via phone (Diamond Resorts) and has informed them that she is revoking their permission to deduct the auto payments from her bank." (UF-DIA-Opp'n ¶152, Ex. 235 at 46.)

- "She mentioned that they've stopped payments in October per Barry. Let her know that it's fine, we don't want her to make any further payments." (UF-DIA-Opp'n ¶152, Ex. 236 at 1.)

- "Client advised that she has an upcoming maintenance fee of $2K and would be glad if she doesn't have to pay this. Asked if she's current on all payments. Will let her know that she doesn't have to make the upcoming payment." (UF-DIA-Opp'n ¶152, Ex. 236 at 2.)

- "Diamond called her in (April) told her she was behind 817.00 so she gave it to them. - they pushed her really hard! (why she's just now telling us I don't know) I told her not to do that again." (UF-DIA-Opp'n ¶152, Ex. 234 at 3.)

- "They accidentally mailed out a mortgage payment to DRI wanted to know if it would be okay to cancel the check - informed them yes." (UF-DIA-Opp'n ¶152, Ex. 234 at 4.)

- "Also went over her inquiry in regards to cutting DRI a check for the balance owned on her contract - went over process and explained on why she is not to make payment - she understood." (UF-DIA-Opp'n ¶152, Ex. 234 at 6.)

- "She went ahead and paid this month's payment because she wanted them to stop calling her, I told her to not pay next month's payment." (UF-DIA-Opp'n ¶152, Ex. 234 at 11.)

- "We talked about the maint[enance fee] that will be due in Jan. I told him we are telling all of our Diamond clients not to make it and the attorney will try to negotiation it." (UF-DIA-Opp'n ¶152, Ex. 234 at 23.)

- "We cannot legally advise you to stop your payments. We do ask that you please make sure that you contact your developer or bank to remove yourself from auto-pay." (UF-DIA-Opp'n ¶152, Ex. 235 at 59.)

This evidence is consistent with the Owner testimony and expert analysis—all of which creates a triable issue of fact. Defendants claim for summary judgment on causation and damages is inappropriate.

## C.  Defendants Admit To Interfering With Diamond Contracts And Violating The Law.

### 1.  *Defendants' MSJ admits the point of their service is to "exit" Diamond contracts, which is "interference and disruption."*

Defendants sell an attorney referral service that interferes with or disrupts Diamond's relationship with Owners. This is undisputed and the Exit Defendants admit as much in their Motion:

- "The Exit Defendants have helped thousands of timeshare owners, including Diamond owners, exit their unwanted timeshare contracts." (ECF 596 at 18).

- "In providing services to their customers, the Exit Defendants use safe and legal methods [of getting out of a timeshare contract] which have proven to achieve resolution for their customers." (*Id.* at 19.)

- "Exit Defendants *can*—and *have*—gotten timeshare owners out of their contracts in a safe and legal manner, including Diamond owners." (*Id.* at 45) (emphasis in original).

Defendants' admissions alone create a material dispute of fact that renders inappropriate summary judgment dismissing Diamond's claims.

2. *They also admit to "referring" Owners to the Slattery Defendants.  But they are not a certified lawyer referral service under California law.*

There is no dispute that the Defendants are running an illegal, uncertified lawyer referral service. The Exit Defendants admit that their business model is to run a lawyer referral service:

- "As part of their business models, Pandora and RAG assign each of their customers to a referred attorney for legal representation."  (Exit Defs.' MSJ [ECF 596] at 19.)

- "The Exit Defendants' business involves connecting owners with attorneys who will represent them in seeking to cancel or rescind."  (*Id.* at 45.)

- The Slattery Defendants entered into oral and written agreements whereby they accepted hundreds of referrals of Diamond Owners, and other timeshare owners, from the Exit Defendants. (UF-DIA ¶¶43-44.)

It is undisputed that neither TSC nor RAG are lawyer referral services certified by CalBar. (UF-DIA ¶¶124, 151.) This by itself establishes a violation of § 6155 by the Exit Defendants and the Slattery Defendants. Cal. Bus. & Prof. Code § 6155 (prohibiting operation of uncertified lawyer referral service, and prohibiting an attorney from accepting referrals from an uncertified service). Thus, dismissal of Diamond's claims is improper.

### D. <u>Defendants' Summary Judgment Cannot Be Based On Complaints About Diamond's Sales Practices.</u>

Defendants devote a large portion of their brief to presenting a handful of one-off complaints about Diamond from Owners. They also present "customer complaints" from online websites, such as the Better Business Bureau, as well as "customer reviews" (including positive reviews from Diamond Owners) from TrustPilot, the reputation management company engaged by Defendants to manage their negative online presence. (Defs. SS ¶6.) None of this information is material to

the claims at issue in this case. Diamond's claims are not based upon Defendants' false statements regarding Diamond's sales practices.  Instead, the claims are about Defendants' false and misleading statements about its own "exit" services and other misconduct as part of the scheme. Neither the owner complaints nor online reviews have any bearing on the questions of whether Defendants' advertising was false and misleading, the "exit" service was simply a default, or the conduct damaged Diamond.

Tellingly, not a single Owner declaration offered in support of Defendants' summary judgment speaks to any specific services provided by the Defendants. None of the testimony from the owner declarations dispute the evidence Diamond offered in support of its Motion. None of the owners deny being told by the Exit Defendants to stop making payments to Diamond. None of the owners discuss any litigation or class action lawsuits filed by the Lawyer Defendants based upon consumer protection laws. The voluminous evidence submitted by Diamond in Diamond's Motion revealing how the "exit" is procured through breaching the timeshare contract via nonpayment or default remains undisputed.

The Exit Defendants' reliance on the Assurance of Discontinuance ("AOD") is also improper. By its own terms, nothing in or about the AOD can be used by the Exit Defendants as evidence in this action. (UF-DIA-Opp'n ¶156, Ex. 244; AOD, ¶126.) Moreover, the corporate representative of the Arizona Attorney General, Mathew DuMee, was deposed in this action regarding the AOD. Mr. DuMee's testimony confirms that: (1) the AOD involved only Arizona domiciles or consumers who attended sales presentations in the State of Arizona; (2) Defendants cannot rely on any statements in the AOD (which, at any rate, constitute improper triple hearsay) or Diamond's settlement of the Arizona matter as evidence for any purpose or any proceeding in this action, including to support the present motion; and (3) Arizona's confidentiality statute precludes the disclosure of information regarding the identities of the consumers at issue in the Arizona matter, including whether any of those

consumers are among the Diamond Owners at issue herein. (UF-DIA-Opp'n ¶¶157-159.) The Court should disregard Defendants' proffer of the AOD agreement as inappropriate under its terms and irrelevant to the issues pending before the court.

### III.   THE MIDDLE DISTRICT OF FLORIDA RECENTLY DENIED DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN A SIMILAR LAWSUIT.

A federal district court recently denied the defendants' motions for summary judgment in a case with nearly identical claims, nearly identical laws, nearly identical parties, and nearly identical arguments.  (*See* Wyndham Order, Lin Decl. ¶91, Ex. 258.)  This Court should follow the decision reached in that nearly identical case and deny Defendants' Motions.

The *Wyndham* case involves claims brought by a timeshare developer for harm resulting from the attorney referral scheme between the same timeshare exit companies as this case—Pandora Marketing, LLC and Intermarketing Media, LLC—and the same exit lawyer and his three law firms as this case—JL "Sean" Slattery, Slattery, Sobel & Decamp, LLP, Del Mar Law Group, LLP and Carlsbad Law Group, LLP. (Wyndham Order at 2.) The evidence in *Wyndham* established that the Exit Defendants made false statements in their sales presentations. (*Id.* at 3.) The timeshare developer also established that "[a]fter having contact with the [Exit Defendants], the timeshare owners stop making payments to Plaintiffs." (*Id.*)

In *Wyndham*, the Slattery Defendants engaged in the same conduct as they do in this case:

- Once a timeshare owner is referred to them by the exit companies, the Lawyer Defendants send two letters to the timeshare developers (*Id.* at 4.);

- Once the Lawyer Defendants send their letters, the timeshare developers are no longer permitted to communicate directly with the owners (*Id.*);

- The Lawyer Defendants do nothing else and do not initiate any litigation for any owner (*Id.* at 4-5); and

- The Lawyer Defendants were aware of the false statements in the Exit Defendants' advertising, took no steps to correct them and continued to accept referrals (*Id.* at 5).

On these facts, the timeshare developer plaintiffs alleged violations of the Lanham Act, tortious interference with contractual relations, violation of Florida's deceptive and unfair trade practices statute, and civil conspiracy to commit these violations. (*Id.*)

The Lawyer Defendants moved for summary judgment arguing that there was no evidence of injury or damages. (*Id.* at 6.) In response, the timeshare developer presented evidence that the Lawyer Defendants damaged the goodwill that the plaintiffs "developed and fostered through its customer relationships because they were no longer able to contact their timeshare owners once the owners received correspondence from the Lawyer Defendants." (*Id.* at 8.) In addition, the timeshare developer submitted evidence that it "had to handle the defaulted accounts and the inventory recovery from the defaulted owners" and lost revenue resulting from the loss of fees. (*Id.* at 9.) This evidence of injury raised a triable fact and the Lawyer Defendants' motion was denied.[8]  (*Id.*)

In addition to denying the Lawyer Defendants' motion for summary judgment, the *Wyndham* court partially granted summary judgment to the timeshare developer on their claims against the Lawyer Defendants. (*Id.* at 2.) The court granted summary judgment to the timeshare developer as to the first four elements of the Lanham Act claim. (*Id.* at 11.) In reaching that conclusion, the Court found that the exit companies violated the Lanham Act:

---

[8]The Exit Defendants' motion for summary judgment was denied as moot (Order, Lin Decl. Ex. 263 [ECF 727]) after the Court entered default judgment against the Exit Defendants as a sanction for their discovery misconduct. *Wyndham Vacation Ownership, Inc. v. Slattery, Sobel & Decamp, LLP*, 2021 WL 5275700, *7-*8 (M.D. Fla. 2022) (recommending that court grant amended motion for sanctions and enter default against TSC and RAG); *Wyndham Vacation Ownership, Inc. v. Slattery, Sobel & Decamp, LLP*, 2022 WL 291787, *4-*5 (M.D. Fla. 2022) (adopting report and recommendation and entering default against TSC and RAG). The issue of causation and damages will be tried.

> Plaintiffs have established that Marketing Defendants misrepresented an inherent characteristic of their product, exit from a timeshare contract, by advising timeshare owners that they would be out of the contractual obligations for their timeshares once a letter was sent by an attorney. Such misrepresentation is material as it likely influenced timeshare owners to pay for Marketing Defendants' services to exit their timeshare contracts.

(*Id.* at 11.)

The court then rejected the Lawyer Defendants' argument that their acceptance of referrals did not necessarily enable the Exit Defendants' scheme:

> There is evidence that Lawyer Defendants were crucial to Marketing Defendants' exit strategy because without their services, the exit strategy represented to the owners failed… Lawyer Defendants argue that accepting referrals did not make Marketing Defendants' false advertising possible because Marketing Defendants could just refer to another lawyer. However, that appears to be the point. If no lawyer agreed to accept referrals from Marketing Defendants, their false advertising fails. And Lawyer Defendants did in fact accept their referrals despite understanding Marketing Defendants' exit strategy.

(*Id.* at 12.)

As discussed herein, Diamond has presented not only substantially identical factual evidence as to that which was before the *Wyndham* court, but also expert analyses supporting causation and damages. The *Wyndham* decision is persuasive and this Court should rely upon its thoughtful analysis given the similarity of parties, similarity of claims, similarity of law and similarity of factual record. As the court did in *Wyndham,* Defendants' arguments that there is "no evidence" of injury or harm to Diamond should be rejected and the case should proceed to trial. This Court should follow the *Wyndham* precedent and reject Defendants' arguments that there is "no evidence" of injury or harm to Diamond. Defendants' Motions should be denied, and this matter should proceed to trial.

## IV.   THIS COURT SHOULD DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE LANHAM ACT.

The Exit Defendants argue that the Lanham Act claims should be dismissed

-14-

because there is no material fact issue regarding: (1) that the advertising is false or misleading; (2) injury and standing; (3) causation and damages; (4) the application of the statute of limitations.  But ample evidence counters each of these arguments, and the Motion should be denied.

### A. Falsity, Commercial Speech, Deception, And Materiality Are Not Disputable.

As set forth in Diamond's Motion, Defendants' "exit" scheme centers around the following five subject statements:

- Defendants legally terminate timeshare contracts based on the timeshare developer's misrepresentations and unethical sales practices (UF-DIA ¶16);

- the "exit" is obtained through the legal work of attorneys based on consumer protection laws (UF-DIA ¶17);

- that attorneys file litigation, class actions, or bundled lawsuits, or threaten such litigation to negotiate an "exit" (UF-DIA ¶18);

- the "exit" service has 100% success rate or a 100% money back guarantee (UF-DIA ¶19);

- the heirs of timeshare owners will automatically inherit the payment obligations of the timeshare contract. (UF-DIA ¶20.)

*See* Diamond's Mot. (ECF 593-55).  As set forth in Diamond's Motion, voluminous evidence establishes the elements of falsity, commercial speech, deception, and materiality.

> 1. *The subject statements are literally false and/or misleading, which is supported by substantial evidence.*

Discovery establishes that these five statements are literally false and/or misleading.

