# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, LLC, et al.,<br><br>        Plaintiffs,<br><br>        v.<br><br>PANDORA MARKETING, LLC d/b/a TIMESHARE COMPLIANCE, et al.,<br>        Defendants. | CV 20-5486 DSF (ADSx)<br><br>Order GRANTING in Part and DENYING in Part Motions *in Limine* (Dkts. 638, 640, 641, 642, 644, 651, 654, 661, 662) |
| INTERMARKETING MEDIA, LLC d/b/a RESORT ADVISORY GROUP,<br><br>        Counter-claimant,<br><br>        v.<br><br>DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, LLC, et al.,<br>        Counter-defendants. | |

Before the Court are motions *in limine* filed by Plaintiffs/ Counter-defendants, Diamond Resorts U.S. Collection Development LLC and Diamond Resorts Hawaii Collection Development LLC (collectively, Diamond); Defendants Slattery, Sobel & Decamp, LLP; Del Mar Law Group, LLP; Carlsbad Law Group, LLP; JL "Sean" Slattery (collectively, the Defendant Law Firms), and Pandora Marketing LLC; and Defendant/Counter-claimant Intermarketing Media LLC (RAG).[1]

## I. Defendants' Motions *in Limine*

## A.    Defendants' Motion *in Limine* No. 1 (Dkt. 661)

Defendants seek to preclude references to attorney referral services and violations of California Business and Professions Code § 6155 because Diamond's complaint failed to provide sufficient notice of the claim, there is no private right of action under § 6155, and § 6155 does not apply to Defendants.  Dkt. 661 at 2-7.  Diamond opposes.  See Dkt. 698.

Diamond amended its complaint four times.  The Fourth Amended Complaint (4AC) does not refer to § 6155.  See Dkt. 307 (4AC).  There are no allegations of an entity operating for the direct or indirect purpose of referring potential clients to attorneys.  There are no allegations that an entity was not properly registered with the State Bar of California.  Nor are there any allegations that referrals or their acceptance were illegal.  See 4AC.  The section of the complaint alleging UCL violations also makes no reference to the operation of an illegal attorney referral service.  See 4AC ¶¶ 399-430.  Diamond's repeated use of the word "referral" is not sufficient to plead a violation of § 6155. The 4AC did not put Defendants on notice that Diamond was pursuing a claim for violation of § 6155 against them.

---

[1] All rulings on motions *in limine* are tentative.  The issues may be raised again during trial outside the presence of the jury if circumstances change.

Diamond may not pursue a UCL claim based on Defendants' alleged operation of an unlawful attorney referral service.  Defendants' motion *in limine* No. 1 is GRANTED.

## B.   Defendants' Motion *in Limine* No. 2 (Dkt. 662)

Defendants seek to preclude argument or evidence of damages until Diamond establishes Article III standing.  Dkt. 662 (Defs. MIL No. 2) at 1.  They argue that Diamond has not suffered an injury-in-fact because the underlying debt of the timeshare owners at issue has been waived and released or forgiven; Diamond has entered settlement agreements or judgments with certain owners; and the loans that serve as the basis for Diamond's claims have likely been transferred, assigned, or sold by Diamond to third parties for securitization purposes.  Id. at 2.  They argue that until and unless Diamond can sufficiently establish actual ownership of each and every agreement at the time of Defendants' actionable conduct, it must be precluded from offering evidence concerning damages.  Id. at 3.[2]

Diamond opposes the motion on the grounds that: (1) it is an improper attempt to re-litigate summary judgment issues regarding standing and damages, (2) it is procedurally improper because it does not identify actual evidence at issue and instead seeks to exclude "damages" generally, and (3) it presents a disputed factual issue inappropriate for an *in limine* ruling.  See Dkt. 696.

Diamond seeks damages as to 783 "owners."  Although the Court found that Diamond raised issues sufficient to defeat summary judgment with respect to Article III standing, see Order re Special Master's Report & Recommendation (Order), Dkt. 765 at 5-8, it appears extremely unlikely that Diamond will be permitted to seek damages in this litigation relating to all of those owners.  Indeed, the Court agreed with the Special Master's finding that the record was "not established

---

[2] At the pretrial conference, counsel indicated that matters settled or arbitrated outside of the lawsuit and the "McCroskey owners" have been removed from the damages calculation.

enough" to resolve the issue of the ownership of the loans." Id.  The
Court addressed these issues at the pretrial conference.  It appears that
some of these issues may be appropriate for the Court to decide based
on legal briefing alone.  To the extent this relates to Diamond's
standing, the issue should be resolved before trial if possible.

Further, the Court agrees with Diamond that Defendants' motion
is overly broad and fails to identify the specific evidence Defendants
seek to exclude.  See United States v. Lewis, 493 F. Supp. 3d 858, 861
(C.D. Cal. 2020) ("[M]otions in limine must identify the evidence at
issue and state with specificity why such evidence is inadmissible.")
(quoting Colton Crane Co., LLC v. Terex Cranes Wilmington, Inc., No.
08-CV-08525-PSG (PJWx), 2010 WL 2035800, at *1 (C.D. Cal. May 19,
2010)).  "The failure to specify the evidence that a motion *in limine*
seeks to exclude constitutes a sufficient basis upon which to deny the
motion." Id. (internal quotations and citations omitted).

Defendants' motion *in limine* No. 2 is DENIED.

## C.    **Defendants' Motion *in Limine* No. 3 (Dkt. 654)**

Defendants seeks to exclude hearsay statements by Defendants'
customers, including in emails, customer relations management (CRM)
data entries, and call transcripts.  Dkt. 654 at 3.  They also seek to
exclude "the remainder of the call transcripts under Rule 403[.]" Id. at
1.  Based on Diamond's draft exhibit list, Defendants anticipate that
Diamond will seek to introduce statements made by timeshare owners
and customers of the Exit Companies in which customers suggest they
may have been advised or recommended to stop paying on their
timeshares. Id. at 3.

Diamond argues that Defendants' request to exclude all of their
customers' statements is improper, vastly overbroad, and premature.
Dkt. 695 at 7.  It argues that it should be afforded the opportunity to
know what evidence is at issue and to respond to any specific hearsay
objections. Id.

The Court will not allow inadmissible hearsay, see Fed. R. Evid. 802, but Defendants' request is vague and fails to identify the specific evidence Defendants believe is inadmissible.  Defendants' motion is not premature, and the Court will not allow the parties to waste the Court's time or test the jury's patience with repetitive efforts to introduce potentially inadmissible evidence.  Nor will the Court be placed in the position where it must repeatedly rule on potentially complicated and time-consuming objections while the jury waits.

Defendants' motion *in limine* No. 3 is DENIED.  After the parties comply with the orders issued in the Court's Order re Trial Preparation, the Court will advise the parties of the admissible documents.

### D.    Motion to Exclude Plaintiffs' Expert Witness Jamie Baldwin (Dkt. 640)

#### 1.    Legal Standard

District courts act as gatekeepers for expert testimony by applying Rule 702 to ensure evidence is both relevant and reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999) (Daubert imposed a special "gatekeeping obligation" on trial judges for all expert testimony).  An expert witness may testify if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The proponent bears the burden of proving the proffered testimony satisfies Rule 702.  See Cooper v. Brown, 510 F.3d 870, 942 (9th Cir. 2007).  In determining whether to allow expert

testimony, the trial judge "must strike the appropriate balance between admitting reliable, helpful expert testimony and excluding misleading or confusing testimony to achieve the flexible approach outlined in <u>Daubert</u>." <u>United States v. Rincon</u>, 28 F.3d 921, 926 (9th Cir. 1994). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." <u>Primiano v. Cook</u>, 598 F.3d 558, 565 (9th Cir. 2010).

The Court is given broad discretion to decide how to test reliability. <u>United States v. Hankey</u>, 203 F.3d 1160, 1168 (9th Cir. 2000). For example, scientific evidence is reliable "if the principles and methodology used by an expert are grounded in the methods of science." <u>Clausen v. M/V New Carissa</u>, 339 F.3d 1049, 1056 (9th Cir. 2003). The court's focus "must be solely on principles and methodology, not on the conclusions that they generate." <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 595 (1993). Courts must determine whether the reasoning or methodology underlying testimony is valid and whether that reasoning or methodology can be applied to the facts in issue. <u>Id.</u> at 592-93.