**First**, three subject statements assert that the "exit" is a legal service, based on Diamond's misrepresentations and unethical sales practices, obtained through the work of attorneys based on consumer protection laws. Furthermore, lawyers procure

the "exit" through litigation, class actions, bundled lawsuits, or negotiations threatening the same. (UF-DIA ¶¶16-18.) However, the Exit Defendants admit that they have no communications with Diamond, and delegate the legal work to the Slattery Defendants. (UF-DIA ¶41.) In turn, the Slattery Defendants admit that their "exit" service consists of two letters to Diamond without any follow-up, and no correspondence was sent on behalf of dozens of Diamond Owners. (UF-DIA ¶¶51-53, 55.)[9] Nor have the Slattery Defendants filed in-court litigation, class actions, or bundled lawsuits. (UF-DIA ¶49.)

In their Motion, the Exit Defendants claim that such adverting does not mention Diamond specifically, and therefore cannot be false. (*See* Exit Defs. MSJ at 43.) But this ignores that the entirety of the sales process—from multi-media advertising, to sales scripts, to sales call, to the actual "exit" contract—is the focus of the Lanham Act claim. (Diamond's Mot. at 11-22.) The Exit Defendant admit the subject advertisements were published, that sales scripts containing the subject statements were used, and audio files verify those same subject statements were made to Diamond Owners.  (UF-DIA ¶¶14, 25-34.)

Alternatively, the Exit Defendants claim that its advertisements pose rhetorical questions or should be ignored as mere opinion statements. (*See* Exit Defs. MSJ at 43-44.)  But this misunderstands Diamond's claim and misrepresents the material facts at issue in this lawsuit.  Diamond asserts that the subject statements describe the "exit" as a legal service whereby attorneys will work to seek an "exit" based on Diamond's purported unethical sales practices.  But facts establish that the "legal" work performed as to Diamond is simply two exit letters with no follow-up, implicit or explicit instructions not to pay, and resulting default. (UF-DIA ¶¶51-53, 55, 69-73, 89-93.)

---

[9] Similarly, the McCroskey Defendants admit that after 2017 they hid their involvement from Diamond and did not engage in negotiations.  (UF-DIA ¶¶59-60, 62.)

In other words, Diamond's lawsuit, and the underlying facts, seeks recovery for the Exit Defendants' purported legal services and commercial speech touting the same. For this reason, the Exit Defendants one-off claims regarding Diamond "high pressure sales pitch" miss the mark. (*See* Exit Defs. MSJ at 46.) Diamond's claims focus on the legal work purportedly performed during the "exit" service—not on Defendants' assertions about Diamond.

**Second**, the Exit Defendants' assertion of a 100% success rate or 100% guarantee is literally false or misleading. (UF-DIA ¶¶19, 29, 32.) The Exit Defendants claim there is "zero evidence" in the record that the guarantee was false. (*See* Exit Defs. MSJ at 46.) This ignores the factual record and cannot be a basis for summary judgment. Documents show that "exits" have not been procured for approximately half of Diamond Owners; both Slattery and McCroskey admit there is no way to force Diamond to cancel without a compelled process. (UF-DIA ¶¶77-79.) Documents clearly establish that refunds were not paid after the guaranteed "exit" did not occur. (UF-DIA ¶¶86-87.)

**Third**, the Exit Defendants' assertion that timeshare contracts automatically obligate the Owner's heirs upon death are also literally false or misleading.  As a fact matter, Diamond does not automatically transfer an Ownership interest without the inheriting party's consent. (UF-DIA ¶81.) And in any event, there is no automatic payment obligation, as an heir is permitted to disclaim any timeshare interest, including Diamond's timeshare contracts under the probate laws in the fifty States. *See* Diamond's Mot. at 14-15) (probate statutes permitting disclaimer of interest).

Despite this, the Exit Defendants claim that because Diamond's contract indicates timeshare interests are "perpetual" that advertising that the contract automatically obligates an heir to pay the contract is true. (Defs. SS ¶28.) But this is simply not correct. A perpetual property interest does not mean that any payment obligation is automatically transferred, or that such property cannot be disclaimed. (*See* Diamond's Motion at 14-15.)  Indeed, the Exit Defendants' own exhibits to their

-17-

Motion for Summary Judgment expressly acknowledge that heirs are permitted to disclaim Ownership interests. (*See* Exit Defs. Mot., Butler Decl. ¶ 4 [ECF 596-2, Page ID 21986.])

Case law clearly supports that such statements are literally false or misleading. *See Allergan U.S., Inc. v. Prescribers Choice, Inc.*, 364 F. Supp. 3d 1089, 1109-12 (C.D. Cal. 2019) (defendants' statements in promotional materials regarding legal compliance were literally false); *Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, 310 F. Supp. 3d 1089, 1119-21 (S.D. Cal. 2018) (advertising misrepresented efficacy of weight loss drug; literal falsity established); *Nat. Grange of the Ord. of Patrons of Husbandry v. Cal. Guild*, 334 F. Supp. 3d 1057, 1066-67 (E.D. Cal. 2018) (literally false statement established on summary judgment).

### 2. *There is no dispute as to commercial speech, deception, or materiality.*

Notably, Defendants do not address the elements of commercial speech, deception, or materiality.  This is not surprising, as voluminous evidence supports such elements.

Regarding commercial speech, Defendants cannot contest that the subject statements were all made in advertising, sales scripts, and sales presentations recorded in audio files. (UF-DIA ¶¶14-34.) Case law supports that statements made in advertising and sales presentations qualify as commercial speech. *Allergan*, 364 F. Supp. 3d at 1110-11 (oral sales presentation was commercial speech); *Semco, Inv. v., Amcast, Inc.*, 52 F.3d 108, 111-14 (6th Cir. 1995) (misrepresentations in sales brochure was commercial speech); *Underground Sols., Inc. v. Palermo*, 188 F. Supp. 3d 717, 725, 732 (N.D. Ill. 2016) (false statements to customers was commercial promotion).

As to materiality and deception, such elements are presumed where the statements are literally false.  (*See* Diamond's Mot. at 11, 20-21.)  And, in any event, there is substantial evidence that Owners relied on and were deceived by the subject

statements. (UF-DIA ¶¶83-84, 88; UF-DIA-Opp'n ¶152.) This is sufficient to establish materiality and deception. *See AECOM Energy & Constr., Inc. v. Ripley*, 348 F. Supp. 3d 1038, 1056 (C.D. Cal. 2018), *rev'd on other grounds*, 851 F. App'x 20 (9th Cir. 2021); *ITEX Corp. v. Global Links Corp.*, 90 F. Supp. 3d 1158, 1173 (D. Nev. 2015).

## B. The Slattery Defendants Do Not Contest Knowledge And Participation In False And Misleading Advertising And Other Aspects Of The "Exit" Scheme.

The Slattery Defendants do not challenge the knowledge, inducement and participation elements relating to contributory Lanham Act claims. Nor is this surprising, as voluminous evidence establishes that the Slattery Defendants knew of, induced, and participated in the false and misleading advertising, and other aspects of the "exit" scheme. (*See generally* Diamond's Mot. at 23-27.)

**First**, there is substantial evidence that the Slattery Defendants are aware of the false and misleading advertising, given their close business relationship with the Exit Defendants. (UF-DIA ¶¶46-47 (describing awareness of advertising, discussions regarding a guarantee, and general strategy of advertising).)  Knowledge is further established because the advertising is serious and widespread.  (UF-DIA ¶¶14, 25-26); *Merck Eprova AG v. Gnosis SPA,* 901 F.Supp.2d 436, 451-56 (S.D.N.Y. 2012).

**Second**, the Slattery Defendants encourage the false and misleading advertising by providing the legal service that is the core of the "exit" scheme and concealing that the service is simply a default. (UF-DIA ¶¶17, 21, 41, 48-49, 66, 105-107.) Such involvement in the scheme itself satisfies both knowledge and participation. *See Wyndham Vac. Ownership, Inc. v. Miller*, 2019 WL 5394074, at *6 (M.D. Fla. 2019) (material participation established through providing a necessary good or service); *Newton Group,* Order at 32-33, Lin Decl. Ex. 265 (S.D. Fla. April 4, 2022) (denying defendants MSJ on contributory Lanham Act; referral arrangement in "exit" scheme sufficient to create genuine issue of material fact).

**Third**, the Slattery Defendants failed to halt the false and misleading advertising despite an obligation to do so. *See Duty Free Ams., Inc. v. Estee Lauders Cos., Inc.*, 797 F.3d 1248, 1277-78 (11th Cir. 2015). This includes a host of fiduciary duties, including the duty of loyalty and to disclose. *See* Rest. (3d) Law Governing Lawyers § 16 (2000). By failing to disclose the actual legal services provided—"exit" letters, without follow-up, leading to default—and not litigation, class actions, or bundled lawsuits—the Slattery Defendants are contributorily liable under the Lanham Act. *U.S. Struct. Plywood Integrity Coal. v. PFS Corp.*, 524 F. Supp. 3d 1320, 1332 (S.D. Fla. 2021) (looking the other way "easily satisfies" the material participation standard).

Instead, the Slattery Defendants claim that Diamond's 30(b)(6) witness testimony and interrogatory responses do not delineate this evidence. (*See* Slattery Defs. MSJ at 9-10.) But this misunderstands Diamond's discovery obligations. Evidence of the Slattery Defendants' knowledge and participation in the "exit" scheme was in the possession, custody, and control of Defendants. It existed in the form the Exit Defendants' false and misleading advertising, sales scripts and presentations, and concealment from Owners. Similarly, the Slattery Defendants' participation in the scheme was likewise in the possession, custody, and control of Defendants. Diamond's discovery responses were not required to delineate what was uniquely in the knowledge and possession of the Slattery Defendants—namely their robust involvement in the "exit" scheme. *Hitachi, Ltd. v. AmTRAN Tech. Co. Ltd.*, 2006 WL 2038248, *3 (N.D. Cal. 2006) (interrogatories "seeking information 'peculiarly within the knowledge of individuals, and not chargeable to [the requested party]' may be struck down"); 1 Federal Rules of Civil Procedure, Rules & Commentary Rule 33 ("[T]he responding party does not have an obligation to obtain information known by third persons not under the party's control.").

As an initial matter, because the subject statements are literally false and misleading and because TSC and RAG intentionally set out to deceive consumers,

the elements of consumer deception and materiality are presumed.  (Diamond's Mot. at 20-21); *AECOM*, 348 F. Supp. 3d at 1056 ("[W]here a statement is literally false or the defendant intentionally set out to deceive, both actual deception and materiality are presumed."); *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040-41 (9th Cir. 1986) (presuming materiality and deception where statements were literally false). Even without this presumption, substantial evidence shows that Owners were deceived by the subject statements. (UF-DIA ¶¶83-84 (Owners believed their heirs were automatically obligated to pay contracts, and that results were guaranteed or 100% successful); UF-DIA ¶88 (consumer surveys support this finding of deception).)

Additionally, the Slattery Defendants reliance on *Valentich v. United States*, 194 F. Supp. 3d 1033 (E.D. Cal. 2016) is misplaced.  There, in her lawsuit alleging negligence, the plaintiff's interrogatory response averred that "I do not claim that [the alleged tortfeasor] was negligent."  *Id.* at 1035.  Plaintiff thus admitted that the alleged tortfeasor did not breach his duty of care. *Id.* at 1037.  Here, Diamond makes no such concession; rather, Diamond has provided ample evidence of the subject statements, their materiality, and their deception.  (Diamond's Mot. at 12-17, 20-21); (UF-DIA ¶¶16-20, 83-84, 88.)

The other case that the Slattery Defendants rely on, *Grassmueck v. Potala Village, LLC*, 2018 WL 2984831 (W.D. Wash. 2018), is inapposite.  In *Grassmueck*, the Court considered the defendant's interrogatory responses on summary judgment because the defendant did not identify any other evidence (e.g., deposition testimony) on the claim at issue.  *Id.* at *9.  Unlike the defendant in *Grassmueck*, Diamond has identified voluminous evidence supporting the elements of its Lanham Act claim, including the falsity, materiality, and dissemination of the subject statements. (Diamond's Mot. at 12-17, 20-21); (UF-DIA ¶¶16-20, 83-84, 88.)

The Slattery Defendants also conveniently ignore well-settled case law cited in *Grassmueck*.  "[U]nlike responses to requests for admission or statements in a

-21-

party's pleadings, responses to interrogatories are not ordinarily considered binding on a party." *Id.* (citing *Donovan v. Crisostomo*, 689 F.2d 869, 875 (9th Cir. 1982) ("[i]nterrogatories do not supersede or supplement pleadings, nor do they bind parties as an allegation or admission in a pleading or pre-trial order")); *Victory Carriers, Inc. v. Stockton Stevedoring Co.*, 388 F.2d 955, 959 (9th Cir. 1968) (holding that answers to interrogatories are not given the same binding effect conferred on responses to requests for admission)).  Again, Diamond has provided ample evidence to support its Lanham Act claim.  (Diamond's Mot. at 12-17, 20-21); (UF-DIA ¶¶16-20, 83-84, 88.) Accordingly, this Court should deny the Motion.

**C.**    **There Is Voluminous Evidence Of Injury, Causation, And Standing.**

The Exit Defendants concede that "[t]he issue of standing to sue for violation of statute is a pure legal issue." (Exit Defs. MSJ at 33-34.) They also acknowledge that the Court previously addressed the issue of standing at the motion to dismiss stage and held that Diamond's alleged damages, such as contract losses and future sales, were sufficient to support false advertising claims.  (*See* Exit Defs. MSJ at 34); *Diamond Resorts U.S. Collection Dev., LLC v. Pandora Mktg., LLC*, 2020 WL 8768056, *5 (C.D. Cal. 2020) ("*Pandora Mktg.*"); *Obesity Research*, 310 F. Supp. 3d at 1115 ("The Court addressed this issue at the motion to dismiss stage, and found that [asserting party] met its burden at that time."). The Exit Defendants now seek to relitigate standing, arguing that Diamond offers no evidence to satisfy the zone-of-interest test or proximate cause requirement to establish standing under the Lanham Act.  The Exit Defendants are wrong.