However, "[t]he <u>Daubert</u> factors were not intended to be exhaustive nor to apply in every case." <u>Hankey</u>, 203 F.3d at 1168 (<u>citing to</u> <u>Kumho Tire</u>, 526 U.S. at 156). "Whether <u>Daubert</u>'s suggested indicia of reliability apply to any given testimony depends on the nature of the issue at hand, the witness's particular expertise, and the subject of the testimony. It is a fact-specific inquiry." <u>Id.</u> (<u>quoting</u> <u>Skidmore v. Precision Printing & Packaging Inc.</u>, 188 F.3d 606, 618 (5th Cir. 1999)). When the reliability of expert testimony depends heavily on the knowledge and experience of the expert, the <u>Daubert</u> factors of peer review, publication, potential error rate, etc. are not applicable. <u>See id.</u> at 1169; <u>Kumho Tire</u>, 526 U.S. at 150 ("Engineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases . . . . In other cases, the relevant reliability concerns may focus upon personal knowledge or experience."). "[I]n considering the admissibility of testimony based on some 'other specialized knowledge,' Rule 702 generally is construed liberally." <u>Hankey</u>, 203 F.3d at 1168 (citations omitted).

### 2. Baldwin Opinion

Defendants seek to exclude the testimony and opinions of Diamond's expert witness, statistician Jamie McClave Baldwin, Ph.D. Dkt. 640-1 (Defs. MIL Re Baldwin) at 7. They contend Diamond has no evidence that the Exit Defendants[3] engaged in any act designed to interfere with the contracts of the timeshare owners on which it bases its claims, and statistical analysis cannot substitute for direct evidence of interfering behavior for a tortious interference claim. Id. They contend that Dr. Baldwin has "found nothing more than an association between retention of an exit company by an already dissatisfied owner who already wants out of his or her timeshare, and default." Id. at 8. Defendants argue that Dr. Baldwin's report, opinion, and testimony must be excluded because: (1) her methodology fails to meet established standards in statistical analysis for controlling for potential confounding factors and independently verifying data, (2) her opinions on causation are contradicted by the evidence, and (3) her opinions cannot help the jury find tortious interference because her study design and data analysis cannot logically support her proffered opinions on causation and cannot establish acts of interference. Id. at 12-13.

Dr. Baldwin was retained to review and analyze "data related to payment and/or default behavior of Owners; to determine the effect, if any, of a relationship between Owners and third party exit companies . . . including . . . Defendants, regarding payment and/or default behavior; and to opine on the factors that may have caused an Owner to default in their payment obligations[.]" See Dkt. 640-2 (Westlund Decl.), Ex. A (Baldwin Report) at 3-4. Dr. Baldwin used a logistic regression model to examine the relationship between the variable of interest – in this case, the event of whether or not a timeshare owner defaulted on a loan – and various explanatory variables including loan origin year, original loan amount, whether the owner made the first payment on the loan, and whether the owner lodged a complaint with Diamond about their contract in the year prior to default. Id. at 10-13.

---

[3] "Exit Defendants" refers to Pandora and RAG collectively.

Dr. Baldwin opined: (1) "The occurrence of a [Letter of Representation from a law firm associated with a timeshare exit company, referred to as a TPE LOR] shows a highly statistically significant association with the incidence of defaulting on a loan," (2) "The occurrence of a TPE LOR from Defendants demonstrates an even stronger association with the incidence of defaulting on a loan than other non-Defendant [third party exit companies]," (3) "The association remains very strong and highly statistically significant after controlling for other relevant factors, such as credit rating and whether the Owner had complained about their contract to Diamond. After accounting for these relevant factors, the odds of default increase by over 4600% after Diamond receives an LOR from Lawyer Defendants." Id. at 22. She concluded, "These results are fully consistent with Plaintiffs' allegations that Owners contracting with Defendants causes an increase in the likelihood that the Owners default on their timeshare loans." Id.

Diamond opposes the motion on the grounds that Dr. Baldwin is qualified, applies accepted statistical methods to business data, and her testimony is relevant. Dkt. 649 (Opp'n to Defs. MIL Re Baldwin) at 2. Diamond argues: (1) under Daubert and the Federal Rules of Evidence, wholesale exclusion of expert testimony is the exception, not the rule; (2) Defendants do not contest Dr. Baldwin's qualifications or general methodology; (3) Defendants' arguments about Dr. Baldwin's methodology go to the weight, not admissibility of her opinions; and (4) Dr. Baldwin's testimony is relevant because her analysis establishes that the retention of Defendants increased the odds of default by 47 times, compared to timeshare owners who did not retain a third party exit company. Id. at 2-3.

Although Dr. Baldwin's study demonstrates a correlation between timeshare owners retaining Exit Defendants and defaulting on their loans, Dr. Baldwin does not offer an opinion as to whether the Exit Defendants caused owners who retained their services to default on their loans with Diamond. She opines on the association between the two, not causation. To the degree Dr. Baldwin purports to opine on causation, she does not make that link. Her methodology shows statistically significant "associations" between the variables she

analyzed, but it does not show causation.  <u>See</u> Baldwin Report at 17. Diamond contends that there is substantial direct and indirect evidence of interference supporting Dr. Baldwin's conclusions but does not elaborate on the evidence it intends to offer to prove causation.  Opp'n to Defs. MIL Re Baldwin at 21, 23.  Defendants pointed out, and Diamond did not dispute, that it deposed only a few of the timeshare owners for whom Diamond claims damages.  Defs. MIL Re Baldwin at 9.  Defendants also noted that Diamond sought and obtained leave to take up to 50 additional depositions of Diamond owners by written questions but did not take those depositions.  <u>Id.</u> at 10.

Diamond argues that courts have concluded that expert testimony is sufficient to establish interference.  Opp'n to Defs. MIL Re Baldwin at 24.  The Court disagrees.  The "general view in the law" is "that probabilistic evidence alone can't carry a plaintiff's burden." <u>NOCO Co. v. OJ Commerce, LLC</u>, 35 F.4th 475, 487 (6th Cir. 2022). And just because Dr. Baldwin found a statistically significant association between a TPE LOR and a timeshare owner defaulting on a loan, does not mean that Exit Defendants caused these particular 783 timeshare owners to default on their loans.  The Court finds that Dr. Baldwin's opinions are not relevant to proving any elements of Diamond's claims and therefore would not be helpful to the jury.

Defendants' <u>Daubert</u> motion to exclude Dr. Baldwin is GRANTED.[4]

## E.   Motion to Exclude Plaintiffs' Expert Witness Bruce Isaacson (Dkt. 641)

Defendants seek to exclude the testimony and expert report of Diamond's expert witness, Dr. Bruce Isaacson.  Dkt. 641-1 (Defs. MIL Re Isaacson).  Diamond retained Dr. Isaacson to conduct a survey to "measure the impressions conveyed by certain advertising materials

---

[4] In any event, it would be premature for the Court to permit Baldwin's testimony until it determines the scope of damages that Diamond may pursue.

that . . . were disseminated by" the Exit Defendants.  Dkt. 641-2 (Westlund Decl.), Ex. A (Isaacson Report) at 1.  Defendants argue that Dr. Isaacson's testimony must be excluded because: (1) his methodology fails to meet established standards in survey research for designing a control condition and defining an appropriate target population (2) his methodology was developed expressly for litigation and does not satisfy accepted practices in the scientific community for such independent research, and (3) the survey cannot help the jury determine deception, materiality, or proximate causation under the Lanham Act.  Defs. MIL Re Isaacson at 5.  They assert Dr. Isaacson's opinions are the product of a survey methodology that was found unreliable and unhelpful in In re Elysium Health-ChromaDex Litigation, No. 17-cv-7394 (LJL), 2022 WL 421135, at *8-15 (S.D.N.Y. Feb. 11, 2022).  Id. at 1.  They contend that by aggregating numerous changes and changing statements that Diamond does not allege violate the Lanham Act, Dr. Isaacson makes it impossible to determine whether the difference in the messages conveyed and the effect of those messages that he purported to measure resulted from language Diamond alleged is false or misleading or from language that is nonactionable.  Id. at 2.  Defendants also argue that Dr. Isaacson failed to properly define the target population for his survey because he used all timeshare owners rather than "timeshare owners who want to exit their timeshares or at least are thinking about doing so."  Id. at 12.

"The proponent [of survey evidence] . . . bears the burden of establishing its admissibility."  Keith v. Volpe, 858 F.2d 467, 480 (9th Cir. 1988).  The Ninth Circuit has "long held that survey evidence should be admitted as long as it is conducted according to accepted principles and is relevant."  Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., 618 F.3d 1025, 1036 (9th Cir. 2010) (simplified).  "[I]ssues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility. These are issues for a jury or, in a bench trial, the judge."  Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1263 (9th Cir. 2001) (citation omitted).