The Exit Defendants fail to meet their burden of showing that Diamond lacks standing to sue under the Lanham Act. *See Obesity Research*, 310 F. Supp. 3d at 1115-16 (after asserting party met its burden of establishing standing at the motion to dismiss stage, it was the defending party's burden to establish lack of standing at the summary judgment stage). As set forth below and in Diamond's Motion, Diamond submits ample evidence to rebut the Exit Defendants' arguments and show

that it has suffered an economic or reputational injury proximately caused by the Exit
Defendants' false and misleading advertising. Accordingly, the Motion should be
denied as to the issue of standing.

### 1.   *The standard for standing under the Lanham Act.*

As a preliminary matter, the Exit Defendants mischaracterize the standard for
standing under the Lanham Act.  "[T]he standard for standing under the Lanham Act
is not a difficult one." *Obesity Research*, 310 F. Supp. 3d  at 1116 (citing *Lexmark
Int'l, Inc. v. Static Control Comps., Inc.*, 572 U.S. 118, 136 (2014)). And a plaintiff
meets its burden of establishing standing to sue under the Act by showing that it has
"***likely*** suffered an economic or reputational injury proximately caused by [the
defendant]'s false advertisements."  *Id*. (emphasis added).[10]  For example, courts
have found standing under the Lanham Act where the plaintiff has established that
the defendant has or may divert business from the plaintiff, *Coastal Abstract Serv.,
Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999), or where
"commercial competition" was evidenced by "protracted litigation," *H.I.S.C., Inc. v.
Franmar Int'l Importers, Ltd.*, 2022 WL 104730, *6 (S.D. Cal. 2022); *Newton
Group,* Order at 27, Lin Decl. Ex. 265 (S.D. Fla. April 4, 2022) (Lanham Act standing
established where exit company caused owners to stop making contract payments,
discouraging future sales, and harming Diamond's reputation).

Moreover, where, as here, a plaintiff sues to enjoin conduct that constitutes
false advertising under the Lanham Act, the plaintiff need not prove injury. *See
Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989); *c.f.
Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1411 (9th Cir. 1993) ("[A]n inability
to show actual damages does not alone preclude a recovery under section 1117.")

---

[10]The Exit Defendants' assertions that Diamond must prove that it "has suffered lost
sales" and that "Diamond … cannot satisfy the zone-of-interest test unless it can
establish harm to its reputation" are wrong.  *See* MSJ at 34-35.  Diamond's burden is
much lower and only requires Diamond to establish that it has or will ***likely*** suffer an
economic or reputational injury. Nevertheless, Diamond has submitted voluminous
evidence of actual economic injury proximately caused by their false advertising
statements.  *See* Section III(C)(A)(2).

(quoting *Bandag, Inc. v. Bolser's Tire Stores*, 750 F.2d 903, 919 (Fed. Cir. 1984) (stating that, even if a plaintiff is unable to demonstrate damages resulting from the defendant's § 43(a) violation, § 1117 allows the district court to award the plaintiff any just monetary award so long as it constitutes "compensation" for the plaintiff's losses or the defendant's unjust enrichment and is not simply a "penalty" for the defendant's conduct)).   Thus, if there was no triable issue as to causation and injury (which evidence supports there is a jury question), Diamond's Lanham Act claim would still be viable to the extent it seeks an injunction—which is part of the relief sought here.

Diamond meets this burden as there is voluminous evidence that Plaintiffs have (or, at a minimum, will likely) suffer both economic and reputational harm proximately caused by the Exit Defendants' false and misleading advertising.[11]

### 2.   *Evidence of economic injury.*

The Exit Defendants do not dispute that the goal of their services is to terminate Diamond Owner contracts.   In fact, the Exit Defendants' present motion repeatedly touts that "[t]he Exit Defendants have helped thousands of timeshare owners, including Diamond owners, exit their unwanted timeshare contracts." (Exit Defs. MSJ at 18.)   The Exit Defendants also explicitly advise Diamond Owners that they should pay the "exit" fee in lieu of Diamond's timeshare contract payments, thereby diverting such payments from Diamond to Defendants.   (UF-DIA ¶75.)

---

[11] The Exit Defendants conflate Article III Constitutional standing with Lanham Act standing even though the distinction is outlined in *Lexmark*.   There, the Supreme Court explained the difference between Article III and statutory standing. *See Lexmark*, 572 U.S. at 125 ("Lexmark does not deny that Static Control's allegations of lost sales and damage to its business reputation give it standing under Article III to press its false-advertising claim, and we are satisfied that they do"); *see id.* at 129 ("[section 1125(a)'s] broad language might suggest that an action is available to anyone who can satisfy the minimum requirements of Article III."). The *Lexmark* Court then discussed statutory standing, which involves whether plaintiff's claims "fall within the zone of interests protected by the law invoked," *id*. at 126 (quotations omitted), and how "a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute," *id*. at 132.

-24-

Moreover, as set forth in its Motion, Diamond has proffered voluminous evidence to support its claims of lost sales, including: (1) a declaration and deposition testimony by Diamond's corporate representative and Vice President of Club and Owner Services, Brad Harris; (2) deposition testimony by Diamond Owners who engaged the Defendants' services; (3) the Expert Report of John C. Jarosz (the "Jarosz Report"), calculating that Diamond's lost revenues from Diamond Owners' unpaid obligations attributable to Defendants is $16.7 million; and (4) the Expert Report Submitted by Dr. Bruce Isaacson Measuring the Messages Communicated by Advertising Materials from Timeshare Compliance and Resort Advisory Group (the "Isaacson Report").  (UF-DIA ¶96.)  This evidence satisfies the zone-of-interest test and shows that Diamond has been damaged through defaulted contracts, maintenance fee carrying costs associated with these defaults, and additional damages relating to the continuation of the referral relationship between Defendants. *See Diamond Resorts Int'l, Inc. v. Aaronson*, 371 F. Supp. 3d 1088, 1102 (M.D. Fla. 2019) (finding that unpaid obligations along with the lost customers who owed the obligations constitutes "lost sales"); *Halicki Films LLC v. Sanderson Sales and Mktg.*, 547 F.3d 1213, 1229 (9th Cir. 2008) (finding an injury-in-fact where plaintiff submitted two expert reports estimating damages in excess of $7 million dollars).

Indeed, Diamond presented similar evidence to establish its standing to sue for similar claims under the Lanham Act in *Aaronson*, an action before the U.S. District Court for the Middle District of Florida.  There, Diamond submitted an expert report (similar to the Jarosz Report offered by Diamond here) from a damages expert who opined that its monetary losses from delinquent payments amounted to over $4.5 million. *Aaronson*, 371 F. Supp. 3d at 1102.  Based on this expert report, the court denied the defendants' motion for summary judgment, explaining: "Diamond's claimed injuries from damage to its business reputation and lost sales in the form of unpaid promissory notes and other fees—and the evidence it has presented to support those injuries at this stage—place Diamond within the Lanham Act's § 1125(a) zone

of interests." *Id.* at 1103; *Newton Group*, Order at 27-30, Lin Decl. Ex. 265 (denying defendants summary judgment as Owners' stopping payment, expert analysis was sufficient circumstantial evidence of causation).

More importantly, although the Exit Defendants' rebuttal damages expert, Antonio Argiz, claims to disagree with the Jarosz Report's calculation of $16.7 million in lost revenues, Mr. Argiz expressly concedes that Diamond has suffered at least $1.82 million in lost revenues and $2.6 million in total damages. (UF-DIA-Opp'n ¶162, Ex. 246, Argiz Report, at 8.) The Exit Defendants' competing expert report alone creates a triable issue of material fact that the jury must be allowed to resolve at trial. *See Zetwick v. City of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) ("[W]here evidence is genuinely disputed on a particular issue—such as by conflicting testimony—that 'issue is inappropriate for resolution on summary judgment.'") (quoting *Direct Techs., LLC v. Elec. Arts, Inc.*, 836 F.3d 1059, 1067 (9th Cir. 2016)); *Pan Pac. Retail Props., Inc. v. Gulf Ins. Co.*, 471 F.3d 961, 970 (9th Cir. 2006) ("[T]he district court erred in granting summary judgment to the defendants, resolving [an] issue in light of the disputed and conflicting evidence before it.")); *see also Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 381 (9th Cir. 1992) ("[W]e see no basis for appellees' arguments that the conflicting testimony regarding the dates in question somehow supports a grant of summary judgment in appellees' favor. To the contrary, the existence of that conflict only underscores the inappropriateness of a grant of summary judgment as to this issue.").

Finally, it is well-settled that the Lanham Act also protects against *future harm* to plaintiffs. *See, e.g.*, 15 U.S.C. § 1125(a) (providing protection to any person "who believes that he or she is or is likely to be damaged" by the defendant's false advertising); *Lexmark*, 572 U.S. at 131 (noting that "unfair competition" claims were historically viewed, as being concerned "with injuries to business reputation and present and *future sales*") (emphasis added); *CareDx, Inc. v. Natera, Inc.*, 2019 WL 7037799, at *7 (D. Del. 2019) ("[T]he fact that CareDx has not pointed to a specific,

already-lost sale is not dispositive of CareDx's false advertising claim. CareDx's Complaint alleges that Natera is making statements to the effect that CareDx's product is inferior to Natera's product, and that these statements 'have harmed and will continue to harm CareDx through loss of goodwill, reputation, profits, and prospective business contracts.'[]That is sufficient here… ."). Because the Exit Defendants do not dispute Diamond meets its burden of establishing a triable fact issue as to lost future sales, their Motion should be denied.

Consequently, Diamond's evidence (as well as the Exit Defendants' evidence) creates a triable issue of fact as to economic injury.

### 3.     *Evidence of reputational injury.*

The Exit Defendants do not dispute that the subject advertisements make disparaging statements about the timeshare industry and accuse timeshare developers of engaging in unlawful activity. And, as set forth *supra* Section II, these statements are false and misleading. These facts and evidence alone are sufficient to create a triable issue as to reputational harm. *See Aaronson*, 371 F. Supp. 3d at 1102 ("Given the Subject Advertisements, particularly those targeted at Diamond, the Court finds that a reasonable jury could find that any false accusations in the Subject Advertisements have harmed Diamond's reputation."); *Lexmark*, 572 U.S. at 138 (stating that a false advertising claim may arise "[w]hen a defendant harms a plaintiff's reputation by casting aspersions on its business"); *Newton Group*, Order at 30-31, Lin Decl. Ex. 265 (denying defendants MSJ in a timeshare "exit" case; reputational injury caused by advertisements disparaging timeshare industry).

Moreover, voluminous evidence and expert analysis indicates that the Exit Defendants disparage Diamond's reputation, including deposition testimony from its corporate representative, Brad Harris;[12] scripts for sales calls; and audio recordings.

---

[12]The Exit Defendants incorrectly assert that Mr. Harris did not "identify any alleged harm to Diamond's reputation attributable to Defendants" during his deposition. (*See* MSJ at 35; UF-DIA-Opp'n ¶163, Ex. 247, Harris Dep.,

(UF-DIA ¶¶26-31; UF-DIA-Opp'n ¶163.)  In addition, Diamond's marketing and consumer behavior expert, Dr. Bruce Isaacson, conducted a consumer survey in this case using video advertisements aired by the Exit Defendants and concluded:



(UF-DIA ¶88, Ex. 120, Isaacson Report, at 38 ¶102.)  *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145-46 (9th Cir. 1997) ("[T]he consumer survey testimony of Struman and the market analysis testimony of Wagner provides adequate evidence for a reasonable jury to conclude that Plaintiffs suffered actual injury as a result of Defendants' advertisements."); *Brunswick Corp. v. Spirit Reel Co.*, 832 F.2d 513, 525 (10th Cir. 1987) (stating that actual consumer confusion entitling a plaintiff to monetary damages may be demonstrated through consumer surveys); *U-Haul Int'l, Inc. v. Jartran, Inc.*, 601 F. Supp. 1140, 1148-49 (D. Ariz. 1984) (basing damage award on market analysis).

Despite the Exit Defendants' assertions, the fact that their expert disagrees with Dr. Isaacson's conclusions is not a basis for dismissal on summary judgment—rather, that is precisely why dismissal is inappropriate. *See Zetwick*, 850 F.3d at 441; *Direct Techs., LLC*, 836 F.3d at 1067; *Pan Pac. Retail Props.*, 471 F.3d at 970; *Cutter Biological, Inc.*, 971 F.2d at 381. Even a case cited in the Exit Defendants' motion agreed that the evidence and opinions in the Isaacson Report would create a triable issue of fact regarding reputational injury. *See Orange Lake Country Club,*

*Inc. v. Reed Hein & Assocs., LLC*, 2019 WL 7423517 (M.D. Fla. 2019) (finding that "present[ing] evidence that the advertisements on [a] Website reflect negatively on the timeshare industry and make Website viewers less likely to purchase a timeshare" would be "enough to create a question of fact with respect to reputational harm"; but granting summary judgment dismissing claim because plaintiffs' complaint failed to allege any reputational harm).

Finally, given that the Exit Defendants' Motion is not a motion to strike or exclude the Isaacson Report, their reliance on *Wyndham Vacation Ownership v. Sussman*, 2021 WL 4948099 (M.D. Fla. 2021), is misplaced.[13] In fact, nothing in *Sussman* addresses the issue of standing, the zone-of-interest test, or reputational injury. Instead, the issue was whether the court should strike or exclude the expert testimony of the plaintiffs' economics expert (which was being offered to establish the proximate cause element of Wyndham's Lanham Act claims concerning *economic injury*) as unreliable and irrelevant. Therefore, the case has no bearing on whether the Isaacson Report is sufficient evidence to create a triable issue of fact on a motion for summary judgment regarding Diamond's claimed *reputational harm*.