Courts in the Ninth Circuit have relied on <u>Pittsburgh Press Club v. United States</u>, 579 F.2d 751, 759-60 (3d Cir. 1978), when examining whether a survey was conducted in accordance with generally accepted principles.  <u>See</u> <u>Gibson v. Cnty. of Riverside</u>, 181 F. Supp. 2d 1057, 1067-68 (C.D. Cal. 2002); <u>United States v. Various Gold, Silver and Coins</u>, Nos. 3:11-cv-01179-SI; 3:11-cv-01424-SI, 2013 WL 5947292, at *4-5 (D. Or. Oct. 30, 2013).  The Third Circuit stated:

> A proper universe must be examined and a Representative sample must be chosen; the persons conducting the survey must be experts; the data must be properly gathered and accurately reported. It is essential that the sample design, the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical techniques. Just as important, the survey must be conducted independently of the attorneys involved in the litigation. The interviewers or sample designers should, of course, be trained, and ideally should be unaware of the purposes of the survey or the litigation. A fortiori, the Respondents should be similarly unaware.

<u>Pittsburgh Press</u>, 579 F.2d at 758.

Diamond opposes on the grounds that Dr. Isaacson's survey was reliably conducted in accordance with generally accepted principles. Dkt. 648 (Opp'n to Defs. MIL Re Isaacson).  It asserts that the Ninth Circuit takes a permissive approach to survey evidence and once the generally accepted principles are met, any technical issues with a survey go to the weight of the survey rather than its admissibility.  <u>Id.</u> at 3-4.  Diamond argues that Dr. Isaacson is an expert in the field of consumer surveys and has been qualified as such in cases around the country, he designed the survey questionnaire to ask non-leading and non-suggestive questions to measure the messages conveyed by the advertisements, the survey was conducted online through an online panel provided by ProdegeMR with no involvement from counsel, and survey respondent were not made aware that the survey was conducted for litigation purposes.  <u>Id.</u> at 4-6, 22.

The Court agrees with Diamond. Dr. Isaacson has expertise in surveys and marketing and is qualified to testify as a survey expert. See Isaacson Report at 11-14; Isaacson Report, Ex. 1. The survey measured messages communicated by two of the Exit Defendants' video advertisements, referred to as "test" videos. Id. at 3. The survey also measured altered versions of the videos – "control" videos – that were "designed to isolate the effect of certain disputed text that the Plaintiffs claim is false or misleading" by removing or modifying the text claimed to be false or misleading. Id. at 7. For each video, a group of respondents saw a test version of the video and another group saw the control version. Id. at 16. Each group was asked the same set of questions about the video they viewed. Id. Dr. Isaacson surveyed 538 individuals. Id. at 23. The respondents included individuals who currently own a timeshare for a vacation property or resort and were selected based on a series of qualifying questions. Id. at 17. The Court finds that Dr. Isaacson's survey was conducted in accordance with accepted principles.

Defendants rely heavily on Dr. Shari Seidman's Reference Guide on Survey Research and Elysium to argue that Dr. Isaacson's methodology fails to meet established standards of survey research because he chose not to test the effect of each statement claimed by Diamond to be false or misleading individually. Defs. MIL Re Isaacson at 9. However, neither is binding on this Court and as Diamond points out, neither holds that control stimuli must isolate individual statements. Opp'n to Defs. MIL Re Isaacson at 7. Defendants misinterpret Elysium; there the court found that the survey design failed to "correct for potential 'focalism'" because the control messages differed from the tested messages "in that they were not the subject of the earlier survey questions, particularly the question which asked the respondents whether they took away a specific message from a challenged statement," and "[a]s a result, the survey design failed to correct for the potential flaw . . . that respondents would overweight the significance of what they were earlier asked to notice with regard to the test messages, when no parallel existed with the control messages." 2022 WL 421135, at *14. This is not the issue Defendants raise here.

Defendants' remaining concerns with Dr. Isaacson's opinions go to the weight of the evidence, not its admissibility. See, e.g., Shannon Fabrics, Inc. v. Jo-Ann Stores, Inc., No. CV 13-9509 PA (SHx),2015 WL 12752445, at *2 (C.D. Cal. Jan. 6, 2015) ("Plaintiff contends that Mr. Isaacson's expert opinions are inadmissible because he used the wrong universe of potential consumers when conducting his survey and makes other methodological errors. . . . Plaintiff's objections to Mr. Isaacson's opinions go to the weight of that evidence, and not its admissibility.") (citation omitted); Tokidoki, LLC v. Fortune Dynamic, Inc., No. CV 07-1923 DSF (PJWx), 2008 WL 11338772, at *2 (C.D. Cal. Sept. 29, 2008) (stating that "[d]efects in the screening and questioning methodology are the types of technical deficiencies that go to weight, not credibility," and declining to exclude survey conducted by Dr. Isaacson) (citation omitted).

Defendants' Daubert motion to exclude Dr. Isaacson is DENIED.

## F.  Motion to Exclude Plaintiffs' Expert Witness John C. Jarosz (Dkt. 642)

Defendants seek to exclude the testimony and opinions of Diamond's damages expert, John C. Jarosz. Dkt. 642-1 (Defs. MIL Re Jarosz). Diamond retained Jarosz to: "1) calculate Defendants' profits attributable to their alleged misconduct, 2) calculate Plaintiffs' losses suffered as a result of Defendants' alleged misconduct, and 3) evaluate an economically optimal level of punitive damages." Dkt. 774-1 (Jarosz Report) at 2. Defendants contend that Jarosz's opinions must be excluded for numerous reasons. They argue that Jarosz's opinions regarding tortious interference damages are unreliable because they are based on: (1) "an estimated probability of default in a six-month period taken from the report of [Dr. Baldwin] which is, in and of itself, unreliable," (2) "heavily redacted, unsupported documents, and/or self-serving statements provided by Plaintiffs," and (3) "speculative rather than actual maintenance fees paid, or to be paid, by Plaintiffs." Defs. MIL Re Jarosz at 2-3. They argue that his opinions are also misleading because: (1) "Mr. Jarosz failed to verify Plaintiffs' standing to claim damages in that approximately 77% of the notes are securitized/sold to

13

third parties upon origination," (2) "Mr. Jarosz failed to verify Plaintiffs' standing to claim damages in light of the fact that the creditor on the cancelled debt is 'Diamond Resorts Financial Services, Inc.,'" (3) "Mr. Jarosz failed to ascertain the tax benefits received in connection with the IRS Form 1099-C that is filed in connection with each defaulting loan," and (4) "Plaintiffs are not necessarily damaged by the recovery of reclaimed points in that Plaintiffs' business model requires that they maintain a certain level of inventory to avoid the need to build or acquire additional resorts." Id. at 3. Finally, Defendants argue that Jarosz's opinions on punitive damages "are not within the purview of an expert witness." Id. at 4.

Diamond counters that there is no dispute that Jarosz is qualified to offer his opinions on damages. Dkt. 646 (Opp'n to Defs. MIL Re Jarosz) at 1. It contends that Defendants are attempting to improperly exclude Jarosz's opinions by asserting baseless legal arguments and attacking certain data and information on which Jarosz's analysis is based. Id. Diamond argues that Defendants' legal assertions concerning Diamond's standing and purported mitigation obligations are improper and not a basis to exclude expert testimony. Id. It also argues that the objections regarding information Jarosz relied on in forming his opinions are appropriate for cross-examination but are not grounds for excluding his opinions. Id.

The Court agrees that Defendants' legal arguments are not persuasive. Defendants argue that Jarosz's opinions and testimony must be excluded because he failed to properly consider mitigation efforts required to be taken by Diamond and failed to confirm that Diamond has standing. See Defs. MIL Re Jarosz at 18-21. Defendants' arguments are unsupported by legal authority. It is also unclear to the Court why Defendants expect Diamond's damages expert to have considered mitigation efforts when the burden of proving a plaintiff failed to mitigate damages falls on the defendant. See Powerhouse Motorsports Grp. Inc. v. Yamaha Motor Corp. U.S.A., 221 Cal. App. 4th 867, 884 (2013). It is also not the role of an expert witness to "confirm" whether parties in a lawsuit have standing. These are inappropriate bases for excluding expert opinions.

Defendants also argue that Jarosz's reliance on Dr. Baldwin's report and information provided by Diamond, and failure to use "actual data" render his opinions unreliable. See Defs. MIL Re Jarosz at 8-18. "[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1017 n.14 (9th Cir. 2004) (quoting Children's Broad. Corp. v. Walt Disney Co., 357 F.3d 860, 865 (8th Cir. 2004)). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." Children's Broad. Corp., 357 F.3d at 865. Moreover, challenges to an expert's assumptions and inferences amount to impeachment but do not go to admissibility. Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc., 738 F.3d 960, 969 (9th Cir. 2013). "[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable. The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." Id. at 969-70. Defendants may raise their concerns on cross examination. See Daubert, 509 U.S. at 596 ("[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); Primiano, 598 F.3d at 565 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."). But the Court has granted Defendants' motion to exclude Dr. Baldwin. The parties are ordered to meet and confer and file a joint statement with their positions concerning the impact of that exclusion on Jarosz's opinion.