Under these circumstances, Diamond has created a triable issue of fact as to reputational harm and has (again) satisfied the zone-of-interest test to establish its standing to sue under the Lanham Act.

### 4. *Diamond meets the proximate cause requirement*.

The "proximate-cause requirement" for statutory standing under the Lanham Act "generally bars suits for alleged harm that is 'too remote' from the defendant's

---

[13] Even if the Exit Defendants' Motion was a motion to strike, their objections to the Isaacson report "go to the weight, and not the admissibility, of Wagner's testimony." *See Southland Sod Farms*, 108 F.3d at 1143 (finding expert testimony was admissible because alleged defects with expert's opinion—including that the expert's "model was unreliable because it did not consider what [product] sales would have been as a result of lawful competitive efforts;" it made certain purportedly improper assumptions about competing products and the relevant product market; "and it did not account for the fact that the drought and recession in Southern California may have affected different producers differently" went "to the weight, and not the admissibility, of [the expert's] testimony").

unlawful conduct." *Lexmark*, 572 U.S. at 133. The sufficiency of proximate cause allegations turns on whether "the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.* To satisfy this requirement, "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* As set forth below and in its Motion, Diamond's evidence easily meets this standard. Defendants' reliance on inapposite cases and inaccurate statements of law and fact do not change this.

a.   <u>Economic Injury</u>

**First,** there is direct evidence that Diamond Owners stopped making payments to Diamond as a result of their engagement of Defendants. Owners directly state they stopped making timeshare payments because they retained the Exit Defendants. (UF-DIA ¶94.) Moreover, Diamond's presents direct communications between over 100 Diamond Owners and Defendants confirming the same. (UF-DIA-Opp'n ¶155.)[14] This is more than sufficient to establish a fact issue for the jury.

**Second**, Diamond's circumstantial evidence shows that (1) Diamond Owners engaged Defendants after seeing or hearing the false advertising statements at issue (UF-DIA-Opp'n ¶160); (2) there was widespread exposure to the subject statements through the Exit Defendants' multi-media marketing campaign, including internet, radio, television, text messages, and telephone marketing (UF-DIA ¶14); (3) the subject advertising statements make timeshare owners substantially more likely to hire the Exit Defendants (UF-DIA-Opp'n ¶161); and (4) after controlling for all other relevant factors, the odds of default increase over 4600% after retaining Defendants' "exit" services (UF-DIA ¶95).

This evidence is sufficient for a reasonable jury to find that the subject advertisements proximately caused Diamond's economic injuries. *See Lexmark*, 572

---

[14] If necessary, additional examples will be provided at trial.

-30-

U.S. at 139 ("'Where the injury alleged is so integral an aspect of the [violation] alleged, there can be no question' that proximate cause is satisfied."); *Aaronson*, 371 F. Supp. 3d at 1109-10 ("While direct evidence is lacking, Diamond has competent circumstantial evidence to show that a reasonable jury could find that the Subject Advertisements proximately caused Diamond's alleged injuries.").

### b.   Reputational Harm

The Exit Defendants' proximate cause argument completely ignores Diamond's claims for reputational harm.  But as the court in *Aaronson* explained:

> To the extent the jury finds that the accusations in the Subject Advertisements harmed Diamond's reputation, there is no question about proximate causation. *See Lexmark Int'l*, 572 U.S. at 138 ("When a defendant harms a plaintiff's reputation by casting aspersions on its business, the plaintiff's injury flows directly from the audience's belief in the disparaging statements.") Moreover, if a jury determined that the Subject Advertisements contained known falsehoods, proximate causation could easily follow. *See id.* ("[A] defendant who 'seeks to promote his own interests by telling a known falsehood to or about the plaintiff or his product' may be said to have proximately caused the plaintiff's harm." (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008))).

371 F. Supp. 3d at 1109 n.16. The extent that the subject statements harmed Diamond's reputation will be determined at trial.  However, as set forth above, Diamond has offered sufficient evidence for a jury to find reputational harm and, thus, proximate causation therefor.

### c.   The cases cited by the Exit Defendants fail to support their motion

The two cases cited in the Exit Defendants' motion that purportedly support Diamond's alleged failure to prove proximate cause are inapposite and, more importantly, are contrary to this Court's prior holdings.  In particular, the Exit Defendants already incorrectly argued at the motion to dismiss stage that Diamond could not establish proximate cause because the advertisements themselves did not directly cause Diamond Owners to stop making payments to Diamond.  The Court rejected the Exit Defendants' argument because "[t]here is a direct link between Exit

Defendants' disparaging advertisements and communications and individuals ceasing payments to Diamond." *Pandora Mktg.*, 2020 WL 8768056, at *6.

Denying the Exit Defendants' motion to dismiss, the Court explained:

> In *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 269-70 (1992), the Supreme Court articulated three factors that bear on proximate cause: (1) the difficulty of "ascertain[ing] the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors," (2) whether permitting the suit to proceed "would force courts to adopt complicated rules apportioning damages among plaintiffs at different levels of injury from the violative acts, to obviate the risk of multiple recoveries," and (3) whether the "general interest in deterring injurious conduct" justifies grappling with these complex issues. The Court finds the Holmes factors favor a finding of proximate cause. There are a limited number of Diamond Owners who stopped paying Diamond as a result of engaging the Exit Defendants' services. Through discovery, the parties can easily determine which of these Owners engaged the Exit Defendants as a result of the alleged false advertising. There will then be no need for "complicated rules apportioning damages."

*Id.* at *6. For the reasons discussed above, Diamond has met its burden of proof. The Exit Defendants' attempt to use its motion for summary judgment as a pseudo motion for reconsideration is improper.

The unpublished cases relied upon in the Exit Defendants' motion are neither controlling nor persuasive. For example, in *Orange Lake*, the plaintiffs failed to allege reputational harm as a basis for their Lanham Act claims. 2019 WL 7423517, at *14. In fact, the court in *Orange Lake* noted that, *if the plaintiffs had alleged reputational harm*, allegations and expert testimony (similar to those offered by Diamond in this case) evidencing that the advertisements reflected negatively on the timeshare industry as a whole and made consumers less likely to purchase a timeshare *would have* created a genuine issue of fact with respect to reputational harm. *Id.* ("It is without dispute that the advertisements at issue in this litigation accuse Plaintiffs and all timeshare companies generally of engaging in deceitful, manipulative, or otherwise imprudent behavior. Furthermore, Plaintiffs' expert witness, Dr. David Stewart, has presented evidence that the advertisements on the Website reflect negatively on the timeshare industry and make Website viewers less likely to

-32-

purchase a timeshare. Even in the absence of a request for monetary damages, courts have held that such allegations are enough to create a question of fact with respect to reputational harm.") (citing *Aaronson*, 371 F. Supp. 3d at 1102).

Moreover, unlike the plaintiffs in *Orange Lake*, Diamond alleges (and offers evidence showing) that the false and misleading advertising at issue was intended to induce consumers to engage Defendants and to ultimately cease making payments to Diamond, including during oral sales presentations, in text messages, and during phone calls, which are all part of the Exit Defendants' advertising campaign. Indeed, the bigger issue the court was addressing in *Orange Lake* appears to be that the plaintiffs offered nothing more than their unsubstantiated allegation that "but for Defendants' deceitful advertisements, their timeshare owners would not have hired Defendants and would not have ceased making payments."[15]

The holding in *Westgate Resorts, Ltd. v. Reed Hein & Associates, LLC*, 2020 WL 674108 (M.D. Fla. Feb. 11, 2020), is distinguishable for many of the same reasons: the plaintiffs did not allege reputational harm and none of the statements at issue were alleged to cause or intend to cause owners to stop making payments.[16]

As discussed above, the allegations and evidence in this case are more analogous to *Aaronson*. As the court in *Aaronson* explained:

> Defendants' contentions that none of the Subject Advertisements expressly direct viewers to stop making payments to Diamond or to initiate legal action and that no direct evidence exists that Defendants' Diamond Clients stopped payments or began arbitration proceedings based solely on the Subject Advertisements miss the mark on causation. While direct evidence is lacking, Diamond has competent circumstantial

---

[15] *See* Defs.' Mot. for Summ. J. at 7, *Orange Lake Country Club, Inc. v. Reed Hein & Assocs.*, ECF 326 (M.D. Fla. 2019), Lin Decl. Ex. 264: "Plaintiffs have provided no evidence supporting any damage to market share, including expert opinions or testimony from their corporate representative on damages. Further, there is no record evidence relating to loss of market share, and Plaintiffs cannot provide any such evidence." (internal citations omitted).

[16] Additionally, the Exit Defendants' motion incorrectly states that on reconsideration, the *Westgate* court "grant[ed] summary judgment as to Lanham Act claim for lack of causation" on reconsideration. MSJ at 39. As the court's April 27, 2020 opinion expressly states: "Westgate [did] not seek reconsideration of the Court's grant of summary judgment on its Lanham Act claim." *Westgate Resorts v. Reed Hein & Assocs.*, 2020 WL 3265972, at *2 n.2 (M.D. Fla. 2020).

-33-

evidence to show that a reasonable jury could find that the Subject Advertisements proximately caused Diamon's alleged injuries.

371 F. Supp. 3d at 1109-10.

*Aaronson* is consistent with the Court's rulings at the motion to dismiss stage, as well as other courts finding that plaintiff timeshare developers can sue under the Lanham Act based on advertisements that do not directly state that timeshare owners should stop making payments to the plaintiffs. *See Westgate Resorts, Ltd. v. Reed Hein & Assocs., LLC*, 2018 WL 5279156, at *10 (M.D. Fla. 2018) ("Plaintiffs adequately alleged that their injuries were proximately caused by Defendants' alleged false and misleading statements. They allege that TET Defendants made advertising statements which, inter alia, falsely deceived Westgate Owners into believing that Plaintiffs engage in unlawful conduct and falsely guaranteed to relieve Westgate Owners of their Timeshare Agreement obligations. The advertising statements caused identifiable Westgate Owners to retain TET and to stop making payments as required under their Timeshare Agreements. As a result, Plaintiffs suffered harm to their reputational and commercial interest. When viewed in the light most favorable to Plaintiffs, these allegations sufficiently allege injuries flowing directly from TET Defendants' statements."); *Wyndham Vacation Ownership, Inc. v. Gallagher*, 2019 WL 5458815, at *6 (M.D. Fla. 2019) ("Defendants provide no authority to support its contention that the Subject Advertisements must have directed Wyndham Owners to withhold trade from Wyndham. To the contrary, '[c]ourts have found that causation just requires that the false advertising proximately cause the claimed injury—it need not be the only cause or even the predominant cause of the injury.' . . . Moreover, 'Supreme Court precedent shows that an intervening step will not vitiate proximate cause in all instances. What is more important . . . is the certainty with which . . . the injury is fairly attributable to the statutory violation.'"); *Wyndham Vacation Ownership v. Reed Hein & Assocs., LLC*, 2019 WL 3934468, at *4 (M.D. Fla. 2019) (same); *see also Wyndham Vacation Ownership, Inc. v. Totten Franqui*

-34-

*Davis & Burk, LLC*, 2019 WL 7905018, *4 (S.D. Fla. 2019) (concluding that plaintiff had standing to bring Lanham Act claim, explaining that defendants' arguments to the contrary "lack merit" and did not "warrant discussion").

### d.    The Exit Defendants' remaining arguments fail.

The Exit Defendants' remaining arguments fail to establish why Diamond lacks standing based on the proximate cause requirement for the following reasons.

**First**, the fact that Diamond was unable to take depositions via written questions does not somehow negate the voluminous evidence, including in-person deposition testimony, Diamond *did* obtain.

**Second**, the Exit Defendants' assertion that Diamond must somehow establish that the Exit Defendants' ads were the only cause of Diamond's injuries is wrong. *See Gallagher*, 2019 WL 5458815, at *6 ("'[C]ourts have found that causation just requires that the false advertising proximately cause the claimed injury—it need not be the only cause or even the predominant cause of the injury.'[]Moreover, 'Supreme Court precedent shows that an intervening step will not vitiate proximate cause in all instances. What is more important … is the certainty with which … the injury is fairly attributable to the statutory violation.'"); *Wyndham Vacation Ownership v. Reed Hein & Assocs., LLC*, 2019 WL 3934468, at *4 (same).

**Third**, the Court has already rejected the Exit Defendants' argument that the advertisements at issue did not specifically name Diamond at the motion to dismiss stage, holding:

> The Exit Defendants also argue that Diamond's claim does not come within the Lanham Act's zone of interest because their advertisements do not name Diamond and they and Diamond are engaged in different businesses … . The Court agrees with the district court in *Wyndham Vacation Ownership v. Reed Hein & Associates, LLC*, No. 6:18-cv-02171-GAP-DCI, 2019 WL 3934468, at *5 n.6 (M.D. Fla. Aug. 20, 2019) that "common sense dictates that an entity can plausibly be harmed by disparaging statements directed at the industry it occupies." *See also U-Haul Int'l, Inc. v. Jartran, Inc.*, 522 F. Supp. 1238, 1247 (D. Ariz. 1981) ("[T]here need be no direct and explicit comparison to a named competitor." (quotation marks omitted)). The Court finds Diamond's allegations of injury are sufficient.

-35-

1  *Pandora Mktg.*, 2020 WL 8768056, at *5.

2  **Fourth**, Diamond's claims for disgorgement of profits are limited to amounts

3  paid by Diamond Owners to Defendants. (UF-DIA-Opp'n ¶164); *Pandora Mktg.*,

4  2020 WL 8768056, at *6 (finding that "[t]here will then be no need for 'complicated

5  rules apportioning damages'" because "[t]here are a limited number of Diamond

6  Owners who stopped paying Diamond as a result of engaging the Exit Defendants'

7  services"). Thus, there is no risk that "every timeshare developer would have the

8  same viable claim against RAG and Pandora" such that "Pandora and RAG would

9  be required to disgorge the same profits over and over again." (Exit Defs. MSJ at 40.)