However, Jarosz may not testify about the "economically optimal level of punitive damages." "Whether punitive damages should be awarded and the amount of such an award are issues for the jury. . . . Juries have . . . wide discretion in determining what is proper." Bankhead v. ArvinMeritor, Inc., 205 Cal. App. 4th 68, 78 (2012). "The essential question for the jury, the trial court, and the appellate courts

is whether the amount of the award substantially serves the public
interest in punishment and deterrence. The California Supreme Court
has established three criteria for making that determination: (1) the
reprehensibility of the defendant's misdeeds; (2) the amount of
compensatory damages, though there is no fixed ratio for determining
whether punitive damages are reasonable in relation to actual
damages; and (3) the defendant's financial condition." Stevens v.
Owens-Corning Fiberglas Corp., 49 Cal. App. 4th 1645, 1658 (1996)
(collecting cases). Courts have found expert testimony on defendants'
financial condition and ability to pay a punitive damages award to be
acceptable, rather than testimony on the appropriate amount of
punitive damages. See, e.g., Poosh v. Phillip Morris USA, Inc., 287
F.R.D. 543, 549-50 (N.D. Cal. 2012) (permitting expert to testify as to
the "default" measure of defendants' financial condition, current net
worth, but excluding opinions on net worth "based on a wide variety of
financial statistics" and financial information going back a number of
years); In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods.
Liab. Litig., No. 3:11-MD-2244-K, 2014 WL 3557345, at *9 (N.D. Tex.
Jul. 18, 2014) ("DePuy argues that Bayley is in essence providing a
range of damages for the jury to award. That is not what Mr. Bayley is
opining. He is giving the jury figures for Defendants' ability to pay - one
of the statutory mandated factors to be considered in determining an
amount of punitive damages.").

Jarosz provides the jury with a range for an award of punitive
damages and encroaches on the province of the jury. Jarosz calculated
a potential range of punitive damages by applying an analytical
framework found in economic literature. Jarosz Report at 31. The
framework "proscribes calculating total damages (inclusive of punitive
damages) as 'harm caused multiplied by the reciprocal of the
probability of being found liable.'" Id. at 32. Jarosz concluded that "if
such punitive damages are deemed appropriate by the Court, total
damages (inclusive of punitive damages, disgorgement damages, and
tortious interference damages) computed as 1.5 to 1.7 times tortious
interference damages is supported by the instant economic facts and
relevant literature" and "reflects a punitive damages amount that

might range from roughly $350,000 to $4.0 million." <u>Id.</u> at 33.  Jarosz's opinion on punitive damages is not limited to Defendants' financial condition and ability to pay a punitive damages award, and is therefore excluded.

Defendants' <u>Daubert</u> motion to exclude John C. Jarosz is GRANTED in part and DENIED in part.  In addition, the Court will consider a request that the Court order Diamond to provide unredacted versions of any documents he relied on.

### G.    Motion to Exclude Plaintiffs' Expert Witness Howard C. Nusbaum (Dkt. 644)

Defendants seek to exclude or limit the testimony and opinions of Diamond's expert rebuttal witness, Howard Nusbaum.  Dkt. 644-1 (Defs. MIL Re Nusbaum).  Nusbaum was retained by Diamond to review and rebut the conclusions and methodologies of Defendants' expert, Kenneth Free.  Dkt. 644-2 (Klein Decl.), Ex. 1 (Nusbaum Report) at 1.  Defendants argue that Nusbaum's entire rebuttal is "essentially pure argument and a net opinion virtually devoid of documented or appropriately sourced authority relying exclusively upon ARDA, an industry funded and led organization."  Defs. MIL Re Nusbaum at 11.  They argue that his report should be excluded in its entirety because: (1) he deliberately ignored the letters of explanation provided by Defendants and referred to in Free's report, (2) his opinions on the six topics in his report have no factual basis or a false or incomplete factual basis, and (3) the rebuttal exceeds the issues raised in Free's report.  <u>Id.</u>  They assert that Nusbaum's rebuttal is "replete with negative and derogatory references concerning exit companies" despite there being virtually no mention of exit companies in Free's report.  <u>Id.</u> at 12.

"The function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party."  <u>Marmo v. Tyson Fresh Meats, Inc.</u>, 457 F.3d 749, 759 (8th Cir. 2006) (internal quotation marks and citation omitted).  Rule 26(a)(2)(D)(ii) permits the admission of rebuttal expert testimony that is "intended solely to contradict or

rebut evidence on the same subject matter identified" by an initial expert witness. The phrase "same subject matter" should be read narrowly because a broad reading that "encompass[es] *any* possible topic that *relates* to the subject matter at issue . . . will blur the distinction between 'affirmative expert' and 'rebuttal expert.'" Vu v. McNeil-PPC, Inc., No. CV 09-1656 ODW (RZx), 2010 WL 2179882, at *3 (C.D. Cal. May 7, 2010).

Diamond argues that Nusbaum's report is based on 20 years of industry experience, he considered a myriad of information in preparing his report, and Free's failure to cite the letters of explanation he reviewed made it impossible for Nusbaum to rebut specific issues. Id. at 11-12. It contends that regardless of the "level of Mr. Nusbaum's consideration, this is not a sufficient basis for the exclusion of Nusbaum's opinions." Id. at 13. Diamond also asserts that Defendants' arguments that Nusbaum's report is self-serving and that he is an interested party are baseless because he is not, nor has he ever been employed by Diamond. Id. Diamond contends that Free did not limit his report to the subject matter in the reports of Diamond's other experts, and that Nusbaum's discussion of exit companies serves to rebut portions of Free's opinions. Id. at 14.

The Court agrees that Nusbaum is qualified to opine on the timeshare industry. See Nusbaum Report at 1-5. His opinions[5] are supported by a review of numerous sources identified in Exhibit B to his report. See id., Ex. B. Defendants' arguments about the scope of materials Nusbaum reviewed and the factual basis for his opinions go to the weight, not the admissibility of his opinions. Defendants may also question Nusbaum about any potential bias on cross-examination. The Court will not rule on the admissibility of such opinions without more information and can determine the appropriate scope of his testimony only after Free has testified.

---

[5] As with the other experts, not all of the statements in Nusbaum's report actually constitute admissible opinions.

Defendants' <u>Daubert</u> motion to exclude Howard C. Nusbaum is DENIED.

## II. Diamond's Motions *in Limine*

### A.     Motions *in Limine* Nos. 1-5 (Dkt. 651)

#### 1.     Diamond's Sales Training, Sales Practices, and Customer Complaints

Diamond seeks to exclude evidence and testimony related to Diamond's sales training, sales practices, and customer complaints. Dkt. 651-1 (Pls. MILs) at 2. Diamond specifically requests that the Court exclude the following evidence and testimony, and any other similar evidence: (1) Diamond's Sales and Quality Assurance Training Materials, (2) Diamond Owner complaint logs, (3) Diamond owner letters of explanation, (4) Diamond owner complaint emails, (5) complaints on public websites, (6) testimony of Diamond employees regarding sales training and complaints, and (7) testimony of Diamond owners regarding their sales experience and complaints about Diamond. <u>Id.</u> at 3. Diamond contends that this evidence is inadmissible because it is irrelevant, largely based on hearsay, unduly prejudicial, and will confuse the issues for the jury. <u>Id.</u> Diamond asserts that Defendants will argue that it was Diamond's actions and not their actions that caused owners to breach their contracts with Diamond based on its sales tactics and customer dissatisfaction. <u>Id.</u> at 4. It argues that the fact that owners took issue with Diamond's sales process or were otherwise dissatisfied does not mean they were predisposed to breach their contract. <u>Id.</u>

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). "The Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Irrelevant evidence is not admissible." Fed. R. Evid. 402.

Defendants oppose the motion on the grounds that the evidence is relevant to the following claims and defenses: (1) the causation element of Diamond's tortious interference claim, (2) the justification defense to tortious interference, (3) the privilege defense to tortious interference for the Defendant Law Firms, (4) the "valid contract" element of tortious interference, (5) the falsity of statements element of the Lanham Act claim, (6) the unclean hands defense, and (7) failure to mitigate damages.  Dkt. 699 (Opp'n to Pls. MILs) at 4-5.

To prevail on its claim for tortious interference with contract, Diamond must show: (1) there were valid contracts between Diamond and the owners; (2) Defendants knew about the contracts; (3) Defendants acted with intent to induce the owners to breach the contracts or disrupt the contractual relationships; (4) the owners breached or disrupted the contracts; and (5) Diamond suffered damages as a result.  Quelimane Co. v. Stewart Title Guar. Co., 19 Cal.4th 26, 55 (1998).  The third element requires Diamond to show that Defendants knew the interference was certain or substantially certain to occur as a result of their actions, because "no liability can arise unless [Defendants' alleged wrongful or unjustified conduct caused the breach."  Bank of New York v. Fremont Gen. Corp., 523 F.3d 902, 909 (9th Cir. 2008).