10  **Fifth**, the Exit Defendants' remaining arguments regarding Diamond's pre-

11  existing reputation and past "infractions" are clearly triable issues of fact and largely

12  based on hearsay or otherwise inadmissible evidence.

13  **Sixth**, the Exit Defendants reliance on the Arizona AOD is improper.  As noted

14  above, the AOD only involved Arizona residents, Defendants cannot rely on such

15  statements subject to the explicit terms of the AOD, and Arizona's confidentiality

16  statue prohibits identification of any consumer at issue.  The AOD is simply not

17  relevant to these proceedings. *See* Section II.D, *supra;* (UF-DIA-Opp'n ¶¶156-159.).

18  Accordingly, the Exit Defendants' motion should be denied.

19  **D.   There Is Voluminous Evidence Of Damages And Disgorgement.**

20  As discussed in Section IV(C), *supra*, and in Diamond's Motion, there is

21  substantial evidence of the economic and reputational harm Diamond has suffered as

22  a result of the Exit Defendants' false and misleading advertisements.  In addition,

23  Diamond's damages expert, John C. Jarosz, has provided evidence and testimony

24  that supports Diamond's claims for disgorgement and that calculates the appropriate

25  amount for disgorgement of profits to be approximately $4.1 million for TSC and

26  $3.9 million for RAG. (UF-DIA-Opp'n ¶165.) As indicated in the Jarosz Report,

27  these amounts were calculated based on amounts paid by Diamond Owners to the

28  relevant Exit Defendant engaged thereby (less refund amounts to TSC, as applicable),

and they represent "the profits that Defendants improperly gained as a result of their alleged false, misleading, and disparaging advertising." (*Id.*)

Moreover, Jarosz calculated the lost sales Diamond suffered as a result of the Exit Defendants' improper conduct (i.e., the lost revenues from Diamond Owners who are in default on their loans ("default damages") or whose loan payments are delinquent, but not yet in default ("delinquency damages")). (*Id.* at 22.)

In his damages calculation, Jarosz accounts for various offsets for Diamond's resale of certain points and the possibility that some Diamond Owners would have defaulted even in the absence of Defendants' conduct ("organic default"). (UF-DIA-Opp'n ¶166.) Thus, default damages were "calculated as the difference between 1) loan payments, plus points resale for organic defaults, less maintenance fees for organic defaults; and 2) points resale for actual defaults, less maintenance fees for actual defaults."(UF-DIA-Opp'n  ¶167.) Delinquency damages are calculated differently and do not offset amounts for resale because Diamond has not reclaimed such points and, therefore, has no opportunity to resell them or any obligation to pay maintenance fees. (UF-DIA-Opp'n ¶168.) However, organic default is still accounted for in the calculation. (*Id.*) Based on these calculations and after all adjustments, Jarosz calculates Diamond's total amount of lost revenues to be approximately $16.7 million. (UF-DIA-Opp'n ¶169.)

As discussed above, the Exit Defendants' rebuttal damages expert, Antonio Argiz, claims to disagree with Jarosz's calculations. Argiz calculates that Diamond has suffered at least $1.82 in lost revenues and $0.77 million for disgorgement of profits—a sum total of $2,585,730. (UF-DIA-Opp'n ¶162.) Thus, there is no question the Diamond has suffered quantifiable damages that can be attributed to Defendants' false and misleading advertising statements.  (UF-DIA ¶96, Ex. 130, Jarosz Report, (explaining that lost revenue damages would be the same for Diamond's Lanham Act and tortious interference claims).) The precise amount of those damages, however, is an issue of fact that must be decided by the jury at trial. *See Zetwick*, 850 F.3d at

441; *Direct Techs., LLC*, 836 F.3d at 1067; *Pan Pac. Retail Props.*, 471 F.3d at 970; *Cutter Biological, Inc.*, 971 F.2d at 381.

## E.   All Of The Subject Statements Were Made Within The Statute Of Limitations.

Diamond's Lanham Act claims were timely. *Karl Storz Endoscopy-Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 857 (9th Cir. 1992) (three-year statute of limitations for fraud applies to Lanham Act claims). TSC's and RAG's argument that Lanham Act claims are somehow entirely barred is unconvincing.

**First**, all of the subject statements were made within the three-year window. (UF-DIA-Opp'n ¶170, Ex.250, Moss Decl., at ¶7 (metadata shows advertisements produced in this litigation were from 2017).) Diamond's Lanham Act claims were filed in January 2020, and were thus timely.

**Second**, generic testimony from one Diamond employee is hardly enough to warrant dismissal of Diamond's Lanham Act claims. Ms. Gingras, Diamond's vice president of financial analytics, testified that she "started to notice" unidentified "activities" by unnamed entities. (UF-DIA-Opp'n ¶171.) Ms. Gingras did not testify as to the specific statements (which form the foundation of Diamond's claims here), or even that her initial experiences with "exit" companies were the Defendants. (*Id.*) In fact, Ms. Gingras testified that she did not know when Diamond first started losing revenue due to Defendants' conduct, and that her testimony was limited to knowledge based on generic account codes used to identify any Owners that were working with "exit" companies. (*Id.* ¶172.) During the deposition, TSC's counsel even agreed that it sounded like Diamond did not have an "eureka moment." (*Id.* ¶173.)

**Third**, even if such testimony were enough to justify the start of the limitations period, such a determination needs to be made by the jury. *Dean v. United of Omaha Life Ins.*, 2007 WL 7079558, *11 (C.D. Cal. 2007) ("These facts are subject to opposing inferences and are not sufficient to foreclose application of the discovery rule at this time. [Defendant's] motion for summary judgment on the basis of the

-38-

statute of limitations is DENIED."); *see also* Section VI.D.4, *infra* (discussing California's discovery rule). At trial, the jury will consider the circumstances surrounding Defendants' operations, and not just general testimony about the inception of the "exit" industry. For example, to identify when Diamond knew of the Lanham Act violations, the jury needs to consider several factors, including: (i) the subject statements were not limited to traditional advertising, but were also made in sales presentations to Owners over the phone or in person (UF-DIA ¶¶23-25, 32) (Fourth Am. Compl. ¶¶6, 80, 153); (ii) the subject statements were made after January 2017 (UF-DIA-Opp'n ¶170); (iii) TSC and RAG did not negotiate directly with Diamond and instead relied on third-party attorneys to provide the "exit" services (UF-DIA ¶41) (Fourth Am. Compl. ¶34); and (iv) after the Exit Company Defendants engage the Owners, several months pass before Owners are introduced to the Lawyer Defendants (UF-DIA ¶43) (Fourth Am. Compl. ¶196.) Diamond did not somehow know Lanham Act violations were occurring the moment it first learned of TSC's or RAG's existence. Any statute of limitation issues will require a detailed factual analysis and must be submitted to the jury.

### F. Case Law Supports Liability Under The Lanham Act.

Despite the Exits Defendants' assertions of a lack of causation or damages, cases establish Lanham Act liability where the subject statements are literally false and misleading. *See Allergan*, 364 F. Supp. 3d at 1109-12 (defendant's statements regarding legal compliance in drug advertising were literally false; Lanham Act satisfied); *Obesity Research*, 310 F. Supp. 3d at 1119-21 (advertising misrepresented efficacy of weight loss drug based on a "major university study"; literal falsity established on summary judgment); *Nat. Grange*, 334 F. Supp. 3d at 1066-67 (disaffiliated state entity's assertion it was still affiliated with national entity held literally false on summary judgment); *AECOM*, 348 F. Supp. 3d at 1055-57 (website misrepresented accomplishments; granting summary judgment on falsity). And courts find literal falsity where, among other things, a business fails to adhere to

promises of a guaranty, or the efficacy of its service. *See Church & Dwight Co., Inc. v. SPD Swiss Prec. Diag., GmBH*, 843 F.3d 48, 65-73 (2nd Cir. 2016) (advertising falsely implied its product was "consistent with the metric used by doctors"); *Allergan*, 364 F. Supp. 3d at 1109-12 (literally false statement asserting legality of drug manufacturing sufficient to grant summary judgment).

In such cases, establishing these elements on summary judgment is routine, regardless of whether actual damages or causation. *See, e.g.*, *Allergan.*, 364 F. Supp. 3d at 1109-12, 1115 (granting partial summary judgment as to liability under the Lanham Act where plaintiff established subject statements were literally false and without any discussion of causation or damages); *Church & Dwight Co.*, 843 F.3d at 72 ("At the liability stage, the Lanham Act 'demands only proof providing a *reasonable basis* for the belief that the plaintiff *is likely to be damaged* as a result of the false advertising.'") (emphasis in original); *accord Obesity Research*, 310 F. Supp. 3d at 1126-1127 (denying parties' motions for summary judgment on element of likelihood of injury and stating: "The Court does not discount the lack of financial documents and analysis documenting FRI's damages, but finds that the weighing of each party's evidence (or lack thereof) is best suited for a jury").

As set forth herein and in Diamond's Motion, the indisputable facts establish that: (1) each of the subject statements is literally false or misleading; (2) the subject statements constitute commercial advertising or promotion; (3) the subject statements were deceptive and material; (4) the Exit Defendants caused the subject statements to enter interstate commerce; and (5) Diamond has been or is likely to be injured as a result of the false statements—however, the amount of damages caused by Defendants' misconduct will be determined at trial.  Under these circumstances, the Exit Defendants' liability under the Lanham Act is established.

## V. THIS COURT SHOULD DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE CALIFORNIA FALSE ADVERTISING LAW.

Defendants argue that Diamond's California False Advertising Law, Cal. Bus. & Prof. Code § 17500, claim fails for the same reasons as the Lanham Act claims. Here, the Lanham Act claims are substantially congruent with the false advertising § 17500 claims. *Allergan*, 364 F. Supp. 3d at 1107-08; *Cleary v. News Corp.*, 30 F.3d 1255, 1263 (9th Cir. 1994); *Obesity Research*, 310 F. Supp. 3d at 1117 n.18 (same); *Summit Tech. v. High-Line Med. Instrs., Co.*, 933 F. Supp. 918, 943 (C.D. Cal. 1996) (same). Because Diamond's Lanham Act claims should not be dismissed for the reasons argued above, neither should their False Advertising Claims. According, Defendants' Motions should be denied.

## VI. THIS COURT SHOULD DENY DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AS TO THE TORTIOUS INTERFERENCE CLAIMS.

### A. Contract Validity, Defendants' Knowledge, Intentional Act To Breach Or Disrupt, And Actual Breach Or Disruption Are Established.

Defendants concede that four of the five elements Plaintiffs must prove for their tortious interference claim are undisputed: (1) Owners had a valid and enforceable contract with Diamond; (2) Defendants had knowledge of these contracts; (3) Defendants intended to induce breach and/or disrupt the Owners' contractual relationships with Diamond; and (4) Diamond's contractual relations with the Owners were actually disrupted and/or breached. *Blizzard Ent. Inc. v. Ceiling Fan Software LLC*, 28 F. Supp. 3d 1006, 1015 (C.D. Cal. 2013); (Diamond's Mot. at 28-31.) Defendants argue that dismissal on summary judgment is appropriate because Plaintiffs have failed to present any evidence to prove the final element of causation and damages. This is incorrect. As laid out further below, Diamond has presented significant evidence of the damages caused by the Defendants' interference

-41-

and/or disruption.  There is a triable issue on causation and damages and dismissal of this claim on summary judgment is inappropriate.

### B.  Diamond Owners Have Enforceable Contracts That Were Disrupted By Defendants.

As detailed in Diamond's Motion, it is undisputed that the Owners and Diamond entered into valid and enforceable contracts.  (UF-DIA ¶¶2, 36, 97-99.) They are enforceable despite Defendants' references throughout its brief to Diamond's alleged sales practices.  Even assuming Diamond's sales practices could lead to a court voiding the contract, the contracts remain valid and enforceable even if potentially voidable and Defendants are prohibited from interfering.  *See* REST. (2D) TORTS § 766, cmt. f; *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1127 (1990) (affirming cause of action for interference with voidable contracts because "it is the contractual relationship, not any term of the contract, which is protected against outside interference" ); *Signal Hill Serv., Inc. v. Macquarie Bank Ltd.*, 2013 WL 12244056, *35 (C.D. Cal. June 12, 2013)("[E]ven a third party's action to induce the termination of a contract that can be legally terminated can support an interference with contractual relations claim."); Wyndham Order at 16, Lin Decl. ¶91, Ex. 258 (rejecting "unenforceable contract" defense because the "Lawyer Defendants' claim that the timeshare contracts are either void or voidable does not bar Plaintiffs' [tortious interference] claim").

Diamond presented extensive evidence of Defendants' intentional acts to disrupt the contracts. (UF-DIA ¶¶69-71, 74-76.) The Exit Defendants' services exist ***because*** there is a valid timeshare contract between Diamond and its Owners, and purport to provide a legal cancellation of the contract. (*Id.* ¶16.)

In defense to its false advertising that states Defendants provide a "legal exit" of the contract, Defendants argue that "urging owners to breach their contracts" is a legal termination.  (Exit Defs. MSJ at 45 n. 4.)  This argument is disingenuous on many levels.  **First**, the evidence shows the scheme involves duping Owners into

-42-

paying Defendants thousands of dollars for legal services—not just defaulting on the contract.   **Second**, Defendants' statements would still be false and misleading because an Owner stopping payment for a "legal termination" does not require attorney services and should not require thousands of dollars of "exit services." **Third**, "urging owners to breach their contracts" is textbook tortious interference.  If Defendants admit that they advertise and provide a service consisting of "urging owners to breach their contracts," Defendants are liable for tortious interference.