The Special Master found that Diamond was entitled to summary adjudication on the issue of proximate cause for Diamond's tortious interference claim.  Special Master's Report & Recommendation (Report), Dkt. 715 at 42.  In reaching this conclusion, he found that there was "no dispute that Diamond had contracts with its owners; that the Exit Defendants knew that Diamond had contracts with its owners; and that the Exit Defendants intentionally interfered with those contracts by, among other things, directing the owners to stop making payments under the contracts."  Id. at 41.  He found that the evidence established that "some owners listened to the Exit Defendants when they told them to stop making payments on the contracts."  Id.  The Court adopted the Special Master's conclusion that the following facts were uncontested: "The Exit Defendants falsely claimed in commercial advertisements and promotions that, with the help of their lawyers,

relying on consumer protection laws, they could help owners legally cancel their timeshare contracts," and "The Exit Defendants falsely claimed in these ads and promotions that they had a 100% success rate." Id. at 36-37. The Special Master noted, "What I am finding is that there is no question that the Exit Defendants generally do not rely on [Diamond's] questionable tactics and consumer protection laws that prohibit such tactics to help the owners legally cancel their timeshares. . . . The terminations are not the result of anything that Diamond did or said in the marketing and sales of the timeshares." Id. at 34-35.

Defendants assert that the Defendant Law Firms will argue that their advice to clients was privileged as a defense to the tortious interference claims and the "information provided in clients' letters of explanation formed the basis of the lawyers' advice on how to proceed with Diamond." Opp'n to Pls. MILs at 7. Defendants assert that the letters of explanation will be introduced "not for their truth but for the impact they had on the lawyers reviewing them." Id. Defendants may introduce the letters for the limited purpose of supporting their privilege defense.

Next, Defendants argue that they intend to show Plaintiffs did not have valid contracts between themselves and the timeshare owners because the contracts were obtained by undue influence, and therefore are invalid. They contend that evidence of "high-pressure sales tactics, misrepresentations, and purchasers' experience of the sales process" are relevant to this defense and the justification defense. Id. at 7-8. At summary judgment, Pandora and RAG argued that the contracts are void or voidable because Diamond induced owners to sign contracts through fraud and Diamond is not a licensed finance lender under California law. See Report at 43. In support of their argument, Defendants submitted the declaration of three timeshare owners – which Diamond objected to on hearsay grounds – who claim they were misled by Diamond's sales representatives and pressured into buying Diamond timeshares. Id. The Court finds that evidence of Diamond's sales practices and training, and customer complaints may be relevant to demonstrating that specific contracts Diamond had with the specific timeshare owners at issue were void or voidable.

Defendants argue that the evidence goes to the unclean hands defense, which would bar Diamond from recovery.  Id. at 9.  They argue that they will need to show that Diamond's conduct, as related to the subject matter of its claims, is inequitable.  Id.  "The doctrine of unclean hands requires unconscionable, bad faith, or inequitable conduct by the plaintiff in connection with the matter in controversy." Fladeboe v. American Isuzu Motors Inc., 150 Cal. App. 4th 42, 56 (2007).  "Under California law regarding . . . the unclean hands defense, '[t]he focus is the equities of the relationship between the parties, and specifically whether the unclean hands affected the transaction at issue.'" Biller v. Toyota Motor Corp., 668 F.3d 655, 667 (9th Cir. 2012) (quoting Jaramillo v. Cnty. of Orange, 200 Cal. App. 4th 811, 820 (2011)).  "The misconduct that brings the unclean hands doctrine into play must relate directly to the cause at issue. Past improper conduct or prior misconduct that only indirectly affects the problem before the court does not suffice."  Id. (simplified).  Whether the doctrine of unclean hands applies is a question of fact.  Id. at 668 (citation omitted).  The Court agrees that the evidence of this nature may be relevant be relevant to Defendants' unclean hands and justification defenses – but it is being submitted for the truth of the matter asserted.

Defendants also intend to present evidence of demand letters and letters of explanation to Diamond as evidence that had Diamond not ignored the demand letter, "various simple mitigating measures would have become apparent and could have easily been negotiated with the lawyers hired for this purpose." Opp'n to Pls. MILs at 9-10.  "[A] plaintiff cannot be compensated for damages that were not incurred or could have been mitigated by reasonable effort or expenditure." Powerhouse, 221 Cal. App. 4th at 884 (citation omitted).  "Whether a plaintiff acted reasonably to mitigate damages, however, is a factual matter to be determined by the trier of fact, and is reviewed under the substantial evidence test."  Id. (citation omitted).  The burden of proving a plaintiff failed to mitigate damages falls on the defendant. Id.  It is unclear to the Court what mitigating measures are apparent from the demand letters and letters of explanation.  The timeshare

owners were told by Pandora and RAG to stop making payments to Diamond and owners did so, defaulting on their loans. Without more information the Court is unable to determine whether the evidence is relevant to Defendants' alleged failure to mitigate damages defense.

Diamond argues that even if the complaint logs, letters of explanation, complaint emails, and website complaints were relevant, they must be excluded because they are hearsay. Pls. MILs at 10. They assert that customer complaints have been recognized as inadmissible hearsay. Id. at 10-11. Defendants contend that the evidence is not being introduced for the truth of the matter asserted; it explains Defendants' conduct in the case and their basis for accepting particular clients, and why there was a basis to conclude the customers' contracts may be unenforceable. Opp'n to Pls. MILs at 10. They contend that "[s]tatements introduced for this purpose show the need for exit assistance in the first place, reveal Defendants' motive to accept a given customer, and support [their] assertions that they are consumer advocates." Id. They argue that the website complaints and complaint emails will be offered to show that Diamond was on notice of potential problems with their operation, and that the complaint logs and letters of explanation should be admitted under the residual hearsay exception, Federal Rule of Evidence 807. Id. at 11.

On one hand, Defendants argue that they intend to use the complaints and letters of explanation to prove that Diamond had unclean hands and its conduct was inequitable, that Diamond's contracts with owners were obtained by undue influence and were invalid, and that Diamond failed to mitigate its damages. On the other hand, Defendants argue that the evidence will not be introduced for the truth of the matter asserted but to explain their conduct and show that Diamond was on notice of the potential problems with its operation. As noted above, for some of these purposes, the evidence is inadmissible hearsay.

Defendants also contend that the Court should admit the evidence under the residual hearsay exception. Federal Rule of Evidence 807 allows for the admission of hearsay statements where:

(1) the statement is supported by sufficient guarantees of trustworthiness – after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

(2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807. The court must consider whether the hearsay is supported by guarantees of trustworthiness. Fed. R. Evid. 807 committee notes on rules to 2019 amendment; FTC v. Figgie Int'l, Inc., 994 F.2d 595, 608 (9th Cir. 1993) ("A court's most important inquiry under this Rule is whether the proffered evidence has trustworthiness equivalent to that of the enumerated hearsay exceptions."). "[T]he existence or absence of corroboration is relevant to, but not dispositive of, whether a statement should be admissible under this exception. Of course, the court must consider not only the existence of corroborating evidence but also the strength and quality of that evidence." Fed. R. Evid. 807 committee notes on rules to 2019 amendment. "District courts must make detailed findings when admitting evidence under [the residual hearsay exception]." Figgie Int'l, Inc., 994 F.2d at 608. The Court declines to admit the evidence under the residual hearsay exception because Defendants have not provided the Court with sufficient details about the specific evidence they intend to introduce in order to make such a determination. In any event, the testimony of the authors is significantly more probative – and will require the declarants to submit to cross-examination. It is extremely unlikely that the Court would admit evidence on this basis.

The Court will not permit the parties to "needlessly present cumulative evidence." Fed. R. Evid. 403. Diamond's motion *in limine* No. 1 is GRANTED in part and DENIED in part.

### 2.    The Arizona Assurance of Discontinuance

Diamond seeks to exclude evidence and testimony related to the Assurance of Discontinuance (AOD) it entered into in December 2016

24

with the Arizona Attorney General.  Pls. MILs at 13.  Under the AOD, Diamond agreed to enact certain programs and polices related to its sales process and product.  Id.  Diamond asserts that on October 15, 2021, a corporate representative of the Arizona AG testified at a deposition that the AOD involved only Arizona domiciles or consumers who attended sales presentations in the State of Arizona, that no statements in the Arizona AOD can be utilized as evidence for any purpose or proceeding, and that Arizona's confidentiality statute precludes the disclosure of information regarding the identities of the consumers at issue in the Arizona AOD.  Id. at 14.  Diamond argues that the Arizona AOD is irrelevant and hearsay.  Id.