## C.   There Is Voluminous Evidence Of Injury And Standing.

As detailed above, Diamond Owners directly state they stopped making timeshare payments because they retained the Exit Defendants. (UF-DIA ¶94; UF-DIA-Opp'n ¶152.) In addition to causing Owners to breach their contracts, the Exit Defendants' wrongful conduct disrupted Diamond's contractual relations by making enjoyment of the contracts "more expensive or burdensome."  *See Upper Deck Co. v. Panini Am., Inc.*, 469 F. Supp. 3d 963, 982 (S.D. Cal. 2020) ("[I]nterference with the plaintiff's performance may give rise to a claim for interference with contractual relations if plaintiff's performance is made more costly or more burdensome.").  The Exit Defendants' interference has injured Diamond through defaulted contracts, maintenance fee carrying costs associated with the defaulted contracts, the loss of future sales, and costly litigation. *See* Section III.D, *supra;* (UF-DIA ¶96.)

Defendants argue that despite this evidence, Diamond lacks standing to pursue their interference with contract claim because "Diamond no longer owns those loans- or loan payments" because "Diamond securitize [sic] these customers' loan obligations and sells them to third parties." (Exit Defs. Mot. at 53.)  Defendants fail to cite to any factual evidence in support of their argument that Diamond no longer owns the loans at issue because that statement is unsupported.   As Ms. Gingras testified, the loan securitization process referred to by Defendants relates to a process of Diamond lending on its collateral, *i.e.* its expected revenue stream from payments made by owners on the loans. (UF-DIA-Opp'n ¶175.)

Moreover, Defendants fail to cite to any evidence or legal citation to support their argument that securitization of loans results in no losses to Diamond on defaulted loans included within that securitization.   Nor could they make this argument.   As Ms. Gingras testified, Diamond remains responsible for addressing defaulted loans that are contained within a securitization.   (UF-DIA-Opp'n ¶176.) Defendants' rebuttal expert, Mr. Argiz, takes the securitization process into consideration and concludes that Diamond suffered losses as the result of Defendants' actions.   (UF-DIA-Opp'n ¶162.)   Thus, according to Defendants' expert witness, Diamond was injured and has standing to pursue a claim for tortious interference.   Defendants also argue that Diamond lacks standing as proven by the named entity on the IRS Form 1099-C which is issued to owners whose contracts have been cancelled.   The named entity is Diamond Resorts Financial Services, Inc. which is the servicer of the loan – not the owner.   (UF-DIA-Opp'n ¶174.)

Defendants made similar arguments in *Wyndham* based upon the parent-subsidiary relationship between the plaintiffs in that case and the entity signing the contracts.   In that case, the parent company/plaintiff presented evidence that they employ personnel to conduct sales presentations as to market the timeshares. (Wyndham Order at 8, Lin Decl. ¶91, Ex. 258.) Although subsidiary companies executed the contracts with the owners, the parent entities assisted with customer relations after the contract was executed, and handled the default accounts and accepted the return of defaulted inventory. (*Id.* at 8-9.) With these facts, the *Wyndham* court denied summary judgment because although "Plaintiffs have failed to demonstrate beyond speculation monetary damages the Parent Corporations incurred from the breached timeshare contracts, there is evidence that the Parent Corporations are not complete strangers to the contracts at issue in this case." (*Id.* at 9.) Moreover, the court determined that the plaintiff could be entitled to an injunction to redress the harm caused by the exit defendants' misrepresentations. (*Id.*)

-44-

Similar to the evidence presented in *Wyndham*, Plaintiffs have presented evidence that it is "not complete strangers to the contracts at issue in the case," and in fact, evidence that they suffered direct economic loss and injury that can redressed by injunctive relief. At most, the evidence of securitization and the servicer's name on the IRS Form 1099-Cs create a dispute of fact as to whether Diamond suffered injury and has standing. Summary judgment in favor of Defendants is inappropriate.

### D.  There Is Voluminous Evidence Of Causation And Damages.

#### 1.  *Baldwin Report*

As detailed above, Dr. Baldwin conducted an analysis of the payment behavior of Diamond Owners and discovered a statistically significant correlation between the odds of default on the timeshare obligations and the association with an "exit" company. (UF-DIA ¶95, Ex. 129, Baldwin Report, at DIUS_DIHI 153406.) Dr. Baldwin also concluded that Defendants' involvement with an Owner demonstrated an even stronger association with a default. (*Id.*) In fact, the odds of default increased by over 4600% when the Defendants were associated with the Owner. (*Id.*) Dr. Baldwin's analysis raises a factual issue of whether Defendants interfered with or disrupted the contractual relationship between Diamond and the Owners.

#### 2.  *Jarosz Report*

In addition to evidence of causation, Diamond has presented evidence as to the amount of damages it incurred as a result of Defendants' tortious interference. According to the expert analysis of Mr. Jarosz, Diamond's losses resulting from Defendants' tortious interference with Owners' contracts totaled $16.7 million. (UF-DIA-Opp'n ¶169.) Defendants' expert calculated the amount of the damages at a lower amount. (UF-DIA-Opp'n ¶162.) This dispute between the experts as to the amount of damages creates a material dispute of fact and dismissal of the claim on this basis is inappropriate.

#### 3.  *Defendants cannot rely upon a "predisposal to breach" argument*

Defendants also argue in their Motions that they cannot be liable for causing Owners to breach their contracts because the Owners were going to breach their contracts in the absence of Defendants' involvement. This is both factually and legally incorrect.

**First**, Owners testified that they did not intend to breach their contract until being advised to do so by the Exit Defendants. (UF-DIA ¶73.) There is no factual evidence to support the argument that the Owners would have breached their timeshare contracts even if they did not seek Defendants' "exit" services.

**Second,** the Owners sought Defendants' "exit" services because they wanted to "legally" terminate their timeshare contracts in a manner and consistent with Defendants' promises, such as through negotiation with Diamond or litigation. (UF-DIA ¶84.) If these Owners were predisposed to simply breach their contracts and walk away, the Owners would have never contacted Defendants – and never paid Defendants the large fees for the legal "exit" services. *Westgate Resorts, Ltd. v. Sussman*, 387 F. Supp. 3d 1318, 1357 (M.D. Fla. 2019) (finding that a timeshare owner seeking the services of an "exit" company "illustrates not a predisposition to breach but a concerted effort to find a legitimate way to terminate their timeshare").

And even assuming the Owners had complaints about Diamond as Defendants argue, that does not mean that these Owners intended to stop payments and suffer the negative financial consequences.  As explained by a federal court involving a similar timeshare exit scheme:

> Expressing displeasure with mounting payments and looking to exit does not amount to reneging on contractual obligations to pay. These owners felt ensnared precisely because they recognized their continually mounting contractual duties. They sought out services they believed would spring them from the trap, when instructed (directly from [the exit lawyer] or via exit company), they stopped paying.

*Sussman*, 387 F. Supp. 3d at 1357 (finding plaintiffs proved causation on tortious interference claim).

***Third***, Dr. Baldwin's analysis found the odds of default significantly increased when Defendants were involved with the Owners. (UF-DIA ¶95, Ex. 129, Baldwin Report, at DIUS_DIHI 153406.) Statistical analysis reveals that the Owners were not predisposed to breaching their contracts, but instead breached their contracts when they became involved with Defendants.

The Court should reject Defendants' arguments that the Owners would have breached without the involvement of Defendants.

4.   *There are fact issues relating to the statute of limitations, which do not bar the claim.*

California's "discovery rule" and the attendant fact issues preclude summary judgment as to instances of default before January 31, 2018.[17] A jury should determine the accrual date for tortious interference claims based on contracts where the Owner defaulted before January 31, 2018.

The "discovery rule" is an equitable rule that postpones accrual of a claim until plaintiff discovers, or has reason to discover, the underlying facts.  Cal. Civ. Proc. § 339; *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999); *Eisenberg Vill. of L.A. Jewish Home for the Aging v. Suffolk Constr. Co., Inc.*, 53 Cal. App. 5th 1201, 1213 ("It is an equitable rule, intended to avoid unjustly depriving plaintiffs of a remedy for their injuries when they have been diligent in seeking to protect their rights."). This rule "protects those who are ignorant of their cause of action through no fault of their own" and suffer from injuries from acts that are hard to detect. *April Enters., Inc. v. KTTV*, 147 Cal. App. 3d 805, 832 (1983) ("A common thread seems to run through all the types of actions where courts have applied the discovery rule. The injury or the act causing the injury, or both, have been difficult for the plaintiff to detect."); *Gryczman v. 4550 Pico Partners, Ltd.*, 107 Cal. App. 4th 1 (2003) (same).

---

[17] The discovery rule also precludes summary judgment on the Slattery Defendants' request for a bar on all tortious interference claims before May 6, 2018.  (Slattery Defs.' Mot. at 15.)  For the reasons discussed in this section, Diamond did not know of the "basic facts giving rise to potential liability" merely because it received a demand letter from the Slattery Defendants.  Relation back is of no consequence given certain facts at issue here, namely the concealment of Defendants' conduct.

Courts have applied the "discovery rule" in the context of intentional interference torts. *See Honda Trading Am. Corp. v. Basf Corp.*, 2020 WL 5913492, *3 (C.D. Cal. 2020) (applying discovery rule to tortious interference claims); *Curley v. Wells Fargo & Co.*, 2014 WL 2187037, *6 (N.D. Cal. 2014) ("California courts have applied the discovery rule to claims for interference with prospective business advantage or interference with contract."); *Nano-Second Tech. Co., Ltd. v. Dynaflex Intern.*, 2013 WL 1855828, *1, *3 (C.D. Cal. May 1, 2013) (denying summary judgment on statute of limitations because neither party offered evidence as to when "plaintiff became aware" of the facts underlying the tortious interference claims). !

Critically, the discovery rule is a fact issue that prevents summary judgment. *Spence v. Clary*, 2021 WL 304391, *4 (C.D. Cal. 2021) ("Ordinarily we leave the question of whether a plaintiff knew or should have become aware of a fraud to the jury. Where there are disputed questions of fact or facts susceptible to opposing inferences as to when the statute of limitations for fraud commenced, summary judgment is not appropriate.") (citing *Gen. Bedding Corp. v. Echevarria*, 947 F.2d 1395, 1397 (9th Cir. 1991)); *Dean*, 2007 WL 7079558, at *11 (denying summary judgment based on fact issues surrounding the discovery rule).

Here, to identify the accrual date, the Court must apply the discovery rule and allow the jury to hear evidence regarding when Diamond learned of the tortious interference. Defendants engaged in a multi-layer, multi-party scheme that prevented Diamond from identifying the causes for the default for a given timeshare contract. Indeed, because Defendants hide their involvement, Diamond could not confirm which of the Diamond Owners had retained the Exit Defendants or were represented by the Lawyer Defendants—until Diamond's counsel received the client list of represented Diamond Owners in discovery. Nor is the default date on a Diamond Owner contract dispositive. Rather, the jury must determine when Diamond learned that **Defendants** induced a breach of the timeshare contracts. For example, the jury

-48-

should consider when Diamond learned that Defendants were telling or encouraging Owners to stop making payments to Diamond.

To determine the applicability of the discovery rule, the jury must consider several factors: (i) some Owners have yet to default (UF-DIA ¶77); (ii) the Slattery Defendants typically send two letters to Diamond with little to no follow up (UF-DIA ¶64) (Fourth Am. Compl. ¶¶125, 130, 146); (iii) the Slattery Defendants did not send letters for every Owner at issue (UF-DIA ¶55); (iv) the McCroskey Defendants did not send letters to Diamond after 2017 or 2018 and hide their involvement in the "exit" process from Diamond (UF-DIA ¶¶57, 63) (Fourth Am. Compl. ¶125); (v) Defendants do not communicate with Diamond for the purposes of litigating or negotiating an "exit" (UF-DIA ¶¶41, 64) (Fourth Am. Compl. ¶¶27, 29, 33, 38); (vi) Defendants pretended to be the Owner or a relative when calling Diamond directly (UF-DIA-Opp'n ¶177); and (vii) after the Exit Company Defendants engage the Owners, several months pass before the Owners are introduced to the Lawyer Defendants. (UF-DIA ¶43) (Fourth Am. Compl. ¶¶196-97.) Defendants cannot repeatedly conceal their involvement in a nationwide consumer scam, and then be rewarded for such conduct.  Rather such facts must be considered by the jury to determine the applicability of the discovery rule.

Indeed, federal courts, including those in the Ninth Circuit, routinely find that concealment of tortious interference is a fact issue that precludes judgment as a matter of law.  *Puri v. Khalsa*, 674 Fed. App'x 679, 687 (9th Cir. 2017) (applying discovery rule to tortious interference claim "based on [defendants'] concealment of facts regarding business and board operations"); *Rosenthal & Rosenthal of Cal., Inc. v. Hilco Trading, LLC*, 2020 WL 2510587, *8 (C.D. Cal. 2020) (applying discovery rule to tortious interference claim where defendants allegedly hid information to "keep plaintiff in the dark"); *Bral Corp. v. Johnstown Am. Corp.*, 919 F. Supp. 2d 599, 612 (W.D. Pa. 2013) (denying summary judgment on tortious interference and fraud claims based on statute of limitations to allow "the fact-finder to make a proper

determination as to the tolling period under the discovery rule"; fact issues concerned "withheld information," "ghost-written letters," and the point at which one could connect the misconduct to the alleged harm); *Peter Farrell Supercars, Inc. v. Monsen*, 82 Fed. App'x 293, 299 (4th Cir. 2003) (lower court did not err by applying discovery rule and allowing the jury to determine if customer was diligent in uncovering fraud; question of whether "party used due diligence to discover the fraud must be ascertained by an examination of the facts and circumstances unique to each case").