Defendants contend that the AOD is "relevant to Diamond's awful reputation and tarnished goodwill which contradicts Diamond's argument that Defendants' conduct harmed Diamond's goodwill in violation of the Lanham Act."  Opp'n to Pls. MILs at 15.  It is unclear whether Diamond still intends to argue that Defendants' conduct damaged its goodwill in violation of the Lanham Act at trial.  Even if the Arizona AOD were relevant, it is hearsay, as are the statements contained within the AOD.  Defendants argue that "certain sections of hearsay within the AOD would not necessarily disqualify the entire document as hearsay," id. at 16, but do not identify what portions of the AOD they intend to present as evidence and whether or why they are not hearsay.  They also contend that the AOD is "a party admission against interest or at least a business record or public record of the Arizona Attorney General."  Id. at 17.  Defendants cite no authority to support the position that the contents of settlement documents prepared by government or regulatory entities constitute admissions by a party-opponent, and it is not the role of the Court to make parties' arguments for them. See Indep. Towers of Wash. v. Wash., 350 F.3d 925, 929 (9th Cir. 2003).

In any event, it appears that the proffered evidence is more prejudicial than probative and would (1) result in a mini-trial concerning the facts underlying the settlement, (2) likely confuse the issues and mislead the jury, and (3) cause undue delay in what will already be a lengthy trial.

Diamond's motion *in limine* No. 2 is GRANTED.

### 3.    Lawsuits, Settlements, Arbitrations, and Testimony Concerning Owners and Entities Not at Issue

Diamond contends that the universe of relevant timeshare owners has been set and the identity of all 783 owners has been disclosed.  Pls. MILs at 15.  Diamond asserts that "[d]espite the defined universe of relevant Diamond Owners, Defendants intend to offer evidence concerning lawsuits, settlements and arbitrations involving other owners or entities not at issue in this case."  Id.  It argues that this evidence is irrelevant, unfairly prejudicial, and impermissible hearsay.  Id. at 16.  Diamond also argues that evidence of Diamond's litigation against other exit companies and affiliated entities is irrelevant.  Id. at 17.

Defendants argue that they should be permitted to present evidence relevant to whether timeshare owners have legitimate pre-existing complaints and litigation against Diamond, and whether Defendants and other timeshare exit companies help such owners.  Opp'n to Pls. MILs at 17-18.  They assert that "Diamond has made these complaints relevant by arguing that Defendants' business is a scam and none of Diamond's consumers actually wanted to exit their timeshare contracts before contacting Defendants."  Id. at 19.  Defendants contend that they should be permitted to show they have prevailed in litigation where timeshare contracts were terminated in a safe and legal way.  Id. at 18.  They assert that Diamond did not disclose the purported list of 783 owners at issue in this case until July 18, 2022 and since then, Diamond has "included scores of exhibits on its proposed exhibits list that relate to consumers or owners who are not identified on their list of 783 at-issue owners."  Id.  Defendants argue that the Court should not exclude evidence of any owner complaints and related litigation or settlement where "Plaintiffs insist on unilaterally expanding and contracting the universe of owners at issue," nor should Diamond be allowed to cherry-pick relevant timeshare owners this late in the case.  Id.  They also contend that they should be permitted to present evidence about wrongful termination

suits against Diamond and evidence showing that Diamond has sued timeshare exit companies to put them out business. Id. at 20.

The parties dispute the relevance and admissibility of three categories of lawsuits, settlements, and arbitrations: (1) those involving timeshare owners and Diamond, (2) those involving former Diamond employees who asserted wrongful termination claims against Diamond for refusing to lie to customers, and (3) those involving Diamond and other timeshare exit companies. But neither party identifies the specific evidence and testimony at issue. The Court will not impose a blanket prohibition on the admission of evidence regarding other lawsuits, settlements, arbitration, and testimony concerning timeshare owners and entities not at issue in this case. However, it is unclear to the Court how any of this evidence is relevant to the claims at issue, particularly after summary judgment. Defendants provide no explanation for why evidence of the wrongful termination suits and Diamond's lawsuits against other timeshare exit companies are relevant, and at this juncture the Court finds them irrelevant. Even if it were relevant, the probative value of such evidence would be substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury and wasting time.

Moreover, settlement negotiations are generally inadmissible under Rule 408(a), which provides that evidence of compromise offers and negotiations, and conduct or statements "is not admissible – on behalf of any party – either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or contradiction." The Rule contains an exception permitting such evidence "for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." Fed. R. Evid. 408(b); see also United States v. Pend Oreille Pub. Util. Dist. No. 1, 926 F.2d 1502, 1507 n. 4 (9th Cir. 1991). "Two principles underlie Rule 408: (1) '[t]he evidence [of compromise] is irrelevant, since the offer may be motivated by desire for peace rather than from any concession of weakness of position;' (2) '[a] more consistently impressive ground is promotion of the public policy favoring the compromise and settlement

of disputes.'" Hudspeth v. Comm'r of Internal Revenue Serv., 914 F.2d 1207, 1213-14 (9th Cir. 1990) (alterations in original) (quoting Fed. R. Evid. 408 advisory committee note 1972).  Rule 408 applies in situations where the party seeking to introduce evidence of a settlement was not a party to the original settlement.  Id. at 1213 (citing United States v. Contra Costa Cnty. Water Dist., 678 F.2d 90, 92 (9th Cir. 1982)).  Defendants may not present evidence of settlements to the extent they intend to offer the evidence to prove the validity or legitimacy of the disputed claims in various cases.

Diamond's concern that admitting evidence of other lawsuits, settlements, and arbitrations would force it to defend itself against those allegation and result in mini trials is a valid one.  Pls. MILs at 16.  The Court will not allow Defendants to waste the Court's and the jury's time with a parade of evidence of other lawsuits.  Doing so would result in a substantial waste of time, cause undue delay, and confuse jurors.  Evidence of timeshare owners' lawsuits against Diamond may be relevant to the extent the lawsuits involve the owners at issue in this case or if Diamond "opens the door."  Defendants must make a written offer of proof as to what evidence they intend to present and for what purpose they intend to admit it.

Diamond's motion *in limine* No. 3 is GRANTED in part and DENIED in part.

### 4.    Timeshare Ownership, the Timeshare Industry, Diamond's Membership in ARDA, and Diamond's Relationship with Other Developers

Diamond seeks to preclude evidence of timeshare ownership, the timeshare industry, and Diamond's relationship with other timeshare developers, including its membership in the American Resort Advisory Association (ARDA).  Pls. MILs at 18.  Diamond anticipates that Defendants will offer this evidence to "generally paint the timeshare industry as bad actors and to somehow justify their own bad acts or argue timeshare owners are predisposed to breach their contracts."  Id. Diamond contends that complaints and commentary about the bad

actors of the timeshare industry are hearsay and such evidence carries no probative value.  Id. at 18-19.  It asserts that bad acts by other timeshare developers are irrelevant to its claims against Defendants.  Id. at 19.

Defendants contend that the evidence is relevant and admissible for numerous purposes.  First, they argue that the evidence is highly relevant to their ability to rebut Diamond's Lanham Act claim because Defendants' commercials talk about deceptive practices within the industry instead of mentioning Diamond and evidence of the operation of the timeshare industry would show the jury that the advertisements are true.  Opp'n to Pls. MILs at 21.  They assert that the evidence is relevant to their unclean hands defense and the justification defense to tortious interference.  Id.  They also contend that background information as to the formation of the Defendant companies is relevant to their state of mind and their ultimate purpose for purposes of the tortious interference claim and punitive damages.  Id.

Defendants' first argument is moot in light of the Special Master's findings.  See Report at 26-37.  The Special Master stated: "The unambiguous factual message that the Exit Defendants are communicating to the timeshare owners is that they are selling a service in which they and their lawyers legally cancel the owners' timeshare contracts based on improprieties by Diamond. . . . The Exit Defendants are not providing that service and they know it." Id. at 34.

The Court declines to impose a blanket prohibition on the admission of evidence of timeshare ownership, the timeshare industry, Diamond's relationship with other timeshare developers, or its membership in the ARDA.  Defendants make general claims about how background information about their formation, the operation of the timeshare industry, and practices of other timeshare developers is relevant to their defenses and damages, but they do not identify the evidence they intend to admit.  While certain evidence may be relevant, its probative value may be substantially outweighed by the danger of unfair prejudice, confusing issues, undue delay, wasting time, and needlessly presenting cumulative evidence.  Fed. R. Evid. 403.  The

Court will not speculate about evidence that has not been identified and without more information the Court is unable to issue a ruling.

Diamond's motion *in limine* No. 4 is GRANTED. After the parties comply with the orders issued in the Court's Order re Trial Preparation, the Court will advise the parties whether it will reconsider this ruling.