In short, Diamond could not identify the tortious interference for the Owners at issue until two events occurred: (i) that Owner, or one of the Defendants, made an affirmative representation indicating that Defendants were providing "exit" services; and (ii) Defendants were directing or encouraging nonpayment.  The accrual analysis is further complicated by the fact that the Owners' timeshare contracts required monthly and annual payments.  *See Tsemetzin v. Coast Fed. Sav. & Loan Ass'n*, 57 Cal. App. 4th 1334, 1346 (1997) ("Periodic monthly rental payments called for by a lease agreement create severable contractual obligations where the duty to make each rental payment arises independently and the statute begins to run on such severable obligations from the time performance of each is due.").  Given the many fact issues surrounding the accrual date, summary judgment based on the statute of limitations is not appropriate.

### E.    Case Law Supports Liability Under TIWC

> 1.    *Westgate Resorts v. Sussman and Wyndham Vacation Ownership, Inc. v. Sussman are distinguishable.*

The Exit Defendants claim that "Diamond cannot create a material issue of fact as to whether the Exit Defendants' actions caused Diamond owners to stop making payments." (Exit Defs. MSJ at 49.) Specifically, the Exit Defendants claim that Diamond must offer individualized proof of causation in the form of testimony from each owner at issue based on the holdings in *Westgate Resorts, Ltd. v. Sussman*,

2019 WL 3848805 (M.D. Fla. 2019) and *Wyndham Vacation Ownership, Inc. v. Sussman*, 2021 WL 4949162 (M.D. Fla. 2021), *reconsideration denied*, 2021 WL 5174784 (Nov. 2, 2021). The Exit Defendants are wrong and mischaracterize the holdings in those cases, which actually support Diamond's claims here.

For example, the court in *Westgate* expressly stated that the plaintiff timeshare developers could establish proximate cause for their tortious interference claims by utilizing statistical evidence interpreted by an expert statistician. The court consequently ordered (1) additional briefing "on the admissibility of statistical evidence to support causation as it relates to the damages element of a tortious interference with contractual relations claim"; and (2) for plaintiffs to identify the statistician they intended to use to establish causation for their tortious interference claims. 2019 WL 3848805 at *2. But the plaintiffs responded that they did not intend to offer expert opinions from ***any*** statistician or ***any*** traditional statistical analysis. *Id.* Instead, the plaintiffs advised the court that "they intend[ed] to offer expert opinions from Steve Wolf, an accountant who analyzed Plaintiffs' business records and owners' payment history in relation to when Mr. Sussman sent Plaintiffs a letter of representation." *Id.*

As a result, the court in *Westgate* granted summary judgment in the defendants' favor, explaining:

> What answers the question of what did owners do as a result of Mr. Sussman's interference is, quite simply, testimony from owners (as the Court said at the Pre-Trial Conference). ***Alternatively, the Court was willing to entertain the possibility that statistical evidence could bridge this gap—which is why the Court asked the parties for briefing.*** That's out, so ***the only remaining possibility is hearing from the owners***. In no circumstances will the Court allow a case to proceed to a jury trial when it hangs on such loose evidentiary threads that Plaintiffs submit here. Plaintiffs' contentions that Mr. Sussman's actions and words suffice to establish the outstanding causation and damages issues are rejected.

*Westgate*, 2019 WL 3848805 at *2 (emphasis added) (internal citation omitted).

Thus, the court in *Westgate* did **not** hold that individualized proof was required to establish a plaintiff's tortious interference claim.  Quite the opposite.  The above

-51-

highlighted language from the *Westgate* opinion is conveniently omitted from the Exit Defendants' motion because it establishes that Diamond **does** meet its evidentiary burden in this action through the testimony and evidence presented by its expert statistician, Dr. Baldwin.  Critically, **the Baldwin Report analyzes statistical data on the cohort Diamond Owners that are at issue in this case**.  This is precisely the type of statistical evidence the *Westgate* court indicated would "bridge the gap" and establish causation for a tortious interference claims.  As such, Diamond's tortious interference claims can and should proceed to trial. *See Newton Group*, Order at 35, Lin Decl. Ex. 265 (statistical analysis from Dr. Baldwin creates fact issue as to causation; denying defendants MSJ on tortious interference).

The Exit Defendants also seek dismissal of the tortious interference claims because, as in *Westgate,* Diamond cannot rely on "a select few timeshare owners" to establish causation as to all "1,000 plus" owners.  This argument is equally baseless.

As a preliminary matter, the Exit Defendants assertions that "no owner testified here that he or she would have continued making payments 'but for the [exit] defendant's [alleged] interference,'" and that "evidence shows that . . . many of those owners stop paying *before* they contacted Pandora or RAG," Exit Defs. MSJ at 50, are simply false.  (UF-DIA ¶94; UF-DIA ¶95, Ex. 129, Baldwin Report, (finding based on statistical data and analysis that Diamond Owners are 20 times more likely to default *after* retaining the Lawyer Defendants to perform "exit" services).)[18]

Moreover, Diamond has found direct communications between over 100 Diamond Owners and Defendants indicating that Defendants directed Diamond Owners to stop making payments to Diamond.[19] (UF-DIA-Opp'n ¶¶152-155.)

---

[18] Even if the Diamond Owners at issue stopped making payments shortly before officially retaining Defendants, this would not support summary judgment on Diamond's tortious interference claims. *See Aaronson*, 371 F. Supp. 3d at 1110 n.17 (denying defendant's summary judgment motion where evidence showed that "nearly 40% of Defendants' Diamond clients generated by the website stopped paying Diamond *just before or after hiring them*") (emphasis added).
[19] Because RAG did not complete its document production until well after the Court ordered deadlines, Diamond anticipates that more examples will be available at the

Diamond's individualized evidence is consequently much stronger and more consistent than the "exemplars" analyzed in *Westgate*—two of which "d[id] not fit the 'pattern' of owner" under litigation. Thus, there is competent evidence for a reasonable jury to find causation.

*Wyndham* is also easily distinguishable. Again, the Exit Defendants' motion ignores the fact that the *Wyndham* court acknowledged expert testimony can be sufficient evidence for a plaintiff to prove causation for a tortious interference claim. 2021 WL 4949162 at *5 ("Without some form of direct testimony from these owners ***or expert testimony*** to fill in the gaps between TET's general practices and the decisions of the individual owners, [the timeshare company] cannot prove causation.") (emphasis added). However, the plaintiffs in *Wyndham* failed to submit *any* admissible expert testimony to establish causation. *Id.* The only evidence submitted by the *Wyndham* plaintiffs to establish causation was: (1) testimony from three timeshare owners indicating they stopped making payments because of defendants; (2) testimony from defendants' officers regarding their general practices in communicating with clients; and (3) "the fact that 208 of the 250 relevant owners stopped making their timeshare payments after hiring [defendants]." *Id.* This is vastly different from the voluminous evidence Diamond offers to support its tortious interference here.[20]

## VII. **THIS COURT SHOULD DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE UCL CLAIMS.**

The Defendants, in cursory fashion, argue that the UCL claims should be dismissed because there is no material fact issue regarding: (1) the existence of unlawful, unfair and fraudulent acts, including their unregistered attorney referral

time of trial as Diamond's analysis of the discovery produced by the parties in this case continues.

[20] It is also notable that the Wyndham court denied the defendant's motion for summary judgment as to the three timeshare owners for whom Wyndham offered direct testimony, holding: "This testimony and the circumstances surrounding their non-payment create an issue of fact as to whether TET caused those owners to breach." *Sussman*, 2021 WL 4949162, at *5.

service; (2) injury and standing; and (3) causation and damages.  Ample evidence counters each of these arguments, and the Motion should be denied.

**A.**     **There Is Voluminous Evidence Of Unlawful, Unfair, And Fraudulent Acts.**

As set forth in Diamond's Motion, Defendants' have engaged in unlawful, unfair and fraudulent acts.

1.    *Defendants' conduct is unlawful.*

Undisputed facts show that the Exit Defendants have violated the Lanham Act, violated the California False Advertising Law, tortiously interfered with Diamond's contracts with Owners, and engaged in a civil conspiracy to effectuate the "exit" scheme.  The undisputed facts show that the Slattery Defendants have contributed to the Exit Defendants' false and misleading advertising, aided and abetted the Exit Defendants' tortious interference of the contracts, and engaged in a civil conspiracy.

2.    *Defendants' conduct is unfair.*

As detailed above and in Diamond's Motion, the Exit Defendants' advertising of its "exit" services is false, misleading and/or are likely to mislead or confuse the public. For example, Defendants advertise that they legally terminate contracts based upon timeshare developer's misrepresentations and unethical sales practices and through the legal work of attorneys based on consumer protection laws. (UF-DIA ¶¶16-17.) However, the Exit Defendants admit that they have no substantive communications with developers and the Slattery Defendants admit that they do not file in-court litigation against Diamond nor do they negotiate an "exit" to Diamond contracts. (UF-DIA ¶¶41, 49, 53.) Contrary to the advertisements, because the Diamond Owners are encouraged to stop making payments, cancellation is procured by breach or default—and not a legal negotiation based on unethical sales for which a lawyer is required. (UF-DIA ¶¶70-73, 78-79, 85.) Thus, Owners pay thousands of dollars to Defendants for an outcome that can be reached for free—by simply defaulting on the contract.

-54-

3.    *Defendants' conduct is fraudulent.*

The Exit Defendants' advertising and oral presentations include multiple statements likely to deceive the public. These includes statements (among others) the Exit Defendants legally terminate contracts based upon unethical sales practices, that a lawyer will file litigation in order to cancel the contract and that the "exit" service has a 100% success rate. (UF-DIA ¶¶16-20.) In reality, the Exit Defendants encourage the Owners to stop making timeshare payments to Diamond and the contract is cancelled due to default. (UF-DIA ¶¶70-73, 78-79, 85.) Similarly, the Slattery Defendants are aware and contribute to the misleading advertisements. They know that the Exit Defendants promise Owners an attorney will file in-court litigation based upon unethical sales tactics and encourage Owners to stop making timeshare payments. (UF-DIA ¶¶46-48.) Despite knowing about these misrepresentations, and that there is no way to force Diamond to cancel a contract, the Slattery Defendants continue to accept referrals. (UF-DIA ¶¶48, 78.)

**B.    Defendants Admit They Engage In Referrals, Which Violates Cal. Bus. & Prof. Code § 6155.**

In their Motion, the Exit Defendants admit they provide lawyer referral services to the public:

- "As part of their business models, Pandora and RAG assign each of their customers to a referred attorney for legal representation." (ECF 596 at 19.)
- "The Exit Defendants' business involves connecting owners with attorneys who will represent them in seeking to cancel or rescind." (*Id.* at 45.)

Similarly, the Slattery Defendants entered into oral and written agreements whereby they accepted hundreds of referrals of Diamond Owners, and other timeshare owners, from the Exit Defendants. (UF-DIA ¶¶43-44.)

Neither TSC nor RAG are lawyer referral services certified by CalBar. (UF-DIA ¶¶124, 151.) This by itself establishes a violation of § 6155 by the Exit Defendants and the Slattery Defendants.   *See* Cal. Bus. & Prof. Code § 6155

-55-

(prohibiting operation of an unregistered lawyer referral service, and prohibiting an attorney from accepting referrals from an unregistered service); *Jackson v. LegalMatch.com*, 42 Cal. App. 5th 760, 773 (2019). In turn, this satisfies the unlawful prong of § 17200. *See LegalForce RAPC Worldwide P.C. v. UpCounsel, Inc.*, 2019 WL 160335, *15 (N.D. Cal. 2019) (UCL claim can be based on defendant's violation of § 6155); *Estakhrian v. Obenstine*, 2019 WL 3035119, *17 (C.D. Cal. 2019) (§ 17200 based on violations of analogous Cal. Bus. & Prof. Code § 6152, regarding attorney solicitation).

### C.    There Is Voluminous Evidence Of Damages.

As detailed above in Section III.B., Diamond has put forth significant evidence of its damages to defeat summary judgment.   In addition to Owner testimony admitting that they stopped payments to Diamond relying upon advice from the Defendants, Diamond has also presented an analysis of over 100 Owners of the same. (UF-DIA-Opp'n ¶¶152-155.)  In addition, Diamond has presented the analysis of Dr. Baldwin which concludes there is a strong correlation between an increased risk of default rates and the involvement of Defendants with the Owners. (UF-DIA ¶95.) Finally, Mr. Jarosz has calculated the amount of damages to which Diamond is entitled on each of its claims. (UF-DIA-Opp'n ¶169.) Although Defendants' expert disagrees as to the amount, there is no disagreement of the nature of Diamond's damages.

### D.    Case Law Supports Liability Under The UCL.

Defendants have engaged in unlawful, unfair and fraudulent business practices that violate the UCL.  *See Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999); *Blizzard*, 28 F. Supp. 3d at 1017 ("A claim under the UCL unlawful prong may be premised upon the unlawful actions that constitute tortious interference with contractual relations."); *Obesity Research*, 310 F. Supp. 3d at 1117 n.18 (finding that "a violation of the Lanham Act would fulfill the UCL's 'unlawful' prong"); *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1107 (9th

-56-

Cir. 2007); *Summit Tech.*, 933 F. Supp. at 943 ("[U]nder § 17200, Plaintiff may redress violations of … the Lanham Act … and Cal. Bus. & Prof. Code § 17500."); *LegalForce*, 2019 WL 160335, at *15 (UCL claim can be based on defendant's violation of § 6155); *Brady v. Bayer Corp.*, 26 Cal. App. 5th 1156, 1173 (2018); *POM Wonderful LLC v. Purely Juice, Inc.*, 2008 WL 4222045, *13 (C.D. Cal. 2008); *see Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002); *Mass. Mut. Life Ins. Co. v. Superior Ct.*, 97 Cal. App. 4th 1282, 1290 (2002); *Newton Group,* Order at 36-37, Lin Decl . Ex. 265 (denying defendants MSJ on deceptive trade practices; direct and circumstantial evidence "exit" scheme participants told customers to stop paying).