### 5.    Diamond's Financial Status

Diamond seeks to exclude evidence of Diamond's market share, revenue, profits, and other related financial information. Pls. MILs at 20. It contends that contrary to the discrete financial information necessary to calculate or rebut Diamond's damages, Defendants may seek to introduce various filings Diamond Resorts International, Inc., a non-party, made to the SEC, quarterly earnings summaries, and documents related to the sale of Diamond to Hilton Grand Vacations, all of which appear on Defendants' Exhibit List. Id. at 20-21. Diamond asserts that information in these documents and related testimony do not show anything related to Diamond's claims nor does it excuse or prevent Defendants' liability for their misconduct, and therefore should be excluded. Id. at 21.

Defendants contend that the financial information is relevant to their defense. First, they assert that Diamond seeks disgorgement under the Lanham Act, which is available as a remedy only if Diamond is a competitor of Pandora or RAG. They argue that financial information about Diamond will demonstrate that it is not a competitor. Opp'n to Pls. MILs at 23. They contend that the financial information is relevant to standing where they allege Diamond did not own many of the contracts at issue because they were sold to raise money for Diamond's parent companies via a securitization process. Id. They also assert that Diamond's financial information is linked to their advocacy and relevant to their defenses. Id. at 24.

It is unclear to the Court why evidence of Diamond's market share, revenue, and profits is relevant to demonstrating that it is not a competitor of Pandora or RAG. Defendants do not identify any specific

financial information about Diamond that would "support that assertion." See id. at 23. Diamond's financial information may be relevant to some of the issues Defendants identify, but Defendants fail to identify the specific financial information they intend to introduce and for what purpose, and the Court will not speculate.

Diamond's motion *in limine* No. 5 is DENIED.

## B.  Motion to Exclude Defendants' Expert Witness Kenneth Free (Dkt. 638)

Diamond seeks to exclude the testimony and opinions of Defendants' rebuttal expert witness, Kenneth Free, on the grounds that he is not qualified as an expert on any of the topics on which he offers opinions. Dkt. 638-1 (Pls. MIL Re Free). Diamond argues that his opinions do not apply any methodology or standard and are based on made-up assumptions. As a result, his opinions are unreliable and irrelevant and should be excluded. Id. at 1.

### 1.  Qualifications

Diamond argues that Free is not qualified to testify as an expert on the following topics: the ARDA Code of Ethics, timeshare pricing, timeshare accommodations availability, the quality of Diamond's inventory, timeshare maintenance fees, and timeshare inventory acquisition strategies. See Pls. MIL Re Free. It asserts that Free has no formal timeshare education, nor did he receive any formal training related to timeshare management or practice. Id. at 1. It contends that Free has had no meaningful involvement with timeshares. Id. at 2. It contends that although Free may have been part of negotiating the joint venture that formed Hilton Grand Vacations, Free's involvement "was limited to developing the business plan for the joint venture, not the underlying timeshare plan or maintenance fee structure." Id. at 3. Diamond also points out that Free has provided timeshare consultancy services on at least four occasions with the most recent being 17 years ago. Id. at 4. Diamond further asserts that Free has never designed a timeshare allocation plan, managed the secondary resale of timeshares, or prepared a timeshare sales manual. Id. at 5.

Nor is Free a certified public account, statistician, licensed appraiser, or an expert in sales, marketing, or consumer behavior.  Id.

Defendants argue that Free is highly qualified, citing his nearly 50 years of experience in the hotel and hospitality industry.  Dkt. 650 (Opp'n to. Pls. MIL Re Free) at 2.  Over the past 49 years he has been employed in hospitality and timeshare operations, asset management, and as a real estate executive, and he has been engaged as an expert witness 146 times.  Id. at 2-3.  He was previously Director of Real Estate Administration for Hilton and was a chief founder of Hilton Grand Vacations Company, Hilton's entry into the timeshare industry.  Id. at 3.  Free is a registered resort professional with the ARDA, is a former Adjunct Professor in Graduate Finance & Strategic Planning at the University of Phoenix and has published articles on timeshares, including two with ARDA.  Id.

Free was engaged to review and rebut the conclusions and methodologies of Diamond's experts Dr. Jamie McClave Baldwin, Dr. Bruce Isaacson, and Dr. Jason C. Jarosz.  Dkt. 638-3 (Lin Decl., Ex. A) (Free Report) at 3.  He was also asked to opine on "the issues of possible wrongful actions or consumer-abusive practices by and within affiliates of Diamond . . . particularly as they have related to the Company's behavior in selling vacation interval points[.]"  Id.  Free describes himself as an expert in resort timesharing.  Id.  He is a "hospitality and timesharing operations, asset management, and real estate executive" and his last position at a hotel company was with Hilton as Director of Real Estate Administration "with responsibility for the real estate sides of all corporate owned hotels, resorts, and resort timesharing."  Id. at 4.  He maintains that his work "requires [him] to maintain current knowledge of rules and regulations and standard practices for timesharing in the United States."  Id.  Free is also a Registered Resort Professional with the ARDA and a licensed real estate broker in California and has been active on committees of the American Hotel & Lodging Association and the International Society of Hospitality Accountants.  Id. at 4-5.

Free's CV demonstrates that he has significant experience in the hotel and hospitality industry, including – to a limited degree – with timeshares. Free Report, Ex. 2 at 58. Free has a Bachelor of Science in Hotel Administration and a Master of Business Administration in Finance and has worked extensively in hotel operations. Id. Free's firm, Straightline Hospitality "focuses on providing advisory services for hotel, resort, and timesharing development and operational issues." Id. Earlier in his career, Free played a role in founding Hilton Grand Vacations. Id. at 59. Free has also authored publications regarding the timeshare industry, and has worked on projects involving timeshares, either as an expert witness or consultant. Id. at 60, 70-73.

There must be "at least [a] *minimal foundation* of knowledge, skill, and experience required in order to give 'expert' testimony" on the relevant topic. Thomas v. Newton Int'l Enters., 42 F.3d 1266, 1269 (9th Cir. 1994) (emphasis added). Diamond's attempt to describe Free's prior experience so narrowly is unavailing. See U.S. Fidelity and Guar. Co. v. Ulbricht, 576 F. Supp. 3d 850, 860 (W.D. Wash. 2021) ("USF&G cites no cases in support of its proposal to define Mr. Miller's prior experience in the insurance industry . . . so narrowly. And doing so would seemingly conflict with the Ninth Circuit's guidance that expert witnesses are qualified to give expert testimony . . . where they possess at least the minimal foundation of knowledge, skill, and experience required.") (simplified). The Court finds that Free is minimally qualified to opine on the topics related to the timeshare industry addressed in his report.

But Free has no education, experience, or any other background in statistics, econometrics, accounting, or damages calculations, see Free Report, Ex. 2 at 58-66, and therefore, even if Dr. Baldwin's opinions were admissible, Free would not be permitted to rebut Dr. Baldwin's opinions. Nor is his opinion concerning the report of Dr. Jarosz likely to be helpful to the jury. Free will not be permitted to rebut Dr. Jarosz's opinions.

### 2.     Opinions on Purported Ethical Violations

Free opines that certain purported conduct by Diamond violates
the ARDA Code of Ethics.  <u>See</u> Free Report at 23-24, 27, 31, 33, 37-38,
50, 51.  Diamond contends that Free's opinions about violations of the
ARDA Code of Ethics or some other vague ethical obligations are
irrelevant.  Pls. MIL Re Free at 7-8.  Defendants counter that
Diamond's "conduct in this matter is certainly relevant with respect to
Plaintiffs' claims, Defendants' defense, and Counter-claimant's
affirmative claims."  Dkt. 673 (Opp'n to Pls. MIL Re Free) at 6.  They
contend that Diamond's objections "go to the weight of the ARDA
violation claims, not the admissibility, nor relevance."  <u>Id.</u>

It is unclear to the Court how Free's opinions about Diamond's
purported ethics violations are relevant.  Free also fails to identify
what provisions of the Code Diamond violated or to provide any
explanation for how he reached his conclusions.  The committee notes
on the 2000 amendment to Federal Rule of Evidence 702 state:

> Some types of expert testimony will not rely on anything like a
> scientific method, and so will have to be evaluated by reference to
> other standard principles attendant to the particular area of
> expertise. The trial judge in all cases of proffered expert
> testimony must find that it is properly grounded, well-reasoned,
> and not speculative before it can be admitted. The expert's
> testimony must be grounded in an accepted body of learning or
> experience in the expert's field, and the expert must explain how
> the conclusion is so grounded.

The Court will await the parties' briefing on this issue before
issuing a ruling.