The unlawful, unfair and fraudulent acts of the Defendants injured Diamond. Plaintiffs present evidence that Defendants' caused Diamond to "lose money or property." *See* Cal. Bus. & Prof. Code § 17204; Bus. & Prof. Code § 17203 (a court may "make such orders and judgments … as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition"); *Clark v. Superior Ct.*, 50 Cal. 4th 605, 613 (2010); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003) ("The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest."). These include damages for defaulted contracts, maintenance fee carrying costs associated with the defaulted contracts, lost future sales, and additional damages relating to the continuation of the referral relationship between Defendants. *See* Section III.D, *supra*; (UF-DIA ¶96.) Defendants' expert disputes the amount of these damages, but not that Diamond suffered damages resulting from conduct that violates the UCL. Thus, the amount of restitution is a triable issue.

The UCL was enacted to protect consumers and competitors from the very type of business practices employed by Defendants' scheme. *Cel-Tech*, 20 Cal. 4th at 181 (UCL has "broad, sweeping language, precisely to enable judicial tribunals to

-57-

deal with the innumerable new schemes which the fertility of man's invention would contrive"). Accordingly, the Court should deny Defendants' Motion.

## VIII. **THIS COURT SHOULD DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO AIDING & ABETTING.**

The Court should deny the Defendants' request for summary judgment as to aiding and abetting tortious interference and UCL violations.[21]  Evidence shows the Slattery Defendants: (i) know of the Exit Defendants' illegal conduct; and (ii) substantially assist the Exit Defendants in furthering that conduct. *See Neilson v. Union Bank of Cal.*, 290 F. Supp. 2d 1101, 1120, 1129 (C.D. Cal. 2003); *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1476 (2014); *Berg & Berg Enters., LLC v. Sherwood Partners, Inc.*, 131 Cal. App. 4th 802, 823 n.10 (2005) (defendant need only "reach a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act"). Critically, this Court previously held that knowledge and substantial assistance could be based on the Slattery Defendants acceptance of referrals and knowledge of the improper conduct in the "exit" scheme. *Diamond Resorts U.S. Collection Dev., LLC v. Pandora Mktg., LLC*, 2021 WL 1573073, *11-*12 (C.D. Cal. 2021) (internal quotes and citations omitted).

### A.   **The Slattery Defendants Know That The Exit Defendants Are Interfering With Diamond's Timeshare Contracts And Committing UCL Violations.**

Discovery confirms that the Slattery Defendants know that the Exit Defendants are committing tortious interference and UCL violations.

**First**, due to Defendants' close relationship, the Slattery Defendants are aware of the Exit Defendants' false and misleading advertising. *See* Section II, *supra*; (UF-

---

[21]  As an initial matter, the Slattery Defendants seek summary judgment on Diamond's "state law claims."  This presumably includes Diamond's aiding and abetting tortious interference and UCL claims.  The Slattery Defendants also only advance causation arguments for these generic references to Diamond's state law claims.  (Slattery Mot. at 11.)

DIA ¶¶45-48.) Such advertising misrepresents the "legal services" provided by the Slattery Defendants. (UF-DIA ¶¶16-21, 27-33.)

**Second**, despite knowing that the timeshare contracts are cancelled through nonpayment and default, the Slattery Defendants do not inform Owners that default is the most likely end result of the service. (UF-DIA ¶¶105, 107.) The Slattery Defendants are also aware that there is no way to guarantee a legal exit to a Diamond timeshare contract. (UF-DIA ¶¶78-79.)

**Third**, the Slattery Defendants are aware that the Exit Defendants interfere with Diamond Owner contracts. In addition to strategy meetings and daily correspondence, the Slattery Defendants and Exit Defendants share a Google Drive containing contract information and "exit" progress. (UF-DIA ¶45.) Because of this and other aspects of the Defendants' close business relationship, the Slattery Defendants are aware of the scale of tortious interference and stop payment instructions. (UF-DIA ¶¶72, 111-113, 122.)

Finally, the Slattery Defendants know that the Exit Defendants commit UCL violations. The Slattery Defendants are aware of the false and misleading advertising, concealment of default, stop payment instructions, and other predicate acts. (UF-DIA ¶¶46-48, 72, 107, 112-113, 122.) And the Slattery Defendants knew or should have known that the Exit Defendants were not a certified lawyer referral service, as such information is publicly available. (UF-DIA ¶¶124, 151.)

### B. Documents And Testimony Establish The Causation And Damages Necessary To Prove Diamond's Aiding And Abetting Claims.

The Slattery Defendants substantially assist the Exit Defendants tortious interference and UCL violations. **First**, the Slattery Defendants continue to accept the Exit Defendants' referrals, despite knowing the "exit" scheme is premised on false advertising, misrepresenting the legal services provided, and default. (UF-DIA ¶¶48, 117-118, 122.)

**Second**, the Slattery Defendants substantially assist and encourage the false and misleading advertising, interference and UCL violations by sending "exit" letters to Diamond (if any), without follow-up. (UF-DIA ¶¶51-55.) The letters also re-direct Diamond's communications to the Slattery Defendants instead of the Owner, which hides the "exit" process (and impending default) from the Owners. (UF-DIA ¶118.)

**Third**, the Slattery Defendants do not correct the false and misleading advertising. The Slattery Defendants are aware that Exit Defendants procure clients via guarantees and promises of litigation, class actions, or other legal services that are never provided. (UF-DIA ¶¶46-49, 77-78.) Slattery admits he did not ask this advertising to be changed. (UF-DIA ¶66.)

**Fourth**, the Slattery Defendants conceal the false and misleading advertising. For example, in November 2018, the Slattery Defendants' case coordinator apologized to TSC for informing a customer that the "exit" services were just two letters and a default; the case coordinator said she wouldn't provide such detail ever again. (UF-DIA ¶105, Ex. 81.)  In a call with an Exit Defendant, Slattery emphasized the need to make the "exit" letters look different so that Diamond cannot identify them as part of the scheme.  (UF-DIA Opp'n ¶178, Ex. 243 ("I just think there has to be a lot, of, um, diligence toward maintaining the clients voice, um, so whether it's, you know, different shades of paper, different fonts, different typewriters, some handwritten, you know? They just have to come across as organic. It can't…your biggest job is to make sure that the letters that you write, after five hundred of them, are not identified as a larger procedure.").)

**Finally**, Diamond has been injured by the Slattery Defendants' aiding and abetting. Substantial evidence establishes that because of the Slattery Defendants participation and assistance in the "exit" scheme, Owners breached their contracts, and Diamond suffered damages. (UF-DIA ¶96.) The exact amount of damages will be determined at trial.

### C.     Case Law Supports Liability Under Aiding and Abetting.

Courts have found that similar evidence establishes the knowledge and substantial assistance elements necessary to prove aiding and abetting claims. *See In re First Alliance Mortg. Co.*, 471 F.3d 977, 984-85 (9th Cir. 2006) (underwriter aided and abetted fraud by mortgage company which sold subprime loans using scripted sales presentations that "obfuscate[d] points, fees, interest rate, and the true principal amount of the loan;" knowledge and substantial assistance established where underwriter received reports of fraudulent practices and services kept fraudster in business); *Am. Master Lease*, 225 Cal. App. 4th at 1477-78 (affirming finding of knowledge and substantial assistance where bank substantially assisted defendants to breach fiduciary duty owed to minority shareholder).

Here, the Slattery Defendants knew of the materials aspects of the "exit" scheme and provided integral services that allowed the scheme to flourish. Accordingly, the Slattery Defendants' request for summary judgment on the aiding and abetting claims must be denied.

### VII.   THIS COURT SHOULD DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO CIVIL CONSPIRACY.

The Court should deny Defendants' request for summary judgment as to civil conspiracy. The Exit Defendants recite the principles of a civil conspiracy claim and then, without analysis or record citations, conclude Diamond's conspiracy claims are "entirely superfluous."  This argument ignores: (i) facts establishing the formation and operation of the conspiracy; (ii) voluminous evidence showing wrongful acts in furtherance of the scheme; (iii) facts establishing causation and damages; and (iv) case law supporting liability under conspiracy.

**First**, undisputed facts establish that the Exit Defendants had the knowledge, agreement, and intention to form a conspiracy. *Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962, 981 (N.D. Cal. 2013) (knowledge, agreement, and intent are the three sub-elements to show "formation and operation" of conspiracy); *United Steelworkers*

-61-

*of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir. 1989) (co-conspirators "need not know the exact details" but should "share the common objective of the conspiracy."). TSC and RAG partnered to provide "exit" services sharing resources, including office space, senior leadership, directors, supervisors, "exit" attorneys, "sales practices," policies, procedures, call scripts, and a Google Drive. (UF-DIA ¶¶11, 45); *see Nestle USA, Inc. v. Crest Foods, Inc.*, 2017 WL 3267665, *16 (C.D. Cal. 2017) ("Concurrence and knowledge may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances."); *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999) (conspiracy elements inferred from circumstantial evidence). Under a services agreement, TSC also performed marketing for RAG and provided the disputed services to RAG's customers. (UF-DIA ¶12); *Chu v. Hong*, 249 S.W.3d 441, 447 (Tex. 2008) (agreement arises from "joint participation in the transactions" and "enjoyment of the fruits of the transactions").

**Second**, undisputed facts evince Defendants' wrongful acts in furtherance of the conspiracy. The Exit Defendants use multi-media marketing and sales presentations to misrepresent that their "exit" service cancels timeshare contracts through litigation, class actions, and/or negotiations based on Diamond's purported high-pressure sales tactics. (UF-DIA ¶¶14-19.) The marketing and sales presentations ignore that "exits" are procured through nonpayment and default (UF-DIA ¶¶64, 107.) The Exit Defendants also instruct and/or encourage Owners to stop paying Diamond (UF-DIA ¶¶69-70) and then conceal the lack of legal work performed after retention. (UF-DIA ¶¶64, 107; UF-DIA Opp'n ¶178.)[22]

**Third**, voluminous evidence establishes causation and damages. Owners state they stopped paying Diamond's timeshare payments because they retained Defendants to perform "exit" services. (UF-DIA ¶94.) Expert analysis indicates that

---

[22] The Slattery Defendants do not explicitly move for summary judgment on conspiracy, but do move on "all claims" based on causation.

Owners are 20 times more likely to default after retaining the Lawyer Defendants to perform "exit" services. (UF-DIA ¶95.)  Diamond's analysis of the documentary evidence produced by Defendants evinces that over 100 Owners were directly told or encouraged to stop paying Diamond.  (UF-DIA-Opp'n ¶152-155.)

As to damages, the timeshare contracts require Owners to make payments to Diamond on loan balances and maintenance fees.  The wrongful acts in furtherance of Defendants' conspiracy damaged Diamond through, among other things, defaulted contracts, maintenance fee carrying costs associated with the defaults, lost future sales, and additional damages relating to the continuation of the Defendants' referral relationship. (UF-DIA ¶96.) The amount of such damages will be determined at trial.

**Finally**, case law supports denial of summary judgment. Conspiracy is established where evidence shows defendants ran a wide-ranging scam with a common objective.  *See Ohio Nat. Life Assur. Corp. v. Davis*, 13 F. Supp. 3d 876, 887 (N.D. Ill. 2014) (conspiracy to procure life insurance for unqualified insureds; coconspirator convinced clients to apply, financed the policies, and sold the policies); *Am. Bank of St. Paul v. TD Bank, N.A.*, 713 F.3d 455 (8th Cir. 2013) (conspiracy where bank and its borrower met three times, participated in suspicious financing, and entered in a forbearance agreement); *In re Rood*, 482 B.R. 132, 143-48 (D. Md. 2012) (conspiracy in investment scheme based on course of conduct, material misrepresentations to borrowers, diversion of funds, and involvement with a disbarred attorney); *Burger v. Hartley*, 896 F. Supp. 2d 1157, 1168-70 (S.D. Fla. 2012) (conspiracy in fraudulent investment scheme; director solicited investors, made material representations regarding the fund, drafted fund agreements containing false statements, and promoted the investments); *Newton Group,* Order at 36, Lin Decl. 265 (denying defendants MSJ as to civil conspiracy).

## VIII.  <u>CONCLUSION</u>

For the reasons set forth above, Diamond respectfully requests that the Court deny Defendants' Motions for Summary Judgment.

-63-

1

2

Dated: April 4, 2022                    BAKER & HOSTETLER LLP

3                                       By: */s/ Nicole Chérie Delgado*

4                                           Teresa C. Chow
                                            Nicole Chérie Delgado
                                            Albert G. Lin (*Pro Hac Vice*)
5                                           Marissa A. Peirsol (*Pro Hac Vice*)
                                            Douglas A. Vonderhaar (*Pro Hac Vice*)
6                                           Brandon T. Crossland (*Pro Hac Vice*)
                                            Lindy K. Keown (*Pro Hac Vice*)
7

8                                       *Attorneys for Plaintiffs and Counter-Defendants*
                                        Diamond Resorts U.S. Collection Development,
                                        LLC, Diamond Resorts Hawaii Collection
9                                       Development, LLC, Diamond Resorts
                                        International, Inc.
10
    4881-3315-2794.2
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-64-

DIAMOND'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT; CASE NO. 2:20-CV-05486-DSF-ADS