### 3.     Legal Conclusions

Diamond argues that Free's opinions contain impermissible legal
conclusions.  Pls. MIL Re Free at 8.  It argues that Free's opinions that
Diamond's conduct could be violations of unspecified laws and legal
standards are not helpful to the jury and invade the province of the

Court to instruct the jury on the applicable law.  Id.  Defendants
contend that Free's opinions on whether Diamond could be engaging in
improper conduct, including false representations and concealment of
material facts is based on his 49 years of experience in the industry and
handling litigation matters.  Opp'n to Pls. MIL Re Free at 7.  They
assert that Free does not make definitive statements that violations
occurred, only that there could be violations.  Id.

Free's report contains numerous conclusions that certain conduct
by Diamond is or "could be" a violation of the duty of good faith and fair
dealing, a violation of securities laws, a false representation,
concealment of material facts, a violation of the duty of fair disclosure,
abusive practices, fraudulent omission of facts, a violation of the
Nevada Administrative Code.  See Free Report at 23, 27, 31, 33, 37-38,
4245, 47, 50-52.

An "expert witness cannot give an opinion as to her *legal
conclusion*, i.e., an opinion on an ultimate issue of law."  Nationwide,
523 F.3d at 1058; see Fed. R. Evid. 704(a), notes of advisory committee
on proposed rule.

The Fourth Circuit has explained that "the best way to determine
whether opinion testimony is unhelpful because it merely states legal
conclusions, is to determine whether the terms used by a witness have
a separate, distinct and specialized meaning in the law different from
that present in the vernacular."  U.S. v. Perkins, 470 F.3d 150, 158 (4th
Cir. 2006) (simplified).  "The district court should first consider whether
the question tracks the language of the legal principle at issue or the
applicable statute; then, the court should consider whether any terms
employed have a specialized legal meaning."  Id.  The Ninth Circuit has
noted, however, that it is sometimes impossible for an expert to render
an opinion without resorting to language in the applicable standard.
United States v. Diaz, 876 F.3d 1194 (9th Cir. 2017) (expert testimony
in narcotics case that prescriptions were not given for a "legitimate
medical purpose" was not a legal conclusion).  "If the terms used by an
expert witness do not have a specialized meaning in law and do not
attempt to instruct the jury on the law, or how to apply the law to the

facts of the case, the testimony is not an impermissible legal
conclusion." Id. at 1199. Moreover, "[w]hen an expert offers an opinion
relevant to applying a legal standard such as probable cause, the
expert's role is limited to describing sound professional standards and
identifying departures from them." Jimenez v. City of Chicago, 732
F.3d 710 (7th Cir. 2013) (simplified).

Free is clearly offering impermissible legal conclusions. His
opinions are not limited to describing legal or professional standards
and identifying departures from them. Free asserts legal conclusions
without providing a reliable basis for his opinions. Further,
Defendants have not established how Diamond's alleged violations of
the Nevada Administrative Code and federal securities laws are
relevant to this case and how Free has the requisite expertise to opine
on these issues. The Court grants Diamond's motion to exclude Free's
opinion and testimony constituting legal conclusions.

### 4.    Opinions that Timeshare Developers are "Bad"

Diamond argues that Free's report consists of "argument riddled
with inflammatory statements and one-sided propaganda directed at
the timeshare industry as a whole, as well as Diamond in particular."
Pls. MIL Re Free at 10. It contends that Free's unfounded assertions
and other biases expressed in Free's report are improper, unfairly
prejudicial, misleading, and should be excluded. Id. Defendants argue
that Diamond may not like Free's opinions, but he is qualified to opine
on the evolution of the timeshare industry, and there is no evidence of
bias in his report or job history.[6] Opp'n to Pls. MIL Re Free at 8.

The Court agrees with Defendants and finds that the probative
value of the opinions are not substantially outweighed by the danger of
unfair prejudice or misleading the jury. Diamond may raise its

---

[6] It is not clear to the Court that the "evolution" of the timeshare industry is
relevant. In any event, all or most of that evidence (proffered by both sides)
us likely to be excluded pursuant to Rule 403.

concerns about Free's bias against timeshare developers during cross-examination.

### 5. Opinions on Timeshare Prices, Inventory Quality, Resale, and Inventory Acquisition Strategy, and Diamond's Additional Sales and Marketing Strategies

Diamond argues that Free's opinions about timeshare pricing, inventory quality, obstacles to resale, inventory acquisition strategy, and Diamond's additional sales and marketing strategies should be excluded because they are based on unreliable methodologies, speculation, and assumptions.  Pls. MIL Re Free at 11-15, 17-20, 22-25.  Diamond identifies various concerns with the metrics and sources Free relies on, as well as other flaws in methodology.  The Court finds that Diamond's concerns go to the weight, not the admissibility of Free's testimony.  See United States v. L.E. Cooke Co., 991 F.2d 336, 342 (6th Cir. 1993) ("[A]ny weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.").  Diamond can certainly cross-examine on these points.

### 6. Opinions on Accommodations Availability

Diamond argues that Free's opinions related to accommodation availability are based on an invalid and unreliable methodology and are entirely unhelpful given the issues in this case.  Pls. MIL Re Free at 16.  Diamond asserts that Free admitted that he never attempted to calculate the actual availability or demand for any Diamond resort.  It contends that Free's conclusion that "it is virtually certain that accommodation availability will be constrained, particularly during periods and at locations in high demand" is based solely on his observation of the sizes and locations of certain Diamond resorts rather than his review of any actual demand data, availability data, or any other data.  Id.

Free opines in part:

(a) Because of the structure and sizing of the controlled resorts,
and the design of the usage program for the Collection, it is
virtually certain that accommodation availability will be
constrained, particularly during periods and at locations in high
demand. Thus the perceived flexibility in using points to make
reservations where and when desired is mischaracterized during
the sales process. . . .

Free Report at 27. His opinion is based on an analysis of Diamond's
accommodation units by location. See id. at 25-26. Free stated: "69% of
available inventory was in thirteen resorts in seven destination
locations, with five of those destination locations being subject to
seasonal demand. That is to say, that if Members do not want to stay
off-season in those seven locations they would be contending with
substantial competitive pressures to successfully reserve their week of
choice." Id. at 25. He went on, "This also indicates that about one-
third (31%) of the resorts in the system have six or fewer whole units
available . . . . And, in fact, many of these units are in resort locations
subject to seasonality. Thus, for these resorts, reservation contention
could be expected to be a problem. In fact, availability could be so
limited as to be almost worthless to Members." Id. at 25-26.

"Trained experts commonly extrapolate from existing data. But
nothing in either Daubert or the Federal Rules of Evidence requires a
district court to admit opinion evidence that is connected to existing
data only by the *ipse dixit* of the expert. A court may conclude that
there is simply too great an analytical gap between the data and the
opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997);
see also United States v. Hermanek, 289 F.3d 1076 (9th Cir. 2002)
("Even if Broderick had explained in detail his knowledge of
defendants[,] . . . he would have been required to establish how he
applied that knowledge to interpret particular words and phrases used
in particular conversations. Without a link between Broderick's
knowledge and the particular matter he interpreted, 'there is simply
too great an analytical gap between the data and the opinion
proffered.'") (citation omitted). The Court agrees with Diamond that

there is too big an analytic gap between the data Free relied on and his opinion. Free may not testify on this issue.

### 7. Opinions on Maintenance Fees

Diamond argues that Free's opinions about maintenance fees are unsupported by any empirical or scientific data or methodology. Pls. MIL Re Free at 21. It also contends that his opinions are not helpful because there are no false advertising claims asserted against Diamond and whether Diamond "[brought] such inventory up to its advertised first class status" is irrelevant. Id. Defendants counter that "Free merely comments, rather than opines concerning escalating timeshare maintenance fees" and that someone need not be an accountant to note that maintenance fees increase. Opp'n to Pls. MIL Re Free at 12. The Court agrees that Free's comments on escalating maintenance fees do not assist the trier of fact because the issue does not require expert testimony. The Court excludes Free's opinion on this topic.

Diamond's Daubert motion to exclude Kenneth Free is GRANTED in part and DENIED in part.

## III. Conclusion

The Court GRANTS Defendants' motion *in limine* No. 1 (Dkt. 661) and Defendants' Daubert motion to exclude Jamie Baldwin (Dkt. 640). The Court DENIES Defendants' motions in limine Nos. 2 and 3 (Dkt. 662, 654), and Daubert motions to exclude Bruce Isaacson, and Howard Nusbaum (Dkts. 641, 644). The Court GRANTS in part and DENIES in part Defendants' Daubert motion to exclude John Jarosz (Dkt. 642). The Court GRANTS in part and DENIES in part Diamond's motions *in limine* (Dkt 651) and Diamond's Daubert motion to exclude Kenneth Free (Dkt 638).

IT IS SO ORDERED.

Date: July 26, 2023

Dale S. Fischer
United States District Judge